UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

STELLA PAK, M.D.,

Plaintiff,

Civil Action No.:
1:23-cv-00378-DNH-DJS

-against-

ALBANY MED HEALTH SYSTEM,

Defendant.
------------------------------------------------------------------X

**DECLARATION OF JASON L. SOLOTAROFF IN SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

JASON L. SOLOTAROFF, ESQ., an attorney duly licensed to practice in the United States District Court for the Northern District of New York, being duly sworn, deposes and says:

1. I am an attorney associated with Giskan Solotaroff & Anderson LLP, attorneys for the Plaintiff, Stella Pak, M.D. ("Dr. Pak"), in this matter, and am therefore fully familiar with the facts and circumstances of the case.

2. I make this declaration in support of Dr. Pak's motion for a preliminary injunction, and upon the exhibits and memorandum of law accompanying this declaration, seeking reinstatement of Dr. Pak to Albany Med Health System's ("Albany Med") residency program, or in the alternative, an order directing Albany Med to immediately correct her final summative evaluation.

3. This declaration is made upon information and belief, except at to those portions where your affirmant has actual knowledge thereof.

4. Attached hereto as exhibits are evaluations, letters, emails, and other correspondence and documents relevant to Dr. Pak's motion. A list of the exhibits follows:

| Exhibit Letter | Description |
|---|---|
| A | New Innovations Evaluations |
| B | Email from Dr. Amory to Dr. Pak, Jan. 10, 2022 |
| C | Email attachment from Dr. Amory to Dr. Pak, Aug. 30, 2022 |
| D | Email from Dr. Adam to Dr. Pak, Sept. 23, 2022 |
| E | Notice of Remediation, Jan. 22, 2022 |
| F | Abigail J. Herron, D.O., Independent Medical Examination, April 1, 2022 |
| G | Letter from Dr. Amory to Dr. Pak, Apr. 28, 2022 |
| H | Letter from Dr. Amory, May 25, 2022 |
| I | May Notice of Remediation, May 26, 2022 |
| J | Notes of June 1, 2022 Meeting |
| K | Email from Dr. Robeson, April 27, 2022 |
| L | Email to Ellen Cosgrove, July 11, 2022 |
| M | Memorandum to Dr. Pak from Katie Vandenburgh re "Request for Reasonable Accommodation," July 22, 2022 |
| N | Email from Dr. Robeson to Dr. Pak, August 3, 2022 |
| O | Email from Dr. Robeson to Dr. Pak, Sept. 16, 2022 |
| P | Email from Dr. Robeson to Dr. Pak, July 18, 2022 |
| Q | Letter from Dr. Robeson to the Residency Dismissal Ad Hoc Committee, Oct. 28, 2022 |
| R | Letter from Dr. Robeson to Dr. Pak, Oct. 17, 2022 |
| S | Letter from Dr. Bartfield to Dr. Pak, Oct. 19, 2022 |
| T | Letter from Ad Hoc Committee to Dr. Pak, Nov. 21, 2022 |
| U | Letter from Dean Boulos to Dr. Pak, Jan. 19, 2023 |
| V | Emails to and from Dr. Antonikowski, Feb. 4, 2022 |
| W | Letter from Susan Hill to Sandra Castilla, VP of Human Resources, May 24, 2022 |
| X | Final Evaluation, Jan. 31, 2023 |
| Y | CPH Quarterly Work-Site Monitor Reports |
| Z | Contract Extension, Sept.-Dec. 2022 |
| AA | ACGME Common Program Requirements |

Dated: July 7, 2023

Respectfully submitted,

*/s/ Jason L. Solotaroff*

Jason L. Solotaroff
GISKAN SOLOTAROFF & ANDERSON LLP
90 Broad Street
New York, NY 10004
Telephone: (212) 847-8315
*Attorneys for the Plaintiffs*

# EXHIBIT A



**Stella Pak**
PGY-2
*Albany Medical Center
Neurology
STROKE JUNIOR
09/15/2021 - 09/26/2021

**Evaluated by:** **Colum Amory, MD, DO**
Faculty
Neurology

**Completed On:** **11/15/2021**

# Inpatient Stroke Rotation

**1* Please give specific examples of the resident's strengths and weaknesses, including times when he or she performed above the level expected of his or her training, and times when he or she fell short of expectations. If relevant, consider giving examples on ability to interpret neuroimaging, localization, patient safety, care coordination, communication, documentation, and professionalism.**

Stella has a lot of work to do to improve her performance. She has incredible enthusiasm which leads her down false paths. She came in one morning very excited about a patient with established moya-moya with bypass already performed, with articles about treatment of newly diagnosed moya-moya and plans which did not apply to this patient. I note that she makes special efforts to slow her speaking down when communicating over the telephone, in an effort to mitigate her accent. I am hopeful that with extensive mentorship and guidance, she will develop into an effecting provider.

**2* Regardless of the resident's actual training level, did he or she perform at the level of:**

- ○ Medical student
- ● Intern
- ○ Early career Neurology resident
- ○ Late career Neurology resident
- ○ Fellow/Attending

She is capable of managing her patients

**PC 1 Patient Care 1: History**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Obtains a basic neurologic history | Obtains a complete and relevant neurologic history | Obtains an organized neurologic history, including collateral information as appropriate | Efficiently obtains an organized hypothesis-driven neurologic history | Serves as a role model in obtaining a hypothesis driven neurologic history |
| ○ | ○ ○ | ● ○ | ○ ○ | ○ ○ | ○ |

○ Not yet assessable

She needs to become more organized in her history

**PC 2 Patient Care 2: Neurologic Exam**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Performs some components of a neurologic exam | Performs a standard neurologic exam accurately | Performs a relevant neurologic exam incorporating additional appropriate maneuvers | Performs a hypothesis-driven neurologic exam | Serves as a role model for performing a hypothesis-driven, complete, relevant, and organized neurologic exam |

○ ○ ● ○ ○ ○ ○ ○ ○ ○

○ Not yet assessable

Her neurologic examination is rudimentary. She needs guidance here as well.

**PC 3 Patient Care 3: Formulation**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Summarizes history and exam findings | Generates a broad differential diagnosis based on history, exam, and localization | Synthesizes relevant information to focus and prioritize diagnostic possibilities | Continuously reconsiders diagnosis in response to changes in clinical circumstances and available data | Serves as a role model for clinical reasoning by demonstrating sophisticated formulation in complex presentations |

○ ○ ○ ● ○ ○ ○ ○ ○ ○

○ Not yet assessable

We need her to focus on the most likely and the most dangerous differential diagnoses

**PC 5 Patient Care 5: Diagnosis and Management of Neurologic Disorders in the Inpatient Setting**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Identifies typical presentations of commonly encountered neurologic conditions | Diagnoses commonly encountered neurologic conditions<br><br>Develops an initial treatment plan for commonly encountered neurologic disorders | Identifies atypical presentations of commonly encountered neurologic conditions<br><br>Individualizes management plan, ensuring the appropriate level of care throughout hospitalization and upon discharge | Diagnoses uncommon neurologic conditions<br><br>Adapts management plan based upon treatment response, disease progression, and complications of therapy | Identifies atypical presentations of uncommon neurologic conditions<br><br>Leads the management of patients with complex and uncommon neurologic conditions |

○ ○ ● ○ ○ ○ ○ ○ ○ ○

○ Not yet assessable

**PC 8 Patient Care 8: Interpretation of Neuroimaging**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Identifies basic neuroanatomy on brain and vascular anatomy of the head and neck magnetic resonance (MR) and computed tomography (CT) | Identifies major abnormalities of the brain and cerebrovascular system on MR and CT<br><br>Identifies basic anatomy of the spine and spinal cord on MR and CT | Interprets typical abnormalities of the brain and cerebrovascular system on MR and CT<br><br>Identifies abnormalities of the spine and spinal cord on MR and CT | Interprets subtle abnormalities of brain and cerebrovascular system on MR and CT<br><br>Interprets MR and CT of the spine | Interprets advanced neuroimaging |

○ ○ ○ ● ○ ○ ○ ○ ○ ○

○ Not yet assessable

## MK 1 Medical Knowledge 1: Localization

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Recognizes the role of localization in neurologic diagnosis | Localizes lesions to general regions of the nervous system | Localizes lesions to specific regions of the nervous system | Localizes lesions to discrete structures of the nervous system | Consistently demonstrates sophisticated and detailed knowledge of neuroanatomy in localizing lesions |
| ○ | ○ ○ | ● ○ | ○ ○ | ○ ○ | ○ |

○ Not yet assessable

## SBP 3 Systems-Based Practice 3: System Navigation for Patient-Centered Care

## PBLI 1 Practice-Based Learning and Improvement 1: Evidence-Based and Informed Practice

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Demonstrates how to access and use available evidence, and to incorporate patient preferences and values to care for a routine patient | Articulates clinical questions and elicits patient preferences and values to guide evidence-based care | Locates and applies the best available evidence, integrated with patient preference, to the care of complex patients | Critically appraises and applies evidence, even in the face of uncertainty, and interprets conflicting evidence to guide care, tailored to the individual patient | Coaches others to critically appraise and apply evidence for complex patients, and/or participates in the development of guidelines |
| ○ | ○ ○ | ○ ○ | ● ○ | ○ ○ | ○ |

○ N/A

She very much enjoys going to the literature to find out more information, and attempts to apply the evidence. She relies on Up To Date too much.

**PROF 2 Professionalism 2: Accountability/Conscientiousness**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Takes responsibility for failure to complete tasks and responsibilities, identifies potential contributing factors, and describes strategies for ensuring timely task completion in the future | Performs tasks and responsibilities in a timely manner with appropriate attention to detail in routine situations | Performs tasks and responsibilities in a timely manner with appropriate attention to detail in complex or stressful situations | Recognizes situations in which one's own behavior may impact others' ability to complete tasks and responsibilities in a timely manner | Develops or implements strategies to improve system-wide problems to improve ability for oneself and others to complete tasks and responsibilities in a timely fashion |
| | Responds promptly to requests or reminders to complete tasks and responsibilities | Recognizes situations that may impact own ability to complete tasks and responsibilities in a timely manner | Proactively implements strategies to ensure that the needs of patients, teams, and systems are met | | |

○ ○ ● ○ ○ ○ ○ ○ ○ ○

○ N/A

I am not certain she has insight into her performance



**Stella Pak**
PGY-2
*Albany Medical Center
Neurology
EMU
07/18/2022 - 07/24/2022

**Evaluated by:** **Marjorie Bunch, MD**
Faculty
Neurology

**Completed On:** **8/4/2022**

# Epilepsy Monitoring Unit Rotation

**1* Please give specific examples of the resident's strengths and weaknesses, including times when he or she performed above the level expected of his or her training, and times when he or she fell short of expectations. If relevant, consider giving examples on ability to interpret neuroimaging, localization, patient safety, care coordination, communication, documentation, and professionalism.**

I did not work with her on EMU during this week but on routine EEG reading. She has a lot of enthusiasm but needs to focus in the right directions. She did several weeks of EEG in a row and I could see improvement in her reading skills, now recognizing common artifacts and waveform variants but tries to seek out a specific finding vs interpret what is in front of her in the moment. She still has difficulty identifying status epilepticus. She worked with me in clinic one day and was very kind to patients, spoke clearly, and was able to address more (not all) of the concerns that I told her to focus on. I asked her to write a note, and instead of composing her own note she edited mine (I can't believe Touchworks allows this) and it took several revisions to get this to the point where it appropriately reflected the visit (counseling that was performed was not documented; then counseling and plan was documented under the history section). This was a routine follow up on a seizure free female of childbearing potential. The visit was at 2:30pm and the note was not completed by 4:30pm but she did tell me there were some "issues" in the resident room that delayed her.

**2* Regardless of the resident's actual training level, did he or she perform at the level of:**

Her EEG reading skills are now adequate for an early first year neurology resident. They were at medical student level at the start of the month.

**PC 1 Patient Care 1: History**

**PC 3 Patient Care 3: Formulation**

**PC 5 Patient Care 5: Diagnosis and Management of Neurologic Disorders in the Inpatient Setting**

N/A as I did not actually work with her in EMU patient care

**PC 6 Patient Care 6: Diagnosis and Management of Neurologic Emergencies**

N/A

**PC 9 Patient Care 9: Electroencephalogram (EEG)**

**PC 12 Patient Care 12: Psychiatric and Functional Aspects of Neurology**

**PBLI 1 Practice-Based Learning and Improvement 1: Evidence-Based and Informed Practice**

**ICS 1 Interpersonal and Communication Skills 1: Patient- and Family-Centered Communication**

**ICS 4 Interpersonal and Communication Skills 4: Communication within Health Care Systems**

Documentation did not fully communicate what was said and discussed during visit



**Stella Pak**
PGY-2
*Albany Medical Center
Neurology
01/24/2022 - 01/30/2022

**Evaluated by:** **Dzintra Celmins, MD**
Faculty
*Albany Medical Center
Neurology

**Completed On:** **1/24/2022**

## General Neurology Inpatient Rotation

**1* Please give specific examples of the resident's strengths and weaknesses, including times when he or she performed above the level expected of his or her training, and times when he or she fell short of expectations. If relevant, consider giving examples on ability to interpret neuroimaging, localization, patient safety, care coordination, communication, documentation, and professionalism.**

Stella is very strong in patient management. She is quick and efficient. She really cares about her patients well being. Her general medical knowledge is excellent. Her neurological knowledge and practical skills needs some improvement, but it is expected early in her training. She is willing to learn. Stella needs to improve her communication skills with nursing staff and should avoid confrontation and doing things by herself without informing nurses. Generally, she is providing very good care for her patients and with some improvement will be good neurologist. She already learn very well lumbar puncture skills.

**2* Regardless of the resident's actual training level, did he or she perform at the level of:**

○ Medical student
○ Intern
◉ Early career Neurology resident
○ Late career Neurology resident
○ Fellow/Attending

I am confident, that with some minor improvements and encouragement, Stella will successfully finish our residency program.



**Stella Pak**
PGY-2
*Albany Medical Center
Neurology
STROKE JUNIOR
09/26/2022 - 09/30/2022

Evaluated by: **Richard Jackson**
Faculty

Completed On: **10/17/2022**

# Inpatient Stroke Rotation

**1* Please give specific examples of the resident's strengths and weaknesses, including times when he or she performed above the level expected of his or her training, and times when he or she fell short of expectations. If relevant, consider giving examples on ability to interpret neuroimaging, localization, patient safety, care coordination, communication, documentation, and professionalism.**

See the email I sent

**2* Regardless of the resident's actual training level, did he or she perform at the level of:**

○ Medical student
○ Intern
● Early career Neurology resident
○ Late career Neurology resident
○ Fellow/Attending

## PC 1 Patient Care 1: History

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Obtains a basic neurologic history | Obtains a complete and relevant neurologic history | Obtains an organized neurologic history, including collateral information as appropriate | Efficiently obtains an organized hypothesis-driven neurologic history | Serves as a role model in obtaining a hypothesis-driven neurologic history |

○ ○ ○ ● ○ ○ ○ ○ ○ ○

○ Not yet assessable

## PC 2 Patient Care 2: Neurologic Exam

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Performs some components of a neurologic exam | Performs a standard neurologic exam accurately | Performs a relevant neurologic exam incorporating additional appropriate maneuvers | Performs a hypothesis-driven neurologic exam | Serves as a role model for performing a hypothesis-driven, complete, relevant, and organized neurologic exam |

○ ○ ○ ● ○ ○ ○ ○ ○ ○

○ Not yet assessable

**PC 3 Patient Care 3: Formulation**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Summarizes history and exam findings | Generates a broad differential diagnosis based on history, exam, and localization | Synthesizes relevant information to focus and prioritize diagnostic possibilities | Continuously reconsiders diagnosis in response to changes in clinical circumstances and available data | Serves as a role model for clinical reasoning by demonstrating sophisticated formulation in complex presentations |

○ ● ○ ○ ○ ○ ○ ○ ○ ○

○ Not yet assessable

**PC 5 Patient Care 5: Diagnosis and Management of Neurologic Disorders in the Inpatient Setting**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Identifies typical presentations of commonly encountered neurologic conditions | Diagnoses commonly encountered neurologic conditions | Identifies atypical presentations of commonly encountered neurologic conditions | Diagnoses uncommon neurologic conditions | Identifies atypical presentations of uncommon neurologic conditions |
| | | Develops an initial treatment plan for commonly encountered neurologic disorders | Individualizes management plan, ensuring the appropriate level of care throughout hospitalization and upon discharge | Adapts management plan based upon treatment response, disease progression, and complications of therapy | Leads the management of patients with complex and uncommon neurologic conditions |

○ ○ ○ ● ○ ○ ○ ○ ○ ○

○ Not yet assessable

**PC 8 Patient Care 8: Interpretation of Neuroimaging**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Identifies basic neuroanatomy on brain and vascular anatomy of the head and neck magnetic resonance (MR) and computed tomography (CT) | Identifies major abnormalities of the brain and cerebrovascular system on MR and CT<br><br>Identifies basic anatomy of the spine and spinal cord on MR and CT | Interprets typical abnormalities of the brain and cerebrovascular system on MR and CT<br><br>Identifies abnormalities of the spine and spinal cord on MR and CT | Interprets subtle abnormalities of brain and cerebrovascular system on MR and CT<br><br>Interprets MR and CT of the spine | Interprets advanced neuroimaging |
| ○ | ● ○ | ○ ○ | ○ ○ | ○ ○ | ○ ○ |

○ Not yet assessable

**MK 1 Medical Knowledge 1: Localization**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Recognizes the role of localization in neurologic diagnosis | Localizes lesions to general regions of the nervous system | Localizes lesions to specific regions of the nervous system | Localizes lesions to discrete structures of the nervous system | Consistently demonstrates sophisticated and detailed knowledge of neuroanatomy in localizing lesions |
| ○ | ○ ○ | ● ○ | ○ ○ | ○ ○ | ○ ○ |

○ Not yet assessable

**SBP 3 Systems-Based Practice 3: System Navigation for Patient-Centered Care**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Demonstrates knowledge of care coordination<br><br>Performs safe and effective transitions of care/hand-offs in routine clinical situations<br><br>Demonstrates knowledge of population and community health needs and disparities | Coordinates care of patients in routine clinical situations effectively using the roles of the interprofessional team members<br><br>Performs safe and effective transitions of care/hand-offs in complex clinical situations<br><br>Identifies specific population and community health needs and inequities for the local population and community | Coordinates care of patients in complex clinical situations effectively using the roles of the interprofessional team members<br><br>Supervises transitions of care by other team members<br><br>Effectively uses local resources to meet the needs of a patient population and community | Role models effective coordination of patient-centered care among different disciplines and specialties<br><br>Role models safe and effective transitions of care/hand-offs within and across health care delivery systems, including outpatient settings<br><br>Adapts practice to provide for the needs of specific populations | Improves quality of transitions of care within and across health care delivery systems to optimize patient outcomes<br><br>Leads innovations in adapting practice and systems for populations and communities with health care disparities |

○ ○ ○ ○ ○ ● ○ ○ ○ ○

○ N/A

**PBLI 1 Practice-Based Learning and Improvement 1: Evidence-Based and Informed Practice**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Demonstrates how to access and use available evidence, and to incorporate patient preferences and values to care for a routine patient | Articulates clinical questions and elicits patient preferences and values to guide evidence-based care | Locates and applies the best available evidence, integrated with patient preference, to the care of complex patients | Critically appraises and applies evidence, even in the face of uncertainty, and interprets conflicting evidence to guide care, tailored to the individual patient | Coaches others to critically appraise and apply evidence for complex patients, and/or participates in the development of guidelines |

○ ● ○ ○ ○ ○ ○ ○ ○ ○

○ N/A

**PROF 2 Professionalism 2: Accountability/Conscientiousness**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Takes responsibility for failure to complete tasks and responsibilities, identifies potential contributing factors, and describes strategies for ensuring timely task completion in the future | Performs tasks and responsibilities in a timely manner with appropriate attention to detail in routine situations | Performs tasks and responsibilities in a timely manner with appropriate attention to detail in complex or stressful situations | Recognizes situations in which one's own behavior may impact others' ability to complete tasks and responsibilities in a timely manner | Develops or implements strategies to improve system-wide problems to improve ability for oneself and others to complete tasks and responsibilities in a timely fashion |
| | Responds promptly to requests or reminders to complete tasks and responsibilities | Recognizes situations that may impact own ability to complete tasks and responsibilities in a timely manner | Proactively implements strategies to ensure that the needs of patients, teams, and systems are met | | |

○ ○ ○ ○ ○ ● ○ ○ ○ ○

○ N/A



Stella Pak
PGY-2
*Albany Medical Center
Neurology
STROKE JUNIOR
10/01/2022 - 10/09/2022

Evaluated by: Richard Jackson
Faculty

Completed On: 12/7/2022

# Inpatient Stroke Rotation

1* **Please give specific examples of the resident's strengths and weaknesses, including times when he or she performed above the level expected of his or her training, and times when he or she fell short of expectations. If relevant, consider giving examples on ability to interpret neuroimaging, localization, patient safety, care coordination, communication, documentation, and professionalism.**

Very punctual Organized Patients and families always appreciated her dedication Attentive in rounds Thorough Stayed late daily Researched cases after hours

2* **Regardless of the resident's actual training level, did he or she perform at the level of:**

- ○ Medical student
- ○ Intern
- ● Early career Neurology resident
- ○ Late career Neurology resident
- ○ Fellow/Attending

**PC 1 Patient Care 1: History**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Obtains a basic neurologic history | Obtains a complete and relevant neurologic history | Obtains an organized neurologic history, including collateral information as appropriate | Efficiently obtains an organized hypothesis-driven neurologic history | Serves as a role model in obtaining a hypothesis-driven neurologic history |
| ○ | ○ ○ | ○ ○ | ● ○ | ○ ○ | ○ |

○ Not yet assessable

**PC 2 Patient Care 2: Neurologic Exam**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Performs some components of a neurologic exam | Performs a standard neurologic exam accurately | Performs a relevant neurologic exam incorporating additional appropriate maneuvers | Performs a hypothesis-driven neurologic exam | Serves as a role model for performing a hypothesis-driven, complete, relevant, and organized neurologic exam |
| ○ | ○ ○ | ● ○ | ○ ○ | ○ ○ | ○ |

○ Not yet assessable

**PC 3 Patient Care 3: Formulation**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Summarizes history and exam findings | Generates a broad differential diagnosis based on history, exam, and localization | Synthesizes relevant information to focus and prioritize diagnostic possibilities | Continuously reconsiders diagnosis in response to changes in clinical circumstances and available data | Serves as a role model for clinical reasoning by demonstrating sophisticated formulation in complex presentations |

○ ○ ○ ● ○ ○ ○ ○ ○ ○

○ Not yet assessable

**PC 5 Patient Care 5: Diagnosis and Management of Neurologic Disorders in the Inpatient Setting**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Identifies typical presentations of commonly encountered neurologic conditions | Diagnoses commonly encountered neurologic conditions | Identifies atypical presentations of commonly encountered neurologic conditions | Diagnoses uncommon neurologic conditions | Identifies atypical presentations of uncommon neurologic conditions |
| | | Develops an initial treatment plan for commonly encountered neurologic disorders | Individualizes management plan, ensuring the appropriate level of care throughout hospitalization and upon discharge | Adapts management plan based upon treatment response, disease progression, and complications of therapy | Leads the management of patients with complex and uncommon neurologic conditions |

○ ○ ○ ● ○ ○ ○ ○ ○ ○

○ Not yet assessable

**PC 8 Patient Care 8: Interpretation of Neuroimaging**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Identifies basic neuroanatomy on brain and vascular anatomy of the head and neck magnetic resonance (MR) and computed tomography (CT) | Identifies major abnormalities of the brain and cerebrovascular system on MR and CT<br>Identifies basic anatomy of the spine and spinal cord on MR and CT | Interprets typical abnormalities of the brain and cerebrovascular system on MR and CT<br>Identifies abnormalities of the spine and spinal cord on MR and CT | Interprets subtle abnormalities of brain and cerebrovascular system on MR and CT<br>Interprets MR and CT of the spine | Interprets advanced neuroimaging |

○ ○ ○ ○ ○ ● ○ ○ ○ ○

○ Not yet assessable

**MK 1 Medical Knowledge 1: Localization**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Recognizes the role of localization in neurologic diagnosis | Localizes lesions to general regions of the nervous system | Localizes lesions to specific regions of the nervous system | Localizes lesions to discrete structures of the nervous system | Consistently demonstrates sophisticated and detailed knowledge of neuroanatomy in localizing lesions |

○ ○ ○ ○ ○ ● ○ ○ ○ ○

○ Not yet assessable

**SBP 3 Systems-Based Practice 3: System Navigation for Patient-Centered Care**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Demonstrates knowledge of care coordination<br><br>Performs safe and effective transitions of care/hand-offs in routine clinical situations<br><br>Demonstrates knowledge of population and community health needs and disparities | Coordinates care of patients in routine clinical situations effectively using the roles of the interprofessional team members<br><br>Performs safe and effective transitions of care/hand-offs in complex clinical situations<br><br>Identifies specific population and community health needs and inequities for the local population and community | Coordinates care of patients in complex clinical situations effectively using the roles of the interprofessional team members<br><br>Supervises transitions of care by other team members<br><br>Effectively uses local resources to meet the needs of a patient population and community | Role models effective coordination of patient-centered care among different disciplines and specialties<br><br>Role models safe and effective transitions of care/hand-offs within and across health care delivery systems, including outpatient settings<br><br>Adapts practice to provide for the needs of specific populations | Improves quality of transitions of care within and across health care delivery systems to optimize patient outcomes<br><br>Leads innovations in adapting practice and systems for populations and communities with health care disparities |

○ ○ ○ ● ○ ○ ○ ○ ○ ○

○ N/A

**PBLI 1 Practice-Based Learning and Improvement 1: Evidence-Based and Informed Practice**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Demonstrates how to access and use available evidence, and to incorporate patient preferences and values to care for a routine patient | Articulates clinical questions and elicits patient preferences and values to guide evidence-based care | Locates and applies the best available evidence, integrated with patient preference, to the care of complex patients | Critically appraises and applies evidence, even in the face of uncertainty, and interprets conflicting evidence to guide care, tailored to the individual patient | Coaches others to critically appraise and apply evidence for complex patients, and/or participates in the development of guidelines |

○ ○ ○ ○ ○ ● ○ ○ ○ ○

○ N/A

**PROF 2 Professionalism 2: Accountability/Conscientiousness**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Takes responsibility for failure to complete tasks and responsibilities, identifies potential contributing factors, and describes strategies for ensuring timely task completion in the future | Performs tasks and responsibilities in a timely manner with appropriate attention to detail in routine situations | Performs tasks and responsibilities in a timely manner with appropriate attention to detail in complex or stressful situations | Recognizes situations in which one's own behavior may impact others' ability to complete tasks and responsibilities in a timely manner | Develops or implements strategies to improve system-wide problems to improve ability for oneself and others to complete tasks and responsibilities in a timely fashion |
| | Responds promptly to requests or reminders to complete tasks and responsibilities | Recognizes situations that may impact own ability to complete tasks and responsibilities in a timely manner | Proactively implements strategies to ensure that the needs of patients, teams, and systems are met | | |

○ ○ ○ ○ ○ ● ○ ○ ○ ○

○ N/A



**Stella Pak**
PGY-2
*Albany Medical Center
Neurology
07/01/2022 - 09/30/2022

**Evaluated by:** **John Lansing, DO**
Faculty
*Albany Medical Center

**Completed On:** **7/26/2022**

# General Outpatient Clinic Evaluation

## 1* History — Patient Care

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Obtains a neurologic history | Obtains a complete and relevant neurologic history | Obtains a complete, relevant, and organized neurologic history | Efficiently obtains a complete, relevant, and organized neurologic history | Efficiently obtains a complete, relevant, and organized neurologic history incorporating subtle verbal and non-verbal cues |

○ ○ ○ ○ ○ ○ ● ○ ○

○ Not yet rotated

## 2* Neurological Examination - Patient Care

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Performs complete neurological examination | Performs complete neurological examination accurately | Performs a relevant neurological examination incorporating some additional appropriate maneuvers | Efficiently performs a relevant neurological examination incorporating all additional appropriate maneuvers | Consistently demonstrates mastery in performing a complete, relevant, and organized neurological examination |

○ ○ ○ ○ ○ ○ ● ○ ○

## 3* Visualizes papilledema

○ Yes
○ No
● Not Observed

4* **Management of Neurologic Disease**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Demonstrates basic knowledge of management of patients with neurologic disease | Discusses general approach to initial treatment of common neurological disorders, including risks and benefits of treatment | Individualizes treatment for specific patients | Adapts treatment based on patient response | Demonstrates sophisticated knowledge of treatment subtleties and controversies |

○ ○ ○ ○ ○ ● ○ ○ ○

○ Not observed

Some about adapting plan after discussion with attending.

5* **Identifies and manages complications of therapy**

◉ Yes
○ No
○ Not Observed

6* **Appropriately requests consultations from non-neurologic care providers for additional evaluation and management**

◉ Yes
○ No
○ Not Observed

7* **Appropriately requests consultations from a neurologic subspecialist for additional evaluation or management**

○ Yes
○ No
◉ Not Observed

8* **Headache - Inpatient Care**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Recognizes common headache syndromes. | Diagnoses and manages common headache syndromes. | Recognizes uncommon headache syndromes. | Diagnoses and manages uncommon headache syndromes. | |

○ ○ ○ ○ ○ ○ ○ ○ ○

● Not applicable

9* **Neurologic Manifestations of Systemic Disease - OP**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Recognizes when a patient's neurologic symptoms may be due to systemic illness | Diagnoses and manages common neurologic manifestations of systemic diseases | Recognizes uncommon neurologic manifestations of systemic disease | Diagnoses and manages uncommon neurologic manifestations of systemic disease | |

○ ○ ○ ○ ○ ● ○ ○ ○

○ Not applicable

10* **Formulation - Inpatient care**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Summarizes history and exam findings | Summarizes key elements of history and exam findings | Synthesizes information to focus and prioritize diagnostic possibilities | Efficiently synthesizes information to focus and prioritize diagnostic possibilities | Consistently demonstrates sophisticated and detailed knowledge of pathophysiology in diagnosis |

○ ○ ○ ○ ● ○ ○ ○ ○

○ Not applicable

11* **Formulation - Localization OP**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Attempts to localize lesions within the nervous system | Localizes lesions to general regions of the nervous system | Accurately localizes lesions to specific regions of the nervous system | Efficiently and accurately localizes lesions to specific regions of the nervous system | Consistently demonstrates sophisticated and detailed knowledge of neuroanatomy in localizing lesions |

○ ○ ○ ○ ● ○ ○ ○ ○

○ Not applicable

12* **Describes advanced neuroanatomy**

○ Yes
○ No
● Not Observed

## 13 Diagnostic Investigation- Inpatient

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Demonstrates general knowledge of diagnostic tests in neurology | Discusses general diagnostic approach appropriate to clinical presentation | Individualizes diagnostic approach to the specific patient | Explains diagnostic yield and cost-effectiveness of testing | Demonstrates sophisticated knowledge of diagnostic testing and controversies |

○ ○ ○ ● ○ ○ ○ ○ ○

○ Not applicable

## 14* Diagnostic Investigation 2 - OP

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Lists risks and benefits of tests to patient | Accurately interprets results of common diagnostic tests | Accurately interprets results of less common diagnostic testing | Recognizes indications of advanced imaging and other diagnostic studies | Recognizes indications and implications of genetic testing |

○ ○ ○ ● ○ ○ ○ ○ ○

○ Not applicable

## 15* Systems thinking, including cost and risk effective practice — Systems-based Practice

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Describes basic cost and risk implications of care | Describes cost and risk benefit ratios in patient care | Makes clinical decisions that balance cost and risk benefit ratios | Incorporates available quality measures in patient care | Engages in scholarly activity regarding cost- and risk-effective practice |

○ ○ ● ○ ○ ○ ○ ○ ○

○ Not yet achieved Level 1

**16* Locate, appraise, and assimilate evidence from scientific studies related to the patient's health problems - Practice-based Learning and Improvement**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Uses information technology to search and access relevant medical information | Uses scholarly articles and guidelines to answer patient care issues | Critically evaluates scientific literature | Incorporates appropriate evidence- based information into patient care<br><br>Understands the limits of evidence-based medicine in patient care | Engages in scholarly activity regarding evidence-based medicine |

○ ○ ○ ○ ○ ○ ● ○ ○

○ Not yet achieved Level 1

**17* Professionalism**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Consistently demonstrates professional behavior, including dress and timeliness | Demonstrates compassion, sensitivity, and responsiveness to patients and families | Demonstrates compassionate practice of medicine, even in context of disagreement with patient beliefs | Advocates for quality patient care | Mentors others in the compassionate practice of medicine, even in context of disagreement with patient beliefs |

○ ○ ○ ○ ○ ○ ○ ● ○

○ Not applicable

**18* Documentation**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Completes documentation in a timely fashion | Completes all documentation accurately, including use of EHR | Demonstrates synthesis, formulation, and thought process in documentation | Mentors colleagues in timely, accurate, and efficient documentation | Engages in scholarly activity regarding interpersonal communication |

○ ○ ○ ○ ● ○ ○ ○ ○

○ Not observed

19* **Educates patients about their disease and management, including risks and benefits of treatment options**

- (●) Yes
- ( ) No
- ( ) Not Observed

20* **Information Sharing, Gathering and Technology**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Effectively communicates during patient hand-overs using a structured communication | Educates patients about their disease and management, including risks and benefits of treatment options | Effectively gathers information from collateral sources when necessary | Effectively and ethically uses all forms of communication | Develops and implements patient education materials |

( ) ( ) ( ) ( ) ( ) (●) ( ) ( ) ( )

( ) Not applicable



**Stella Pak**
PGY-2
*Albany Medical Center
Neurology
12/13/2021 - 12/19/2021

**Evaluated by:** **John Pugh, MD**
Faculty
Neurology

**Completed On:** **1/17/2022**

# Pediatric Neurology Rotation

1* **Please give specific examples of the resident's strengths and weaknesses, including times when he or she performed above the level expected of his or her training, and times when he or she fell short of expectations. If relevant, consider giving examples on ability to interpret neuroimaging, localization, patient safety, care coordination, communication, documentation, and professionalism.**

Stella was pleasant to work with. She was eager to please, motivated and put forth excellent effort. During the first two days of the rotation this was impressive and welcome. By the middle of the week and towards the end of the week clear deficiencies emerged. While she was generally able to function in the capacity of a data gatherer she was not able to incorporate the data gathered into a logical assessment and formulate a differential diagnosis and treatment plan. I think this was hampered by a lack of knowledge - specifically in neurology. For example, not knowing the definition of epilepsy and that a patient who meets that definition requires starting an anticonvulsant. Similarly, she struggled with localization and interpretation of imaging.

2* **Regardless of the resident's actual training level, did he or she perform at the level of:**

- (●) Medical student
- ( ) Intern
- ( ) Early career Neurology resident
- ( ) Late career Neurology resident
- ( ) Fellow/Attending

Stella functions somewhere between the level of an intern and good, 4th year medical student.



**Stella Pak**
PGY-2
*Albany Medical Center
Neurology
04/18/2022 - 04/24/2022

Evaluated by: **John Pugh, MD**
Faculty
Neurology

Completed On: **4/22/2022**

## Pediatric Neurology Rotation

1* **Please give specific examples of the resident's strengths and weaknesses, including times when he or she performed above the level expected of his or her training, and times when he or she fell short of expectations. If relevant, consider giving examples on ability to interpret neuroimaging, localization, patient safety, care coordination, communication, documentation, and professionalism.**

STRENGTHS: 1. Stella is an exceptionally hardworking, diligent and caring person. These qualities are readily visible in her day-to-day work as a physician. I have met very few people who put forth as much effort and maintain such a positive outlook when going about their tasks. She frequently "went the extra mile" in patient care including contacting ancillary sources for histories, obtaining outside medical records, and talking to patients. One example was a 14 year old girl who she took the time to elicit a sexual history on - this was important as the child was on an oral contraceptive and displaying symptoms that could have been due to an STD. These details slipped by the primary pediatrics team. 2. She also demonstrated the ability to learn and incorporate things I had taught her from the first time we worked together - specifically she did an excellent job providing patient education on seizure safety. She was also very good about working with the medical students who joined us taking the time to integrate them in patient care and teach them. 3. Finally, she displayed a few instances of exceptional knowledge that even senior residents who worked with me in the past did not know. For example, a child was admitted to the EMU for nocturnal spells that were concerning for Panayotopoulos Syndrome. While most residents will recognize this epilepsy syndrome, many will not know the specific EEG findings or be able to name the related focal epilepsy syndrome of childhood (Gastaut). AREAS FOR IMPROVEMENT: 1. Systems: a. There were times that Stella struggled with common systems issues such as placing orders (e.g. neurovascular checks rather than neurochecks) b. Acting too quickly - at times Stella was so focused on getting things done that she would move them off her plate without thinking them through. For example, the peds team contacted us to ask about a patient's treatment plan and disposition. It was not a patient we were following and as we were looking through the chart together to see what was going on I had to stop her from sending sending two text responses to the peds team that would have not been helpful. 2. Communication: a. I frequently found it difficult to understand her and often needed to have her repeat herself. This was especially problematic over the phone and when she would speak fast. When she speaks more calmly / slowly it is much easier to understand what she is saying. b. There were issues with communication with the primary team - for example, a child on our service that needed input from the peds team there was confusion as to whether a consult was needed or the patient needed to be transferred to another service c. Incomplete / inaccurate signout - for example, a child with medically refractory epilepsy on a versed drip to which pentobarbital was added. The goal was to drive the child into burst suppression but this was not effectively communicated to the sundowning team. In addition, the plan for the above referenced child in 2b was not well conveyed. d. Communication from the EMU - information from the epilepsy/EMU team concerning the results of continuous EEG's was not always timely or accurate 3. Synthesis / Clinical Thinking: a. Stella has trouble seeing the forest from the trees and will often get hung up / focus too much on minor details in a patient's history b. Likely related to 3a Stella struggles at times to tie together aspects of a patient's history and exam to create a reasonable differential / explanation for a patient's symptoms (e.g. a baby with several findings indicating a segmental patterning malformation)

2* **Regardless of the resident's actual training level, did he or she perform at the level of:**

- ○ Medical student
- ● Intern
- ○ Early career Neurology resident
- ○ Late career Neurology resident
- ○ Fellow/Attending

While there are areas where she is functioning at the level of a junior resident the communication, systems and clinical thinking issues place her skillset more in the realm of an intern. That being said, she is clearly intelligent, hardworking, and compassionate. I think it is possible with time and mentoring for her to improve.



**Stella Pak**
PGY-2
*Albany Medical Center
Neurology
DEMENTIA
07/01/2022 - 09/30/2022

**Evaluated by:** Sara Radmard
Faculty

**Completed On:** 9/9/2022

# Sundowning and Night Float Evaluation

**1* Localization**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Attempts to localize lesions within the nervous system | Localizes lesions to general regions of the nervous system | Accurately localizes lesions to specific regions of the nervous system | Efficiently and accurately localizes lesions to specific regions of the nervous system | Consistently demonstrates sophisticated and detailed knowledge of neuroanatomy in localizing lesions |

○ ○ ○ ○ ● ○ ○ ○ ○

○ Not observed

**2* Formulation**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Summarizes history and exam findings | Summarizes key elements of history and exam findings | Synthesizes information to focus and prioritize diagnostic possibilities | Efficiently synthesizes information to focus and prioritize diagnostic possibilities | Consistently demonstrates sophisticated and detailed knowledge of pathophysiology in diagnosis |

○ ○ ○ ● ○ ○ ○ ○ ○

○ Not observed

3* **Management of Neurologic Disease**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Demonstrates basic knowledge of management of patients with neurologic disease | Discusses general approach to initial treatment of common neurological disorders, including risks and benefits of treatment | Individualizes treatment for specific patients | Adapts treatment based on patient response | Demonstrates sophisticated knowledge of treatment subtleties and controversies |
| ○ ○ | ● ○ | ○ ○ | ○ ○ | ○ |

○ Not observed

4* **Neurologic Emergencies**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Lists kinds of neurologic emergencies | Identifies neurologic emergencies as they are occurring | Initiates management for neurologic emergencies and triages patient to appropriate level of care | Independently directs management of patients with neurologic emergencies | Mentors others in the management of patients with neurologic emergencies |
| ○ ○ | ○ ○ | ○ ○ | ○ ○ | ○ |

● Not observed

5* **Diagnostic Investigation**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Demonstrates general knowledge of diagnostic tests in neurology | Discusses general diagnostic approach to clinical presentation | Individualizes diagnostic approach to the specific patient | Appropriately orders advanced imaging and/or consults for the diagnosis of the specific patient | Demonstrates sophisticated knowledge of diagnostic testing and controversies |
| ○ ○ | ○ ○ | ● ○ | ○ ○ | ○ |

○ Not observed

6 **Accurately interprets results of common diagnostic tests**

○ Yes
○ No
◉ Not Observed

7 **Accurately interprets results of less common diagnostic testing**

- ○ Yes
- ○ No
- ◉ Not Observed

8* **Documentation**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Completes documentation in a timely fashion | Completes all documentation accurately, including use of EHR | Demonstrates synthesis, formulation, and thought process in documentation | Mentors colleagues in timely, accurate, and efficient documentation | Engages in scholarly activity regarding interpersonal communication |

○ ○ ○ ● ○ ○ ○ ○ ○

○ Not observed

9 **Please rate the ability of this resident to MANAGE SIMPLE SEIZURE DISORDERS:**
**- Resident can make medication recommendations for first-time seizures or simple breakthrough seizures in epilepsy**

*The resident*

| CANNOT perform this activity | Can perform this activity with EXTENSIVE GUIDANCE | Can perform this activity with MINIMAL GUIDANCE | Can perform this activity INDEPENDENTLY. | Can GUIDE OTHERS through performing this activity. | Did not observe |
|---|---|---|---|---|---|
| ○ | ○ | ○ | ○ | ○ | ◉ |

10* **Status Epilepticus**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Recognizes convulsive status epilepticus | Manages convulsive status epilepticus | Recognizes and manages non-convulsive status epilepticus | | |

○ ○ ○ ○ ○ ○ ○ ○ ○

● Not applicable

11 **Demyelinating Disorders — Patient Care**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Recognizes when a patient may have a demyelinating disorder | Diagnoses and manages common demyelinating disorders | Recognizes uncommon demyelinating disorders<br><br>Manages acute presentations of demyelinating disorders | Diagnoses uncommon demyelinating disorders | Manages uncommon demyelinating disorders<br><br>Engages in scholarly activity in demyelinating disorders (e.g., teaching, research) |
| ○ ○ | ○ ○ | ○ ○ | ○ ○ | ○ |

● Not yet rotated

12 **Please rate the ability of this resident to RECOGNIZE EMERGENT FINDINGS on MRI and CT of the BRAIN:**

*The resident*

| CANNOT perform this activity | Can perform this activity with EXTENSIVE GUIDANCE | Can perform this activity with MINIMAL GUIDANCE | Can perform this activity INDEPENDENTLY. | Can GUIDE OTHERS through performing this activity. | Did not observe |
|---|---|---|---|---|---|
| ○ | ○ | ○ | ○ | ○ | ○ |

13* **Neuromuscular Emergencies**

14* **Headache Emergencies**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Recognizes headache emergencies | Manages headache emergencies | | | |
| ○ ○ | ○ ○ | ○ ○ | ○ ○ | ○ |

● Not applicable

15* **Movement Disorders Emergencies**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Recognizes movement disorders emergencies | Manages movement disorders emergencies | | | |

○ ○ ○ ○ ○ ○ ○ ○ ○

● Not applicable

16 **Identifies neuro-oncological emergencies and initiates management**

○ Yes
○ No
◉ Not Observed

17 **Please rate the ability of this resident to ANALYSE CEREBRAL ANGIOGRAPHY (CTA, MRA, and Conventional):**

*The resident*

| CANNOT perform this activity | Can perform this activity with EXTENSIVE GUIDANCE | Can perform this activity with MINIMAL GUIDANCE | Can perform this activity INDEPENDENTLY. | Can GUIDE OTHERS through performing this activity. | Did not observe |
|---|---|---|---|---|---|
| ○ | ○ | ○ | ○ | ○ | ◉ |



**Stella Pak**
PGY-2
*Albany Medical Center
Neurology
STROKE JUNIOR
03/01/2022 - 03/06/2022

**Evaluated by:** **Laura Risley, MD**
Faculty
*Albany Medical Center
Neurology

**Completed On:** **4/29/2022**

## Inpatient Stroke Rotation

**1* Please give specific examples of the resident's strengths and weaknesses, including times when he or she performed above the level expected of his or her training, and times when he or she fell short of expectations. If relevant, consider giving examples on ability to interpret neuroimaging, localization, patient safety, care coordination, communication, documentation, and professionalism.**

Dr. Pak is very enthusiastic, especially about research. She is a hard worker, but I have concerns about her efficiency and and that she spends a great deal of effort on tasks that are unnecessary. It is difficult to give her feedback. She is at times a bit abrupt in dealing with families and team members. She was often absent from rounds which is frustrating as she missed discussion on patient care.

**2* Regardless of the resident's actual training level, did he or she perform at the level of:**

● Medical student
○ Intern
○ Early career Neurology resident
○ Late career Neurology resident
○ Fellow/Attending

**PC 1 Patient Care 1: History**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Obtains a basic neurologic history | Obtains a complete and relevant neurologic history | Obtains an organized neurologic history, including collateral information as appropriate | Efficiently obtains an organized hypothesis driven neurologic history | Serves as a role model in obtaining a hypothesis-driven neurologic history |

○ ○ ● ○ ○ ○ ○ ○ ○ ○

○ Not yet assessable

There have been a few instances where vital information was missing -for example not clearly obtaining a last seen well time and a near miss with tPA. Frequently her histories are very detailed on H&P but on day-to-day history of admitted inpatients I have found her chart review to be lacking.

PC 2 **Patient Care 2: Neurologic Exam**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Performs some components of a neurologic exam | Performs a standard neurologic exam accurately | Performs a relevant neurologic exam incorporating additional appropriate maneuvers | Performs a hypothesis-driven neurologic exam | Serves as a role model for performing a hypothesis-driven, complete, relevant, and organized neurologic exam |

○ ○ ● ○ ○ ○ ○ ○ ○ ○

○ Not yet assessable

PC 3 **Patient Care 3: Formulation**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Summarizes history and exam findings | Generates a broad differential diagnosis based on history, exam, and localization | Synthesizes relevant information to focus and prioritize diagnostic possibilities | Continuously reconsiders diagnosis in response to changes in clinical circumstances and available data | Serves as a role model for clinical reasoning by demonstrating sophisticated formulation in complex presentations |

○ ● ○ ○ ○ ○ ○ ○ ○ ○

○ Not yet assessable

I would like to see Stella relax and organize her presentations a bit better. She has a tendency to skip around and this makes her presentations very difficult to follow.

**PC 5 Patient Care 5: Diagnosis and Management of Neurologic Disorders in the Inpatient Setting**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Identifies typical presentations of commonly encountered neurologic conditions | Diagnoses commonly encountered neurologic conditions<br><br>Develops an initial treatment plan for commonly encountered neurologic disorders | Identifies atypical presentations of commonly encountered neurologic conditions<br><br>Individualizes management plan, ensuring the appropriate level of care throughout hospitalization and upon discharge | Diagnoses uncommon neurologic conditions<br><br>Adapts management plan based upon treatment response, disease progression, and complications of therapy | Identifies atypical presentations of uncommon neurologic conditions<br><br>Leads the management of patients with complex and uncommon neurologic conditions |

○ ● ○ ○ ○ ○ ○ ○ ○ ○

○ Not yet assessable

**PC 8 Patient Care 8: Interpretation of Neuroimaging**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Identifies basic neuroanatomy on brain and vascular anatomy of the head and neck magnetic resonance (MR) and computed tomography (CT) | Identifies major abnormalities of the brain and cerebrovascular system on MR and CT<br><br>Identifies basic anatomy of the spine and spinal cord on MR and CT | Interprets typical abnormalities of the brain and cerebrovascular system on MR and CT<br><br>Identifies abnormalities of the spine and spinal cord on MR and CT | Interprets subtle abnormalities of brain and cerebrovascular system on MR and CT<br><br>Interprets MR and CT of the spine | Interprets advanced neuroimaging |

○ ○ ○ ● ○ ○ ○ ○ ○ ○

○ Not yet assessable

**MK 1 Medical Knowledge 1: Localization**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Recognizes the role of localization in neurologic diagnosis | Localizes lesions to general regions of the nervous system | Localizes lesions to specific regions of the nervous system | Localizes lesions to discrete structures of the nervous system | Consistently demonstrates sophisticated and detailed knowledge of neuroanatomy in localizing lesions |
| ○ | ○ ○ | ● ○ | ○ ○ | ○ ○ | ○ |

○ Not yet assessable

**SBP 3 Systems-Based Practice 3: System Navigation for Patient-Centered Care**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Demonstrates knowledge of care coordination<br><br>Performs safe and effective transitions of care/hand-offs in routine clinical situations<br><br>Demonstrates knowledge of population and community health needs and disparities | Coordinates care of patients in routine clinical situations effectively using the roles of the interprofessional team members<br><br>Performs safe and effective transitions of care/hand-offs in complex clinical situations<br><br>Identifies specific population and community health needs and inequities for the local population and community | Coordinates care of patients in complex clinical situations effectively using the roles of the interprofessional team members<br><br>Supervises transitions of care by other team members<br><br>Effectively uses local resources to meet the needs of a patient population and community | Role models effective coordination of patient-centered care among different disciplines and specialties<br><br>Role models safe and effective transitions of care/hand-offs within and across health care delivery systems, including outpatient settings<br><br>Adapts practice to provide for the needs of specific populations | Improves quality of transitions of care within and across health care delivery systems to optimize patient outcomes<br><br>Leads innovations in adapting practice and systems for populations and communities with health care disparities |
| ● | ○ ○ | ○ ○ | ○ ○ | ○ ○ | ○ |

○ N/A

Unfortunately I have had two instances where a family has approached staff and asked not to work with Dr. Pak and patient care has needed to be transferred to someone else. I would like to see some improvement in interaction with families. There have been examples of good interactions with families as well, but I think the consistency of her interactions leads room for improvement.

**PBLI 1** **Practice-Based Learning and Improvement 1: Evidence-Based and Informed Practice**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Demonstrates how to access and use available evidence, and to incorporate patient preferences and values to care for a routine patient | Articulates clinical questions and elicits patient preferences and values to guide evidence-based care | Locates and applies the best available evidence, integrated with patient preference, to the care of complex patients | Critically appraises and applies evidence, even in the face of uncertainty, and interprets conflicting evidence to guide care, tailored to the individual patient | Coaches others to critically appraise and apply evidence for complex patients, and/or participates in the development of guidelines |

○ ○ ○ ● ○ ○ ○ ○ ○ ○

○ N/A

**PROF 2** **Professionalism 2: Accountability/Conscientiousness**

| Not Yet Completed Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | Takes responsibility for failure to complete tasks and responsibilities, identifies potential contributing factors, and describes strategies for ensuring timely task completion in the future<br>Responds promptly to requests or reminders to complete tasks and responsibilities | Performs tasks and responsibilities in a timely manner with appropriate attention to detail in routine situations<br>Recognizes situations that may impact own ability to complete tasks and responsibilities in a timely manner | Performs tasks and responsibilities in a timely manner with appropriate attention to detail in complex or stressful situations<br>Proactively implements strategies to ensure that the needs of patients, teams, and systems are met | Recognizes situations in which one's own behavior may impact others' ability to complete tasks and responsibilities in a timely manner | Develops or implements strategies to improve system-wide problems to improve ability for oneself and others to complete tasks and responsibilities in a timely fashion |

○ ● ○ ○ ○ ○ ○ ○ ○ ○

○ N/A



**Stella Pak**
PGY-2
*Albany Medical Center
Neurology
NIGHT FLOAT 1
04/01/2022 - 06/30/2022

**Evaluated by:** **Kimberly Robeson**
Faculty

**Completed On:** **4/29/2022**

# Sundowning and Night Float Evaluation

## 1* Localization

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Attempts to localize lesions within the nervous system | Localizes lesions to general regions of the nervous system | Accurately localizes lesions to specific regions of the nervous system | Efficiently and accurately localizes lesions to specific regions of the nervous system | Consistently demonstrates sophisticated and detailed knowledge of neuroanatomy in localizing lesions |

○ ○ ● ○ ○ ○ ○ ○ ○

○ Not observed

## 2* Formulation

## 3* Management of Neurologic Disease

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Demonstrates basic knowledge of management of patients with neurologic disease | Discusses general approach to initial treatment of common neurological disorders, including risks and benefits of treatment | Individualizes treatment for specific patients | Adapts treatment based on patient response | Demonstrates sophisticated knowledge of treatment subtleties and controversies |

○ ○ ● ○ ○ ○ ○ ○ ○

○ Not observed

**4* Neurologic Emergencies**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Lists kinds of neurologic emergencies | Identifies neurologic emergencies as they are occurring | Initiates management for neurologic emergencies and triages patient to appropriate level of care | Independently directs management of patients with neurologic emergencies | Mentors others in the management of patients with neurologic emergencies |

○ ● ○ ○ ○ ○ ○ ○ ○

○ Not observed

**5* Diagnostic Investigation**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Demonstrates general knowledge of diagnostic tests in neurology | Discusses general diagnostic approach to clinical presentation | Individualizes diagnostic approach to the specific patient | Appropriately orders advanced imaging and/or consults for the diagnosis of the specific patient | Demonstrates sophisticated knowledge of diagnostic testing and controversies |

○ ○ ● ○ ○ ○ ○ ○ ○

○ Not observed

**6 Accurately interprets results of common diagnostic tests**

● Yes
○ No
○ Not Observed

**7 Accurately interprets results of less common diagnostic testing**

○ Yes
○ No
● Not Observed

**8* Documentation**

9 **Please rate the ability of this resident to MANAGE SIMPLE SEIZURE DISORDERS:**
**- Resident can make medication recommendations for first-time seizures or simple breakthrough seizures in epilepsy**

*The resident*

| CANNOT perform this activity | Can perform this activity with EXTENSIVE GUIDANCE | Can perform this activity with MINIMAL GUIDANCE | Can perform this activity INDEPENDENTLY. | Can GUIDE OTHERS through performing this activity. | Did not observe |
|---|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ | ○ |

10* **Status Epilepticus**

| Level 1 | | Level 2 | | Level 3 | | Level 4 | | Level 5 |
|---|---|---|---|---|---|---|---|---|
| Recognizes convulsive status epilepticus | | Manages convulsive status epilepticus | | Recognizes and manages non-convulsive status epilepticus | | | | |
| ○ | ○ | ● | ○ | ○ | ○ | ○ | ○ | ○ |

○ Not applicable

11 **Demyelinating Disorders — Patient Care**

| Level 1 | | Level 2 | | Level 3 | | Level 4 | | Level 5 |
|---|---|---|---|---|---|---|---|---|
| Recognizes when a patient may have a demyelinating disorder | | Diagnoses and manages common demyelinating disorders | | Recognizes uncommon demyelinating disorders<br>Manages acute presentations of demyelinating disorders | | Diagnoses uncommon demyelinating disorders | | Manages uncommon demyelinating disorders<br>Engages in scholarly activity in demyelinating disorders (e.g., teaching, research) |
| ○ | ○ | ● | ○ | ○ | ○ | ○ | ○ | ○ |

○ Not yet rotated

12 **Please rate the ability of this resident to RECOGNIZE EMERGENT FINDINGS on MRI and CT of the BRAIN:**

*The resident*

| CANNOT perform this activity | Can perform this activity with EXTENSIVE GUIDANCE | Can perform this activity with MINIMAL GUIDANCE | Can perform this activity INDEPENDENTLY. | Can GUIDE OTHERS through performing this activity. | Did not observe |
|---|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ | ○ |

13* **Neuromuscular Emergencies**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Recognizes neuromuscular emergencies | Manages neuromuscular emergencies | | | |

● ○ ○ ○ ○ ○ ○ ○ ○

○ Not applicable

14* **Headache Emergencies**

15* **Movement Disorders Emergencies**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Recognizes movement disorders emergencies | Manages movement disorders emergencies | | | |

● ○ ○ ○ ○ ○ ○ ○ ○

○ Not applicable

16 **Identifies neuro-oncological emergencies and initiates management**

○ Yes
○ No
◉ Not Observed

17 **Please rate the ability of this resident to ANALYSE CEREBRAL ANGIOGRAPHY (CTA, MRA, and Conventional):**

*The resident*

| CANNOT perform this activity | Can perform this activity with EXTENSIVE GUIDANCE | Can perform this activity with MINIMAL GUIDANCE | Can perform this activity INDEPENDENTLY. | Can GUIDE OTHERS through performing this activity. | Did not observe |
|---|---|---|---|---|---|
| ○ | ○ | ○ | ○ | ○ | ◉ |



**Stella Pak**
PGY-2
*Albany Medical Center
Neurology
06/01/2022 - 06/30/2022

**Evaluated by:** **Marianna Spanakis-varelas**
Faculty

**Completed On:** **6/24/2022**

## Epilepsy Monitoring Unit Rotation

**1* Please give specific examples of the resident's strengths and weaknesses, including times when he or she performed above the level expected of his or her training, and times when he or she fell short of expectations. If relevant, consider giving examples on ability to interpret neuroimaging, localization, patient safety, care coordination, communication, documentation, and professionalism.**

Strength: 1) Notes were well written and generated in a timely fashion. 2) She exhibited enthusiasm to learn and participated in one -to-one lecture on EEG basic interpretation. She requested resources to improve knowledge on EEG reading.
Weaknesses 1) Needs to improve EEG reading skills and recognition of basic patterns (such as background rhythm, sleep vs awake state recognition, spikes vs artifacts.

**2* Regardless of the resident's actual training level, did he or she perform at the level of:**

I believe that Stella needs intensive mentoring to help her navigate career goals/objectives and monitor her progress in knowledge and competence.



**Stella Pak**
PGY-2
*Albany Medical Center
Neurology
05/01/2022 - 05/31/2022

**Evaluated by:** **Panayiotis Varelas**
Faculty
**Completed On:** **5/5/2022**

## Neurology Critical Care ICU Rotation

1* **Please give specific examples of the resident's strengths and weaknesses, including times when he or she performed above the level expected of his or her training, and times when he or she fell short of expectations. If relevant, consider giving examples on ability to interpret neuroimaging, localization, patient safety, care coordination, communication, documentation, and professionalism.**

Motivated, clearly studying and trying to learn, with interest in Research. Sometimes adding too much to her notes and with weakness on identifying the important from the trivial. This comes with experience and training. Also too focused on research during a period of time that the focus should be different

2* **Regardless of the resident's actual training level, did he or she perform at the level of:**



**Stella Pak**
PGY-2
*Albany Medical Center
Neurology
04/01/2022 - 06/30/2022

**Evaluated by:** **James Wyant, MD**
Faculty
*Albany Medical Center

**Completed On:** **5/4/2022**

# Sundowning and Night Float Evaluation

**1* Localization**

Stella has a fairly weak knowledge base with regarding to general neurology but I think this is explained by her recently transitioning into a neurology residency. She often collects a satisfactory amount of historical information to complete a neurologic evaluation. Stella has a beginner level neuro exam skill set and she often overlooks subtle abnormalities. She sometimes overlooks prominent abnormalities as well. Stella is able to interpret brain imaging at a level that is commensurate with her training. Stella has several areas for improvement before she can be an effective physician at any level of training. Stella's most glaring weakness is her difficulty with communication. During a weekend call shift, Stella responded to a stroke page and informed me and the other resident that there was a problem. She was unable to describe the problem or if she needed our assistance. She was also unable to describe the part of the hospital that she was in so that we could come assist her. Once I arrived at the correct floor, she told me that she had a negative interaction with another physician. I instructed her to send me and the program director an email with the details of the interaction and the name of the other physician involved. She was unwilling to send that email. In another instance, Stella responded to a stroke page near the end of her shift. Once she verified that the patient was in a stable condition, she discussed the case with a senior resident, then later with the oncoming resident. Stella perceived that there was a difference in management recommendations from these other two residents. Stella was unable to reconcile these recommendations. She brought the situation to my attention but was unable to recognize that this was an example of miscommunication. Stella's next most substantial weak area is her inability to respond appropriately to counseling and criticism. On several occasions I have given her recommendations or described areas for improvement and she has received this information as though it is a personal insult. She has also come to me with the complaint that she is "being singled out" after senior residents or other faculty members have given her mentorship and guidance. Unless she is able to address these two areas, I do not feel that Stella Pak is ready to continue residency.

**2* Formulation**

**3* Management of Neurologic Disease**

**4* Neurologic Emergencies**

**5* Diagnostic Investigation**

**6 Accurately interprets results of common diagnostic tests**

**7 Accurately interprets results of less common diagnostic testing**

8* Documentation

9 Please rate the ability of this resident to MANAGE SIMPLE SEIZURE DISORDERS:
- Resident can make medication recommendations for first-time seizures or simple breakthrough seizures in epilepsy

10* Status Epilepticus

11 Demyelinating Disorders — Patient Care

12 Please rate the ability of this resident to RECOGNIZE EMERGENT FINDINGS on MRI and CT of the BRAIN:

13* Neuromuscular Emergencies

14* Headache Emergencies

15* Movement Disorders Emergencies

16 Identifies neuro-oncological emergencies and initiates management

17 Please rate the ability of this resident to ANALYSE CEREBRAL ANGIOGRAPHY (CTA, MRA, and Conventional):

# EXHIBIT B

[redacted]

**From:** Amory, Colum F <AmoryC@amc.edu>
**Sent:** Monday, January 10, 2022 9:24 AM
**To:** Pak, Stella <paks@amc.edu>
**Subject:** Permissive hypertension

Hi Stella -

I was reviewing your admission note for one of the patients over the weekend. In general, your documentation is very detailed and well thought out. In particular, your plan is well written.

One thing I noted, for your education: you specified a time for permissive hypertension to end, and that goal blood pressure after that time would be normotension. I understand what you are getting at, but practically speaking, it's not a good idea to change parameters to something much more restrictive. If we do that, we'll see the vast majority of our patients on clevidipine infusions, which will require them to be in the Neuro-progressive unit until we can wean them off. Instead, I prefer that we recognize as a team that our goal is to start reducing blood pressure, but leave the parameters at goal<185/110. In point of fact, I do not need my inpatient acute stroke patients to be normotensive when they are discharged, because that may take 7-21 days to achieve. Instead I aim for them to be consistently below 160 systolic by day of discharge.

Another point: I would prefer you not to use the HAS-BLED score. It is generally misused and the numbers misinterpreted. For example, once this patient's blood pressure is better controlled, her score would go down from 5 to 4. For this reason, and others, I don't think it's a good idea to use this score to deny patients anticoagulation for atrial fibrillation. But if it's documented, and a patient then does go on to bleed, we might be held liable.

Just a couple of points for you to think about. Keep up the good work!

Thanks,

Colum F. Amory, MD, MPH
Associate Professor of Neurology
Vice Chair of the Department of Neurology
Director, Division of Vascular Neurology
Program Director, Neurology Residency
Albany Medical Center

[redacted]

# EXHIBIT C

[redacted]

---

[redacted]

[redacted]

**From:** Amory, Colum F <AmoryC@amc.edu>
**Sent:** Tuesday, August 30, 2022 8:05 AM
**To:** Pak, Stella <paks@amc.edu>
**Cc:** Robeson-Gewuerz, Kimberly <robesok@amc.edu>; Unser, Michelle <UnserM@amc.edu>
**Subject:** Feedback from last week

Hello Stella -

Please find formal feedback for last week attached to this email.

Colum F. Amory, MD, MP
Associate Professor of Neurology
Vice Chair of the Department of Neurology
Division Chief, Vascular Neurology
---------------------------------------- CONFIDENTIALITY NOTICE: This email and any attachments may contain confidential information that is protected by law and is for the sole use of the individuals or entities to which it is addressed. If you are not the intended recipient, please notify the sender by replying to this email and destroying all copies of the communication and attachments. Further use, disclosure, copying, distribution of, or reliance upon the contents of this email and attachments is strictly prohibited. To contact Albany Medical Center, or for a copy of our privacy practices, please visit us on the Internet at www.amc.edu.

Feedback for Dr. Pak, based on work on the Stroke Service August 22-26, 2022, as well as other clinical encounters over the previous month

Hello Dr. Pak –

I wanted to write my feedback down and send it to you as a document. Friday was incredibly busy, and I didn't have as much time as I would have liked to give it to you face to face.

First, the positive things I observed.

You are dedicated to your patients, and care deeply about their wellbeing. You demonstrate this daily through intensive review of their data and time spent at bedside and in discussions with the patients and their families. I directly observed you dealing with the family of a patient in severe respiratory distress, and the time you took in your examination and discussion with them.

You have a reasonable amount of medical knowledge, and take a strong interest in furthering that knowledge through research of the literature and reading up on issues that involve your patients. For example, a patient you did a consult on over a weekend had a clinical presentation that you were unfamiliar with. After reading my note, you researched the one-and-a-half syndrome, and then correctly came to the conclusion that the patient in fact had an "eight-and-a-half" syndrome.

You wish to support the medical students in their education. I witnessed you on several occasions giving specific data to medical students who were about to present in order to help them present more effectively.

With patients who are essentially straightforward in their presentation, management, and hospital course, I felt I could rely on you to guide them through their hospital stay.

I will now move on to areas I see that need improvement, and I will organize these by the general competencies of medical education. Before I begin, I wish to recognize that you are in a challenging situation. You have been on remediation for a while, and everyone is aware of this fact. You feel that you are under particular scrutiny, and that all of your actions are opportunities to make your future insecure. In particular, the events that led up to your time away from the program have created difficulties in your relationships with your peers. I believe that these circumstances have impacted your performance, but I also believe that there are issues with your performance that predate all of these events, and which are problematic even when your specific circumstances are taken into account.

MEDICAL KNOWLEDGE

While you have a reasonable amount of medical knowledge, you have a strong tendency to get caught up on little details of the patient's care, without recognizing the larger picture. An

example is the question of bromocriptine use in a patient freshly out of the ICU. You seized onto withdrawal from this medication as an explanation for his tachypnea and diaphoresis, even though in actual fact the medication had been appropriately tapered and discontinued. In actual fact, on further investigation, you found that the patient was dehydrated. I do not raise this to make you feel bad about the decision to restart the bromocriptine, but rather to point out that it took quite some time for you to let go of that initial thought and more thoroughly investigate the situation to come up with a more appropriate and effective solution.

I also have seen you approach each patient as a problem to which there must be a single answer, one which it seems that you feel that only you have been able to find. This is rarely the case, because patients on an inpatient service are often a mix of multiple issues which require a universal and organic approach, and attempts at solving one issue often cause others to worsen. In addition, your approach has the effect of separating yourself from the team. In order for your solution to be the right one, it feels like you are implying that other providers have made mistakes. On multiple occasions this week, you made statements to me that implied that nurses or residents had made incorrect decisions or incorrect documentation. For example, the nurse overnight who over-suctioned. While this may be true, you were not present overnight, and therefore cannot judge whether the nurse was incorrect in their management.

PATIENT CARE

I am very concerned by your performance on patient care this week. You made multiple decisions on your own without notifying the team, your senior resident, or your supervising attending. For example, you restarted bromocriptine on that patient. You switched from oral to IV antibiotics on a patient with UTI because of a minor fever. While I encourage independence on my service, and look for residents to make decisions on care, it must be done within a team-based environment. There were other occasions besides the ones listed above where I agreed with your decisions, but not always.

During this week, we received emails on a daily basis from nurses who were concerned about the orders you placed. One instance was related to placing an order for an oral diet on a patient who had not been cleared by the bedside nurse or by speech and language pathology. I recognize that there may have been miscommunication. However, signout as listed stated NPO until cleared. It would have been better to discuss with bedside nursing during prerounding prior to placing the order.

Another example has to do with an order placed to only suction with MD at bedside. This order is in extremely poor judgement. While I appreciate that you were hoping to cut down on unnecessary interventions, the upshot would be that when a resident was not available to be at bedside (which would be the entirety of the night from 4:30PM until 6-7AM), the nurse would be not allowed to perform a basic and potentially life-saving and simple intervention.

By report, nurses turned routinely to the senior resident in order to get orders placed because they felt unable to get a timely or useful response from you. On at least two occasions, this

resulted in a back and forth of orders placed by you and by the senior resident. This sort of lack of clarity leads to poorer patient care.

INTERPERSONAL COMMUNICATION SKILLS

This remains an area of great concern. I will start by reiterating what I said above. I recognize that your specific circumstances have led to difficulties in relationships with your peers as well as strong concerns on your part that any misstep will lead to negative outcomes for you. Even in the face of this, your behavior this week was highly problematic. On multiple occasions there were issues with communication with your senior resident, your fellow junior resident, and with nurses. In addition, there were issues with communication with me, your attending physician.

Lack of clarity with regards to time of signout, level of signout, expectations during coverage, and return from signout led to confusion within the team, as well as accusations being leveled both at you and by you. This sort of situation is not conducive to good patient care. Lest you think that we are singling you out, I will state expressly that I think communication could be improved in the other direction as well, and I spoke directly with your co-residents about this issue this past week.

I am particularly concerned by a tendency I saw this week to not communicate issues that you had discovered because you were worried that I might retaliate in some way against other individuals. One example is the nurse who may have been over-suctioning. You did not want to get this nurse in trouble, even though the day nurse and the nurse supervisor, per your accounting, already knew about this. Instead, I didn't know about it, and it could have affected my decision making.

Another example with the same patient is your desire not to contradict what a medical student was saying during his presentation on rounds, stating you did not want to interfere in his education, or "steal his thunder." However, you didn't bring it up at all, and we went down a diagnostic and therapeutic pathway which may have been unnecessary. You even went so far as to place the orders for what I had requested without telling me why they may have been unnecessary. This makes it very hard for me to trust what you are saying.

It seems to me that you have in your mind that you either have to withhold information so as not to get into trouble, or you have to get someone else into trouble by revealing information. I disagree with this dichotomy. I believe it is possible in the team environment to educate on issues so that everybody learns, and nobody is in trouble. But that takes openness on everyone's part, as well as kindness, and this applies to you as well.

SYSTEMS BASED PRACTICE

Your ability to work in a team is very negatively affected by everything described above. Most of the time, you appear to be working entirely on your own, without reference to the team's

activities. This is true during pre-rounds, rounds, afternoons, and during time away from service. The care of an inpatient, especially on the stroke service, takes input from multiple providers from multiple teams. I did not see effective coordination of care except in the most straightforward of stroke cases.

PRACTICE-BASED LEARNING AND IMPROVEMENT

Too often I hear you say that you will not do something in the future, only to do something very similar shortly thereafter. An example is the situation where you gave Ativan to the patient because you had status on your differential, but then did not discuss that decision with me, or document it in your note. Subsequently, you chose to restart bromocriptine without notifying me. This is only one example.

You do not take constructive criticism well. Your first response is generally defensive, with attempts to justify your actions, rather than listening with an open mind to your senior residents or your attending physicians, who have much more experience than you do.

PROFESSIONALISM

All of the above has created an atmosphere where your actions come across as unprofessional. I am particularly concerned by the way you toss accusations around. For example, you wrote an email stating that your senior resident stated that nothing had happened during the hour that she was covering your pager for you, but that multiple things occurred that required a lot of work on your part. This implied that she had not done her job. However, when directly questioned, you acknowledged that nothing critical or emergent had changed with your patients. She reported to me directly that she did not receive a page from the nurses while she was covering your pager.

It appears that you wrote this email because you didn’t want me to get angry at you for issues that may have arisen when you were not managing your patients directly. Instead, it feels more like an attempt to make me understand that other residents in this program are not performing at a level you feel they ought to be. I think regardless of your intent, you should be focusing on your own performance rather than the performance of others.

Finally, I would like to address your concern that you are being scrutinized, with the implication that the level of my attention to your performance is somehow inappropriate or out of line with how other residents are being scrutinized.

First, you are on a remediation plan. Any resident who is on a remediation pan by definition has more attention paid to them than a resident who is not on a remediation plan. With that attention, however, come a great deal of extra support that is likewise not being provided to other residents. This is how any program helps a resident to improve to the point of being able to advance. Without the attention and the support, the program will not be able to tell if the resident is ready to move up.

Second, you do not know how much attention is being paid to other residents in the program, nor is it your business to know that. I will say no more on the subject.

As always, as an attending physician and educator, it is my primary goal to support the learners working with me, both by recognizing their strengths, and identifying weaknesses and how those play out in the clinical environment. It is my hope that the detailed feedback in this letter will help you grow into the physician you wish to be.

# EXHIBIT D

**From:** Adam, Octavian <adamo1@amc.edu>
**Sent:** Friday, September 23, 2022 11:14 AM
**To:** Pak, Stella <paks@amc.edu>
**Subject:** RE: Night Admission

Hi Stella,

As per your request below, here is my feedback: you have admitted several patients to the general neuro inpatient service this past week 9/19-9/23 while I was on service. I have had no major concerns. The admissions and the documentation were appropriate.

Octavian Adam, MD
Associate Professor of Neurology
Department of Neurology
Albany Medical Center
47 New Scotland Ave
Albany, New York 12208
Phone: (518) 262-6611
Fax: (518) 262-6612

# EXHIBIT E

1/21/22

Stella Pak, MD

Albany Medical Center

Re: Notice of Remediation

Dear Dr. Pak:

As discussed with you, Dr. Amory and Dr. Robeson on January 21, 2022 this letter and attached remediation plan will serve to further explain the terms of your remediation status. Your remediation will be effective 1/21/22 and will last until 4/21/22.

As we discussed, your performance in several Neurology clinical competencies remains below what is expected for a physician at your level of training, based on your performance and evaluations to date. You are being placed on remediation for the ACGME core competencies: Patient Care domains 3 and 4, Medical Knowledge domain 2, Systems-Based Practice domain 3, Practice-Based Learning and Improvement domain 2, Professionalism domains 1 and 3 and Interpersonal and Communication Skills domains 1 and 3.

In order to be removed from remediation status, you will need to show significant improvement in the core competency listed above commensurate to your PGY-2 level, and it is your responsibility to satisfactorily complete all steps in the attached remediation plan. On 4/21/22 we will reassess your performance and notify you whether your remediation status has been lifted. If you fail to successfully meet the conditions of your remediation and the attached remediation plan, further consequences will ensue, which may include further remediation, probation, elongation of training or dismissal from the program.

Your remediation plan includes the following:

- Patient Care, Medical Knowledge
  - When on night float and/or call we will have you see at least 1 consult with the senior resident. We would also like you to run cases by the senior before calling the attending
- System-Based Practice
  - Please email Jason Clum, NP to find a time to meet and discuss tips for talking to nursing
  - Please watch the following You-tube videos about calling a consult:

- Rush Profession Guidelines: Calling a Consult: https://www.youtube.com/watch?v=RXz6X5-q2Ys
- Strong Medicine: How to call a consult: https://www.youtube.com/watch?v=oEQq4myrXvE

- Professionalism, Interpersonal Communication Skills
  - Please be mindful of your communications with peers and supervisors. We ask that you refrain from texting about complaints. Verbal communication is always preferred. For non-urgent matters we encourage you to do the following:
    - Draft an email to Dr. Robeson but do not send it
    - Think about the issue overnight
    - Revise email as appropriate and forward to Dr. Robeson to discuss issues
  - We will obtain an administrative evaluation to assess any barriers to your completing expected duties. Please respond to request for this evaluation in a timely manner

The terms of the contract are at the discretion of the Program Director(s) and may be changed at any time.

Dr. Pak, we want to help you complete the requirements of the program and of the ACGME so that you can develop into a well-rounded Neurologist. We are happy to discuss any resources and/or accommodations we can provide to help you do so. We want nothing more than your success, so we encourage you to diligently work with us to help you succeed in the program. Please let us know how we can help and support you.

Your signature on this letter acknowledges receipt of this notice and the accompanying remediation plan.

Sincerely,

1/21/22

Colum Amory, MD, MPH
Director, Neurology Residency Program

Date

1/21/22

Kimberly Robeson, MD
Associate Program Director, Neurology Residency Program

Date

Stella Pak, MD

1/21/2022

Date

# EXHIBIT F

Abigail J. Herron, DO

2006 Madison Avenue, 4th Floor
New York, New York 10035

Tel: 347-201-0541
Fax: 855-685-5320

**Independent Medical Examination**

Client Name: Stella Pak
Address: [redacted]

Date of Birth: [redacted]

Date of Evaluation: 2/18/2022, 3/17/2022

Date of Report: 4/1/2022

The independent medical examination process was explained to Dr. Pak, and she understands that no patient/treating physician relationship was established. She was advised that the information provided will not be confidential and that a report will be sent to CPH.

In preparation of this report, I have:

- Evaluated Dr. Stella Pak via video conference on 2/18/2022, phone call on 3/17/2022 and email correspondence on 3/29/2022
- Spoken with Dr. Jeffrey Winseman, treating psychiatrist, on 2/22/2022
- Spoken with Dr. Colum Amory, residency training director, on 3/4/2022 and via email on 3/22/2022

Reliability and Consistency:
I found Dr. Pak to be a reliable and consistent historian.

**Identification**

Dr. Pak is a 32 year old Korean-American woman who is employed as a PGY2 neurology resident at Albany Medical Center. She lives with a roommate in a home in Albany.

**Committee for Physician Health Referral and Alleged Misconduct**

Dr. Pak was referred to CPH at the recommendation of the GME office and her residency program at Albany Medical Center due to concerns about her interpersonal skills and communication.

According to Dr. Amory, there have been concerns from both supervisors, peers, and other staff such as nurses about Dr. Pak's communication and interpersonal relationships. He reports that at times, both attending physicians and peers have described Dr. Pak as tangential and overly inclusive when attempting to communicate about patients. He also reports that she can be excessive in the level of detail she includes in her documentation.

Dr. Amory also describes that Dr. Pak can become emotionally dysregulated, and she has said that she felt singled out or mistreated by her peers. He feels she showed poor insight into the negative consequences of "gossiping" about her peers to others in the program. Additionally, he reported that she "hammer texted" (sent numerous messages in a short period of time) fellow residents with excessive emotion, but minimized it when asked to discuss it.

Notably, Dr. Pak related a story regarding an incident in which she became angry at her senior resident which she feels was the precipitating event to the referral. When I spoke with Dr. Amory, however, he was unaware of the incident and said that this incident did not prompt the referral. Because I feel it is a relevant example of her interactions with colleagues and peers, I am including the description here.

Dr. Pak reported that a few weeks prior to the CPH referral, she and the team were treating a patient who had made a suicide attempt. She explained to her senior resident that she identified with the patient because she was a young woman with Asperger's, which Dr. Pak also has. The senior resident made a comment that the patient was seeking attention, and this was very upsetting to Dr. Pak, who then continued to tell the resident how it was wrong of her to say this. By her own description, she became very upset and Dr. Pak believed that the senior resident reported her to her program director for unprofessional behavior. She reports that she regrets this incident.

Dr. Amory states that there have been no complaints from patients, and there were no direct concerns raised about the quality of care she has provided.

The program, in consultation with the GME office, sought an evaluation from Dr. Winseman, director of student/resident mental health at AMC. Because Dr. Winseman was already involved in Dr. Pak's care as her treating psychiatrist, however, he was

therefore unable to perform an independent evaluation. As a result, she was referred to CPH for evaluation.

**Evaluation of History and Treatment of Illness**

Dr. Pak has no current or past substance use disorder. She denies use of alcohol, tobacco and any illicit substances.

**Psychiatric History**

Dr. Pak reports that she has Asperger's syndrome (also described in the DSM-5 as Autism Spectrum Disorder). She also has anxiety and ADHD.

Dr. Pak has been in treatment with Dr. Winseman since the fall of 2022. They have focused on social skills training, interpersonal interactions, and anger management. Prior to seeing Dr. Winseman, Dr. Pak had been receiving medication for ADHD from her PCP.

She is currently taking Effexor 225 mg daily, Propranolol 10mg TID for social anxiety, Ambien 5mg PRN sleep (approx. 3x per week), Unysom for sleep daily, and Adderall 15mg Daily for ADHD.

Dr. Pak denies any history of self-harm, suicidal ideation, or violence towards others. She has no history of psychiatric emergency visits or psychiatric hospitalization. There is no evidence of psychosis, hypomania or mania.

**Collateral Contacts (treatment providers)**

Dr. Winseman reports that Dr. Pak is engaged in treatment, attends appointments regularly, and has made improvements in her social interactions. He does not have concerns about her ability to practice medicine or participate in the residency program.

**Medical History**

Dr. Pak has no significant medical history. She is not taking any medication for her physical health.

**Family of Origin History**

Dr. Pak was born and raised in South Korea and immigrated to the US at age 18. She reports that her father also has autism. Her brother has struggled academically and socially, and never graduated from high school. She also has an older sister who is unemployed. She reports a very difficult relationship with her mother who was often absent from the family. There was repeated infidelity in her parents' marriage, which was very volatile. Her sister lives in California, her brother lives in Florida, and her parents are in Waterville. Despite the conflict in the marriage, they have never divorced or formally separated.

**Current Family Composition and Social Functioning**

Dr. Pak is not in a romantic relationship at this time. She reports that church and her relationship to God are very important to her. Church is her major source of social connection. She has struggled to make lasting friendships with her colleagues, although reports that she has been going out to dinner with some peers regularly, and feels that her efforts are paying off.

She recognizes that her diagnosis results in difficulty with social interaction, and has been working on social skills training with Dr. Winseman. She reported that she thinks in advance about things she can chat with the nurses about so that their relationship is easier. She also discussed counting to four in her head after someone speaks to make sure that she does not interrupt the other person. Dr. Pak reports that things have improved over the past month, and that she has been having more positive interactions lately. This was confirmed by Dr. Amory.

**Medical Practice History & Functioning**

Dr. Pak graduated from the University of Toledo School of Medicine. Throughout her medical education and training she periodically experienced interpersonal difficulty with nurses and other medical staff. Dr. Pak feels that her volume of speech and Korean accent contribute to her difficulties with communication.

This current program is Dr. Pak's fourth residency program. She worked for part of a PGY1 year at Kettering Medical Center in Ohio (2017-2018) in internal medicine, and was advised to leave the program and repeat her PGY1 year. She then went on to Orange Regional Medical Center in New York where she completed a PGY1 year (2018-2019). She reports that she resigned due to "personal hardship," in the form of "sexual harassment by two male colleagues." She then went to Palm Springs California

and the Desert Regional Medical Center in Family Medicine, but left that program because of her desire to sub-specialize, which she felt was limited by being in a family medicine program. She reports that she then sought her current program in neurology so that she would have a pathway to working in critical care. Dr. Amory (her current program director) noted that she did not receive negative references from her prior training programs.

## Collateral Contact (employment)

As above, Dr. Amory related difficulties with interpersonal communication. When I contacted him on 3/22 to check back in as to how things had been going recently, he reported that there had been an improvement and Dr. Pak had received positive feedback from an attending.

## Legal History

Dr. Pak is not currently independently licensed and operates under the training license at her residency program. She has no history of criminal or civil issues, and has not faced any disciplinary action. She has no history of malpractice cases.

## Current Mental Status Exam

Dr. Pak appeared appropriately dressed with good grooming and hygiene. She navigated the telehealth platform easily. She was alert, oriented, and cooperative throughout the interview. Her mood was anxious. Her speech was fluent if overly formal at times, with normal volume and tone. Her thought process was logical and goal-directed. There was no evidence of delusions or hallucinations. She denied suicidal ideation. She was oriented to person, place and time. Fund of knowledge was intact and there were no gross memory deficits noted. Insight and judgement were intact.

## Assessment

- DSM 5 Diagnosis
  Autism Spectrum Disorder (Asperger's)
  Generalized Anxiety Disorder
  ADHD by history

Dr. Pak presents with deficits in social communication, a lack of natural social reciprocity, and a lack of spontaneous seeking to share enjoyment with others which is consistent with Asperger's Disorder. She also experiences significant periods of anxiety, controlled by medication and therapy, as well as deficits in attention and concentration, which are also improved with medication. Her ADHD and anxiety do not create significant impairment, and do not impact her ability to perform the functions of her role as a physician trainee. The difficulties she has faced at her current training program are consistent with, and a direct consequence of, her Asperger's disorder. It is notable that she has not had complaints from patients, and there have not been concerns about her direct work performance. Instead, her difficulties have been restricted to communication with members of the staff. It is my opinion that Dr. Pak does not experience a level of impairment from her Asperger's Disorder that is such to prevent her from practicing medicine. She has been committed to treatment, including social skills training, from which she is benefitting. Over the period from our initial evalulation to earlier this week, there has been an improvement in her interactions with colleagues.

It is notable, and certainly not typical, that Dr. Pak has worked in multiple training programs. It is my opinion that the programs' lack of awareness of her diagnosis and its associated symptoms likely contributed to the conflict she experienced there. Additionally, this contributed to her sense of not belonging. Her current program director, Dr. Amory, feels it would be helpful if Dr. Pak disclosed her condition to others so that they were better able to understand the deficits she experiences in social functioning.

There do not appear to be any patient safety concerns, and neither Dr. Amory nor Dr. Winseman express concerns about her ability to practice medicine. I do agree that she may want to consider disclosing aspects of her diagnosis, or the diagnosis itself, to close colleagues to help aid in her interpersonal relationship, although this is of course up to her and not a formal treatment recommendation.

**Recommendations:**

- Dr. Pak should continue in her residency program, while continuing to work on her social skills and interpersonal communication.
- She should remain engaged in psychiatric treatment.
- Dr. Pak should consider disclosing her condition, or her communication challenges, to colleagues.

# EXHIBIT G

April 28, 2022

Dr. Stella Pak –

We are deeply saddened to let you know that we will be recommending to the Designated Institutional Officer (DIO) that your position as a resident in the Neurology Residency Program at Albany Medical Center be terminated. Your final day will be May 7, 2022. We undertake this decision in the light of the following issues.

On January 21, 2022, we put in place a remediation plan to assist you with numerous issues relating primarily to professionalism, interpersonal communication skills, and patient care concerns. While you successfully completed all the tasks outlined in the plan, we feel that serious issues remain unresolved, particularly in relation to professionalism and interpersonal communication skills. We must therefore consider the remediation plan not completed.

Furthermore, your performance in the following core competencies is severely lacking:

1. Interpersonal Communication Skills: multiple individuals including many Neurology faculty members, as well as faculty and house staff officers outside the Department of Neurology have raised concerns about your ability to communicate and listen effectively. In particular, concerns have been raised about your communication with patients and families, with nursing staff, and with peers.
2. Professionalism: concerns have been documented about your timeliness to starts of shifts, unwillingness to impart signout in an appropriate manner, as well as concerns about inability to receive constructive feedback from your superiors. Furthermore, your behavior towards your peers has fostered an atmosphere of distrust and avoidance, both on your part and on the part of your peers, which has created a toxic environment not conducive to collegial support and work.
3. Patient Care: All of the above has had a direct impact on the ability of the Neurology Department to provide top level care to the patients entrusted to us. In addition, specific instances of poor care have been documented by Neurology Department faculty members as well as by members of other departments in the hospital.

As per the Graduate Medical Education office of Albany Medical College policy, you have the right to appeal this decision. A copy of the policy will be provided with the letter from the DIO.

Sincerely,

Colum F. Amory, MD, MPH
Program Director, Neurology Residency
Albany Medical Center

# EXHIBIT H

**From:** Amory, Colum F <AmoryC@amc.edu>

**Sent:** Wednesday, May 25, 2022 2:49 PM

**To:** Pak, Stella <paks@amc.edu>

**Cc:** Robeson-Gewuerz, Kimberly <robesok@amc.edu>; Riddle, Catherine <RiddleC@amc.edu>; Bartfield, Joel <BartfiJ@amc.edu>

**Subject:** Residency status

Hello Dr. Pak -

We are formally rescinding your dismissal from the Neurology residency program at Albany Medical Center, with expected reinstatement on Tuesday, May 31. You are expected to work with the Graduate Medical Education office and Human Resources on your request for specific accommodations for your diagnosis of autism. Pending approval or disapproval of this request, your rotations will be limited to electives without direct patient care responsibilities. Electives you may choose from include outpatient subspecialty rotations such as Movement Disorders, Pain, Neuroimmunology, etc., as well as rotations such as neuropathology, neuroradiology. Which you choose is up to you, but please let us know before the end of the week. You will not have your continuity clinic during this time. We expect this to last through the month of June.

We further expect you to provide us with a list of all needed and expected appointments for your health, whether mental or physical, so that we can effectively provide you with the time and coverage needed. Please provide this information directly to Dr. Robeson on an ongoing basis.

You have been on a remediation, which has not yet been successfully completed. This remediation plan will remain in place, and an updated letter of expectations will be sent to you in the near future.

Finally, reintegration into the regular flow of residency life will likely be challenging for you and for your peers. We suggest that you refrain from returning to the resident room until we have had a chance to discuss the situation with the rest of the residency. This is only a suggestion, but one which I hope you will consider strongly. Furthermore,

I believe that it will assist your reintegration if you are open with your peers about your diagnosis and the challenges it has presented for you during this year. Once again, this is a suggestion, but one I hope you will consider.

Thank you,

Colum F. Amory, MD, MPH

Associate Professor of Neurology

Vice Chair of the Department of Neurology

Director, Division of Vascular Neurology

Program Director, Neurology Residency

Albany Medical Center

---------------------------------------- CONFIDENTIALITY NOTICE: This email and any attachments may contain confidential information that is protected by law and is for the sole use of the individuals or entities to which it is addressed. If you are not the intended recipient, please notify the sender by replying to this email and destroying all copies of the communication and attachments. Further use, disclosure, copying, distribution of, or reliance upon the contents of this email and attachments is strictly prohibited. To contact Albany Medical Center, or for a copy of our privacy practices, please visit us on the Internet at www.amc.edu.

# EXHIBIT I

5/26/22

Stella Pak, MD

Albany Medical Center

Re: Notice of Remediation

Dear Dr. Pak:

As discussed with you, Dr. Amory and Dr. Robeson on April 28, 2022, you have failed to successfully complete the terms of your remediation. This letter and attached remediation plan will serve to further explain the terms of your remediation status. Your remediation will be extended until September 1, 2022.

As we discussed, your performance in several Neurology clinical competencies remains below what is expected for a physician at your level of training, based on your performance and evaluations to date. You are being placed on remediation for the ACGME core competencies: Patient Care domains 3 and 4, Medical Knowledge domain 2, Systems-Based Practice domain 3, Practice-Based Learning and Improvement domain 2, Professionalism domains 1 and 3 and Interpersonal and Communication Skills domains 1 and 3.

In order to be removed from remediation status, you will need to show significant improvement in the core competency listed above commensurate to your PGY-2 level, and it is your responsibility to satisfactorily complete all steps in the attached remediation plan. On 9/2/22 we will reassess your performance and notify you whether your remediation status has been lifted. If you fail to successfully meet the conditions of your remediation and the attached remediation plan, further consequences will ensue, which may include further remediation, probation, elongation of training or dismissal from the program.

Your remediation plan includes the following:

- Patient Care
  - You will receive and give sign-out in a timely and professional manner
  - You will communicate with consulting teams in a timely and professional manner regarding patient care issues
- Medical Knowledge

    - You will continue to read independently to expand your medical knowledge

- Professionalism, Interpersonal Communication Skills
    - Please be mindful of your communications with peers and supervisors. We ask that you refrain from texting about complaints. Verbal communication is always preferred. For non-urgent matters we encourage you to do the following:
        - Draft an email to Dr. Robeson but do not send it
        - Think about the issue overnight
        - Revise email as appropriate and forward to Dr. Robeson to discuss issues
    - You will present to work-on time for all shifts
    - You will give and receive sign-out on all patients in a professional and timely manner
    - Be cognizant and respectful of your co-worker's boundaries
    - Strive to improve work-life balance
    - You will communicate any hardships you encounter that limit your ability to care for patients immediately with the chief residents and/or program leadership
    - You are responsible for prioritizing and attending to all personal appointments that are necessary for your well-being
        - You should email Dr. Robeson with a list of each appointment and a coverage plan for patient care duties
        - Dr. Robeson can assist in finding coverage if needed
        - You will notify program leadership immediately of any resistance you receive for completing this part of your remediation plan

The terms of the contract are at the discretion of the Program Director(s) and may be changed at any time.

Dr. Pak, we want to help you complete the requirements of the program and of the ACGME so that you can develop into a well-rounded Neurologist. We are happy to discuss any resources and/or accommodations we can provide to help you do so. We want nothing more than your success, so we encourage you to diligently work with us to help you succeed in the program. Please let us know how we can help and support you.

Your signature on this letter acknowledges receipt of this notice and the accompanying remediation plan.

Sincerely,

[signature] 5/27/22

Colum Amory, MD, MPH Date

Director, Neurology Residency Program

[signature] 5/27/22

Kimberly Robeson, MD
Associate Program Director, Neurology Residency Program

Date

Stella Pak, MD

Date

# EXHIBIT J

**June 1st meeting with Stella Pak**

**Attendance: Kim Robeson, Colum Amory, Cattie Riddle, Michelle Unser, Stella Pak**

Dr. Amory started the meeting by discussing how we hope to move forward with open minds and a fresh start on both sides. We acknowledge Stella's concerns that she is treated differently than other residents. We need expectations and ground rules on how to move forward. We acknowledge that Stella may wish to have an advocate present for all meetings that will have a significant impact on her training, but we also need to be able to meet with her regularly and have informal meetings. Urgent matters may come up that will require us to meet without coordinating schedules with a third party.

We recognize that re-integration will be a challenge. We ask Stella to be deliberate in her interaction with her peers. We need to investigate and respect what is acceptable communication on both sides. This has been a challenge in the past.

We encouraged Stella to discuss explicit expectations of boundaries when working with other residents and attendings in the program. She should ask how they like to be communicated with, when and about what. She needs to realize that these boundaries may change over time and we encourage her to remain flexible. She should also dictate her needs- i.e. that people be direct with her.

We recognize that there are issues with trust between Stella and the other residents. Regardless of why we have these issues, or whether they are valid, we ask her to think about how to re-establish this trust.

Stella mentions that the direct light in the resident room is over stimulating for her. She asks if it would be possible to get her a separate workspace with a desk lamp. Dr. Amory will look into options. We also questioned whether this would add to her isolation. She does not think it would. Dr. Robeson says it might be worth limiting the time she is in that room and looking for other places (library, call room, floors) to work that will be less stimulating.

Stella mentions that she previously spent extra time in the resident room because she thought it would help her relationship with her peers. We told her we do not think this is the case.

A current chief mentions that Stella asked to have a forum to meet with the residents. We asked Stella if she still wants to do this. She said she does. We think this would work best if mediated. We recognize that there is a lot of anger from the residents and worry it would not go well for Stella to face this alone. We encourage her not to dwell on what has happened, but to discuss how to move forward. We think it is a good idea for her to discuss her diagnosis and what she is doing to work on things.

We all recognize that it won't be smooth sailing right away. It will require hard work on all parts. Stella offers that she will wait for the residents to initiate contact with her. We don't necessarily think this is the right move either. We encourage her to be pro-active rather than reactive. We ask her to meet with residents she will be working with closely in order to discuss how best to work together.

We again state that people with autism may have difficulty reading social cues about when enough is enough. We asked Stella to have open face-to-face communication with her peers. We have received emails from people in the hospital who felt uncomfortable with Stella contacting them. Stella wishes people gave this feedback directly to her. Dr. Amory states that they may have tried.

Stella asks for rules about patient care. We encouraged her to clarify if she is hearing different things from different people. She should come to program leadership if there is discrepancy in expectations of her.

We asked Stella to let us know if she thinks anyone is not giving her a fair shot. Stella says she will try to be more flexible. We asked Stella to be aware of her "go to" responses. It might be hard to adjust these.

We again discussed that Stella feels she is treated differently than other residents. We state that we try to treat all residents fairly, but individually. Different residents face different issues that require different responses from leadership.

We want to provide Stella the support to succeed, but we need to make sure this does not come at the expense of the program or other residents. It is our job to treat the program as a whole. We are happy to discuss any accommodations she thinks will be helpful.

Stella again asks to find out what people have said in the past, so she does not make the same mistakes. We again encourage her to look forward rather than backwards. We ask her to recognize that the residents have also struggled with her time away. Stella reports that everyone has been friendly to her since her return. We think this shows they are also offering a fresh start.

We discussed avoiding retaliation on both sides. We will not hold past indiscretions against her. We have also asked that she not hold things against residents that she feels have tried to sabotage her.

We discussed work-life balance. We encourage Stella to find outlets for her energy outside of work. It is not healthy to spend the majority of your day in the resident room. It is ok to work from home or the library.

We again stated that it is important for Stella to go to all appointments for her medical care and wellbeing. She should email program leadership a list of these appointments so that we can ensure proper coverage. She should ideally give us two weeks' notice, so people are not asked to cover at the last minute. We realize that emergencies happen, and she should let us know if she needs more urgent appointments. We recognize that she does not like handing off responsibility. However, it is her responsibility to do this to make sure she gets to needed appointments.

We discussed her remediation letter. Stella was on remediation prior to her dismissal and had not completed the terms of her remediation. We sent her an updated remediation letter. She is free to get outside input on this and there is no deadline for when she needs to get it back to us. However,

remediation is not a negotiation. She is free to disagree with anything in that letter and can send us documentation of such. However, a remediation plan is at the discretion of program leadership on the things we feel she needs to do successfully complete our program.

Stella reports that accusations in the past have been untrue. She says she is always on time and always give sign out. She feels these complaints were intentional. We told her she can take a picture of herself in the resident room on time to document that she is on time. We will continue to notify her when we here of problematic issues.

We state that we do not take the word of one resident on any issue. Many of these issues have been brought up by several people on several occasions. Stella reports that she is fearful to continue training in our program as she feels people assume the worst of her. We recognize this fear. We again encouraged her not to dwell on the past but on how we can best move forward.

We will aim to be more deliberate with our communication. Dr. Robeson will take notes at all meetings moving forward and then email them to Stella for review.

We discussed that for now Stella will be on rotations without direct patient care responsibilities. She is welcome to participate in patient care. We will continue this plan until we meet with her and HR with her request for accommodations.

Stella again states that she is shocked that the residents feel uncomfortable with her. Stella tells us that SUNY has offered to do group training for residents on autism. We are happy to talk to them about any general autism training. We do not think it would be appropriate for the residents to be lectured about how to work with Stella directly.

# EXHIBIT K

[redacted]

---------- Forwarded message ---------
From: **Robeson-Gewuerz, Kimberly** <robesok@amc.edu>
Date: Wed, Apr 27, 2022 at 6:17 PM
Subject: Resident Room
To: Qayyum, Alaina <qayyuma@amc.edu>, Vela, Alan <velaa@amc.edu>, Roubleau, TrentGerard <roublet@amc.edu>, Dahlben, Brian <dahlbeb@amc.edu>, Francis, Jessica <francij4@amc.edu>, Lewis, Lillian <lewisl3@amc.edu>, Chikwem, Ndubisi <chikwen@amc.edu>, Sureddi, Shakthi <suredds@amc.edu>, Kofman, Maria <kofmanm@amc.edu>, Friedler, Brett <friedlb@amc.edu>, Shetty, Amit <shettya@amc.edu>, Kaur, Rmneek <kaurr4@amc.edu>, Koznesoff, Livana <koznesl@amc.edu>, Stella Pak <stellaclairepak@gmail.com>, Pevzner, Peter <pevznep@amc.edu>, Henze, Wesley <henzew@amc.edu>, Quinlan, Miriam <quinlam1@amc.edu>, Puli, Pawan <pulip@amc.edu>, Mathew, Angelina <mathewa5@amc.edu>
CC: Amory, Colum F <AmoryC@amc.edu>

Hi Everyone-

As we discussed at today's meeting, it has come to our attention that items have been going missing from the resident room. We are very disappointed to hear this and take it very seriously. We are required to provide a safe place for our residents to work and leave their things without fear of theft. We will continue to monitor this situation. If this persists we may need to take further action, such as security cameras, to assure the safety of your space. We are hoping it does not come to that.

Please let us know if you have any questions.

Kim Robeson

---------------------------------------- CONFIDENTIALITY NOTICE: This email and any attachments may contain confidential information that is protected by law and is for the sole use of the individuals or entities to which it is addressed. If you

are not the intended recipient, please notify the sender by replying to this email and destroying all copies of the communication and attachments. Further use, disclosure, copying, distribution of, or reliance upon the contents of this email and attachments is strictly prohibited. To contact Albany Medical Center, or for a copy of our privacy practices, please visit us on the Internet at www.amc.edu.

# EXHIBIT L

**From:** Stella Pak
[redacted]

[redacted]

**From:** Stella Pak <Stellacpak@outlook.com>
**Sent:** Monday, July 11, 2022 7:47:36 PM
**To:** Cosgrove, Ellen <cosgroe@amc.edu>
**Subject:** Experience

Good Afternoon, Dr. Cosgrove-

My name is Stella Pak. I am a second year neurology resident at Albany Medical College. I would

greatly appreciate if I could be given an opportunity to discuss the challenges I experienced here with you.

Very Respectfully,
Stella-

**From:** Robeson-Gewuerz, Kimberly <robesok@amc.edu>
**Sent:** Monday, July 18, 2022 9:54 AM
**To:** Pak, Stella <paks@amc.edu>
**Cc:** Amory, Colum F <AmoryC@amc.edu>; Unser, Michelle <UnserM@amc.edu>
**Subject:** Advancement

Hi Stella-

Please find the attached letter about your advancement to PGY-3. I think you would benefit from more training experience prior to advancement to PGY-3. I have attached the process for appeal if you would like to appeal this decision. Let me know if you have any questions.

Kim Robeson

*For non-renewal and non-promotion, resident must be informed in writing at least four months prior to the end of the current House Staff Appointment Agreement. If the primary reason(s) for non-renewal or non-promotion occur(s) in the four months prior to the end of the current agreement, the resident must be given as much advance written notice as possible prior to the end of the current agreement.
From Page 3 in House-Staff Manual Attached (Page 3 also shows what remediation was supposed to be like; For example, it says remediation should have Expected Performance (**in specific and measurable** terms)

The hearing will occur within 20 business days of the date of the Resident's request, unless both parties agree to a longer time frame. (Page 14 of House-staff manual attached)

# EXHIBIT M

ALBANY MED
DEPARTMENT OF HUMAN RESOURCES

43 New Scotland Avenue, MC-56, Albany, New York 12208-3478

**To:** Dr. Stella Pak, Neurology Resident
**From:** Katie Vandenburgh
*Sr. HR Business Partner*
**Date:** July 22nd, 2022
**Re:** Request for Reasonable Accommodation
**cc:** Dr. Robeson

---

Dear Dr. Pak:

I am writing in response to your request for disability-related accommodations that you have requested in connection with your medical residency at Albany Medical Center Hospital. Please note that the purpose of providing disability-related accommodations is to assist you in performing the essential functions of your position as a medical resident in the Neurology Department at Albany Medical Center. A response to each requested accommodation is provided below.

In accordance with applicable law, Albany Medical Center has considered several factors in evaluating your request for accommodations, including, but not limited to, whether the requested accommodations are reasonable and effective; whether the requested accommodations would create an undue hardship to Albany Med or create a direct threat to you, your coworkers or Albany Med's patients; and whether granting the requested accommodations would result in the assignment of your essential duties to other residents or attending physicians.

**Request No. 1: Intermittent Time Off for Appointments**

The documentation you have provided states that you are requesting the following time off on an intermittent basis:

- 1 hour per week to attend communication coaching every Wednesday at 5:30 p.m.
    - Albany Med has approved this requested accommodation.

- 1-2 hours per day up to 2 times per week or a maximum of 4 hours per week for mental health appointments and up to 2 times per week for job coaching.
    - Albany Med will conditionally approve you to take up to 4 hours total per week for these appointments. However, to ensure proper patient care, you will be required to provide Program Director, Dr. Kimberly Robeson, with the dates and times of these appointments at least two (2) weeks in advance. Because it is a fundamental responsibility of a physician to see patients in a timely matter, you will be responsible for rescheduling all your out-patients who are impacted by your appointments/meetings. Albany Med expects that these appointments be rescheduled within 1-2 weeks of their original appointment dates, which may require you to arrange time to see patients outside of your normally scheduled clinic hours. You will also need to ensure that an attending physician is available to supervise you.

- 1 hour, 3 times per month to attend other medical appointments.
    - Albany Med will conditionally approve you to take up to 3 hours total per month for these appointments. However, to ensure proper patient care, you will be required to provide

ALBANY MED
DEPARTMENT OF HUMAN RESOURCES

43 New Scotland Avenue, MC-56, Albany, New York 12208-3478

Program Director, Dr. Kimberly Robeson, with the dates and times of these appointments at least two (2) weeks in advance. Because it is a fundamental responsibility of a physician to see patients in a timely matter, you will be responsible for rescheduling all your patients who are impacted by your appointments/meetings. Albany Med expects that these appointments be rescheduled within 1-2 weeks of their original appointment dates, which may require you to arrange time to see patients outside of your normally scheduled clinic hours. You will also need to ensure that an attending physician is available to supervise you.

**<u>Request No. 2: Intermittent Time Off for Extreme Sensory Input</u>**

- You have requested two (2) hours of time off per week when you are put in a situation where there is extreme sensory input.
  - Unfortunately, Albany Med is unable to approve this requested accommodation. To ensure that patients are being properly cared for, we are unable to allow you to essentially walk away from your job responsibilities for two hours during the middle of a shift. This would create a threat to the health and safety of Albany Med's patients and would also require the temporary reassignment of your essential job duties to other residents and attending physicians, which is not reasonable.

- Your Employment Specialist similarly noted that you have experienced sensory overload issues while completing documentation in the residency room and requested on your behalf the use of a room with less stimuli that you could use to complete documentation.
  - Albany Med can accommodate this request and you can utilize the GME lounge- A315, a vacant exam room, vacant call room or the Schaffer Library.

**<u>Request No. 3: Virtual Training Opportunities</u>**

- You have requested that Albany Med provide you with virtual training opportunities for the didactic teaching conferences.
  - Albany Med can approve this request.

**<u>Request No. 4: Assistance of an Employment Specialist</u>**

- You have requested that Kayleah Morris, an Employment Specialist at Warren, Washington and Albany Counties ARC, be permitted to attend monthly performance meetings with you, Dr. Robeson, and Human Resources.
  - Albany Med can approve this request. However, Ms. Morris may be asked to step out of the meeting if discussions occur that may disclose HIPAA protected information.

**<u>Request No. 5: Assigned Faculty Member</u>**

- You have requested the assignment of a Faculty Member who can provide you with guidance, feedback, and support.
  - Albany Med can approve this request and has identified Dr. Marianna Spanaki-Varelas as your assigned faculty mentor.

ALBANY MED
DEPARTMENT OF HUMAN RESOURCES

43 New Scotland Avenue, MC-56, Albany, New York 12208-3478

**Request No. 6: Written Follow-up from Performance Meetings**

- You have requested that Dr. Robeson provide you with written follow-up from your monthly performance meetings.
    - Albany Med can approve this request.

**Effective Date of Accommodation Plan and Renewal**

The accommodations that have been approved will become effective immediately and will remain in place until December 22nd, 2022. If you require a continuation of any accommodation, you may submit updated documentation from your healthcare provider at that time. Please note that Albany Med reserves the right to reevaluate the granting of any approved accommodation if the accommodation appears to be ineffective, unreasonable, creates an undue hardship, or creates a direct threat to the health or safety of you, other employees, or patients.

If you require any new accommodations not addressed in this letter, you may contact me directly to make a request. Albany Med reserves the right to request documentation in support of any additional accommodations.

Please do not hesitate to contact me if you require any further information about your requested accommodations or if you need any further assistance.

Sincerely,

*Katie Vandenburgh*

Katie Vandenburgh
Sr. Human Resources Business Partner
Vandenk2@amc.edu

The guidelines of this accommodation have been explained to me. My signature below acknowledges receipt of this memorandum.

________________________________________ ______________________________
Employee Signature Date

________________________________________ ______________________________
Human Resources Signature Date

# EXHIBIT N

**From:** Robeson-Gewuerz, Kimberly <robesok@amc.edu>
**Sent:** Wednesday, August 3, 2022 8:43 AM
**To:** Pak, Stella <paks@amc.edu>
**Cc:** Vandenburgh, Kathryn <vandenk2@amc.edu>; Kayleah Morris <kayleah.morris@caparcny.org>; Amory, Colum F <AmoryC@amc.edu>; Unser, Michelle <UnserM@amc.edu>
**Subject:** Meeting Follow-up

Hi Stella-

To summarize yesterday's meeting:

Everyone who works with you comments on what a hard worker you are. This is a great skill that can't be taught. Keep it up! I also commend you on the timeliness of your documentation. Congratulations on your article being accepted to the Journal of Neurology Research!

You continue to struggle with presenting a clear and concise history. I think using the templates we have sent out will be helpful. We also discussed using macros rather than the Touchworks defaults for exam documentation.
There remain some medical knowledge gaps in the basics. This month people identified seizure classification and semiology and migraine medications and side effects as two areas to continue to work on.
We discussed being cautious about allowing the patient's complaints to cloud your judgement when performing a physical exam. Try to remain objective and describe what you see- not what the patient tells you they see.
We discussed time management regarding sign out and getting to clinic on time. I think being more direct with communication will help. Telling people what you need from them rather than giving them options gives less room for misunderstanding. You should spend about 1-2 minutes per patient on sign out.
We discussed ways to cut back on multiple phone calls over night or during rounds. Try to be proactive and ask ahead of time what you might do if "xyz" happens (the patient seizes exam, BP remains high, ect).
You remain distracted during rounds and teaching sessions. I recommended only checking your email at the end of the day as emails should not be urgent and may distract you from the task at hand.

Patient evals- these have not been as helpful as we would like as very few people (only 1) have written comments. They are all positive. I encourage you to give them to patients just before you leave to staff a patient so you are not standing over them while they fill them out. You should instruct them to hand them in to the front desk when they check out rather than you collecting them yourself.

Professionalism issues:

Not showing up to your meeting with Michelle- please communicate before a meeting if you will be late or cannot make it
We should try to avoid rescheduling patients who are scheduled to see you in clinic. Suggesting that "someone else can see them" or that they be rescheduled in 24 hours' notice shows a lack of understanding of this principal.
Boundaries/Situational awareness- please ask someone if it is a good time for feedback or to discuss your remediation before doing so; The hallways or the middle of a busy clinic is likely not a good time.
You should limit after hours calls to attendings for things that are not patient care related .

Noon conference- we understand if you do not want to go to noon conference in person, but I think it's a good idea to take some time out of the middle of the day to focus on learning (watching live rather than after hours). All didactic sessions are recorded live as the medical students watch this way. Marcia Lamb may be able to help troubleshoot if you ever have trouble logging in. Chief and PD check-ins are not recorded.

Patient safety committee- I asked Heidi Blackwell for more information about this. Why is this something you would like to do? How do you think it would help you? I'd like you to think critically about whether this is something that should take your time away from focusing on the other issues we have discussed.

We reached out to IT and have gotten you a pager number- 64551. I let the nurses know. They may page you "555" when your first clinic patient is in a room. Unfortunately, this doesn't always happen when they are very busy. You should continue to watch Touchworks as well.

We take all concerns of harassment seriously. Katie Vandenburgh will be reaching out to you today to discuss your concerns regarding Dr. Risley.

Can we meet on September 8th at 11am for our next performance meeting? You are on elective that week.

Let me know if you have any questions.

Kimberly Robeson, MD
Associate Professor of Neurology
Division of Neuromuscular Medicine
Program Director, Neurology Residency
Albany Medical Center
----------------------------------------------------------------------------------------------------------------------------------------

# EXHIBIT O

---

**From:** Robeson-Gewuerz, Kimberly <robesok@amc.edu>
**Sent:** Friday, September 16, 2022 10:04 AM
**To:** Pak, Stella <paks@amc.edu>
**Cc:** Vandenburgh, Kathryn <vandenk2@amc.edu>; Darlene Fittizzi-Tanski <darlene@certifiedrehabservices.com>; Amory, Colum F <AmoryC@amc.edu>
**Subject:** Meeting follow-up

Hi Stella-

Thank-you for meeting with us yesterday. We did not get through as much as I had hoped. I think it might be worth having you take notes and email me your responses after the meeting next month. This will give you the opportunity to formally document your responses and may allow us to get through things more quickly.

I would like to schedule our next meeting for Thursday, October 13th at 2pm. If this works for everyone I will work on a location.

Things we discussed today:

I commented that you are hardworking, dedicated to your patients and very compassionate. I've noted improvements in your presentations and write-ups.

We discussed a few clinical concerns that have come up this month. My biggest concern with these has been your response to issues when they are presented to you. I also commented that failures in communication often lead to the issues.

We discussed Professionalism issues including missing cases with Dr. Amory, missing a morning with Dr. Radmard, being on your phone in clinic and distracted on rounds. You offered excuses for each of these events.

We discussed your response to feedback. It feels dismissive when you respond to lengthy feedback with an excuse for one single issue.

We discussed issues with boundaries. You continue to send many emails every day. I encouraged you to think about an email before you send it and about whether any response to the email would result in actionable change. We also mentioned that you can utilize our monthly performance meetings for concerns as well if they are items that do not need immediate attention.

You mentioned several times throughout the meeting that you felt areas of concern were being brought up only because they were related to your medical accommodation. We reiterated that your Medical Accommodation Request is information that would never be shared with your colleagues or other attendings and the concerns were mentioned in the meeting because they were common concerns brought to our attention on multiple occasions. We also discussed that the feedback that was provided was unsolicited and that we are not asking everyone you work with after every shift to give feedback.

We discussed the goal of coverage and sign out with other residents.

You mentioned several issues with the nursing on D5 and feeling bullied. I have reached out to Brandon Garcia and Lisa Schryver. I will let you know when I hear back from them.

I asked you to consider that people are hearing things from you rather than other people talking about you. For example, you emailed me concerned that people asked you if you were leaving. I explained that this was prompted by a post you made on social media about joining Bassett health.

I asked you to work on your response to feedback and being present on rounds over the next month.

Thanks,

Kim Robeson

Kimberly Robeson, MD
Associate Professor of Neurology
Division of Neuromuscular Medicine
Program Director, Neurology Residency
Albany Medical Center

# EXHIBIT P

July 18th, 2022

Dr. Stella Pak-

This letter is to inform you that we will be postponing your advancement to a PGY-3 residency position until December 15, 2022. At that time, we will reevaluate whether you have met the criteria for advancement. We do not feel that you have had the requisite patient care experience to acquire the skills required of a senior resident and would benefit from further training opportunities. We are hopeful that with further patient facing rotations and your ongoing remediation plan that you will acquire the skills required to advance to the next level of training.

Please contact me with questions.

Sincerely,

Kimberly Robeson, MD

Program Director, Neurology Residency

Albany Medical Center

# EXHIBIT Q

October 28, 2022

To the members of the Residency Dismissal Ad Hoc Committee-

Dr. Stella Pak joined our Neurology residency program in September 2021, after the unexpected exit of one of our PGY-2 residents. She had completed 1 year of preliminary medicine and 1 year of a Family medicine residency at 3 programs prior to joining us. Her initial enthusiasm was refreshing, and we were excited to have her join us. However, clinical and professionalism issues became evident shortly thereafter. She was initially placed on a remediation plan on January 21, 2022 due to ongoing concerns in several competency domains. Our initial plan included increased supervision with senior residents, discussing systems-based practice with an NP in the department and scripting for professionalism issues. Unfortunately, we saw little improvement with these measures.

Stella had an extended leave of absence from our program from late April through July of 2022. She rejoined patient care in mid-July.

We renewed Stella's remediation plan on June 15th, 2022. The new plan included monthly meeting with me to directly review feedback and make concrete goals for the next month.

Stella continued to struggle clinically and had not made much clinical progress by August. She was initially expected to advance to a PGY-3 role on September 15, 2022. The clinical competency committee did not feel that she was able to operate with the level of independence expected of a PGY-3 resident. We decided to extend her PGY-2 year until December to give her more time to improve these deficiencies, given the extended leave earlier in the year. She appealed this decision to the extent allowable by the GME office.

Stella continues to show deficiencies in all of the core competencies expected of Neurology residents. She was abruptly pulled off clinical service in October due to a patient care concern that led to patient harm. We convened an emergency meeting of the Clinical Competency Committee to discuss the investigation of this case, as well as Stella's progress to date. Several members of the committee expressed a desire to stop working with Dr. Pak due to concern for their license. The unanimous decision of the committee was to dismiss Dr. Pak from our program due to lack of clinical improvement despite 9 months of remediation.

Stella's ongoing deficiencies include:

Patient Care:

There are several documented cases of misdiagnosis and miscommunication with patients. We have received unsolicited feedback from patients who were dissatisfied with their interactions with Dr. Pak. We routinely receive communication from nursing staff about concerns regarding Dr. Pak's orders and interactions with patients. These are all documented in her folder.

Medical Knowledge:

Several faculty members have noted that Stella's medical knowledge is below what is expected of a PGY-2 resident. Furthermore, faculty have documented a failure to improve this knowledge despite being directly taught.

Interpersonal and Communication Skills:

There have been daily issues regarding miscommunication with patients, staff and peers. This has led to confusion regarding patient orders and care.

Practice-Based Learning and Improvement:

Dr. Pak does not take constructive criticism well and has not improved despite frequent feedback. She is unable to focus on the big picture but continually offers excuses for specific issues when examples are provided. She is quick to blame her peers and attendings for issues and has not taken any responsibility for her part in these issues.

Professionalism:

Ongoing Professionalism issues are noted including but not limited to bad-mouthing her peers and faculty to others, being late or missing appointments without notification, frequent and inappropriate calls and texts to peers and faculty members and failing to take responsibility for her own learning. Dr. Pak has also expressed a desire to not work with faculty members who have given her negative feedback in the past.

System-Based Practice

Dr. Pak has difficulty working in a team. Examples of past issues have included attempting to perform a nursing procedure on the floor because the nurse refused to (due to hospital policies), changing orders on patients she is not caring for and placing orders stating that a nurse cannot perform duties that are within their scope of practice. These issues and others are documented in her folder.

Please see the attached document which details the patient care concern that led to Stella's abrupt removal from patient care referenced above.

The residency file maintained by GME contains numerous examples of Dr. Pak's deficiencies cited above. I would be happy to further discuss these examples and the reasons for Dr. Pak's termination from the Neurology Residency Program during the hearing. Thank you for your time in reviewing this case.

Sincerely,

Kimberly Robeson, MD

Program Director

AMC Neurology Residency Program

# EXHIBIT R

Albany Medical College

# The Neurosciences Institute
## Department of Neurology

Mail Code 70, 47 New Scotland Avenue, Albany, NY 12208 Tel: (518)262-5226 Fax: (518)262-6261 www.amc.edu/neurosciences

DEPARTMENT OF NEUROLOGY
Panayiotis Varelas, MD, PhD
Professor and Chair, Department of Neurology

October 17, 2022

Dr. Stella Pak-

This letter is to notify you of the decision to terminate you from the Neurology Residency Program at Albany Medical Center Hospital. While your dismissal from the Residency Program is unfortunate, the culmination of the issues outlined below necessitated this decision. By way of background, on January 21, 2022, we put in place a remediation plan to assist you with numerous issues relating to professionalism, interpersonal communication skills and patient care. This plan was extended with further support offered on June 15, 2022. We have had monthly performance meetings since that time with ongoing issues noted in each of these domains. Most recently, your deficiencies in Interpersonal and Communication Skills and Patient Care have contributed to patient harm.

In addition to the most recent incidents, your performance in the following core competencies is severely lacking:

1. Interpersonal Communication Skills: You continue to make patient care decisions without communicating to your peers and nursing staff which has led to an increased workload for your peers, and eventually to patient harm. Multiple individuals including Neurology faculty members, house staff officers within and outside of the Department of Neurology, nursing staff and patients have raised concerns about your ability to communicate and listen effectively.

2. Practice-Based Learning and Improvement: We have discussed concerns with patient care, medical knowledge, and communication regularly over the past several months. You have failed to accept responsibility for these deficiencies or show evidence that you are working to improve these deficiencies. We have repeatedly discussed your response to feedback, but this also has not improved.

3. Professionalism: Concerns have been documented regarding your interactions with patients, peers, nursing staff and faculty physicians. Your behaviors and actions within and outside of our department continue to lead to distrust and avoidance within our department and outside of the department.

Albany Medical College

The Neurosciences Institute
Department of Neurology

Mail Code 70, 47 New Scotland Avenue, Albany, NY 12208 Tel: (518)262-5226 Fax: (518)262 6261 www.amc.edu/neurosciences

DEPARTMENT OF NEUROLOGY
Panayiotis Varelas, MD, PhD
Professor and Chair, Department of Neurology

4. Patient Care: All of the above has had a direct impact on the ability of the Neurology Department to provide top level care to the patients entrusted to us. In addition, specific instances of poor care have been documented by Neurology Department faculty members as well as members of other departments in the hospital.

As per the Graduate Medical Education office of Albany Medical College policy, you have the right to appeal this decision. A copy of the policy is provided with this letter.

Sincerely,

Kimberly Robeson, MD
Program Director, Neurology Residency
Albany Medical College

**ADULT NEUROLOGY (Tel 518-262-5226 Fax: 518-262-6261):** Tarek Abdelhak, MD, Octavian Adam, MD, Colum F. Amory, MD, MPH, Charles Argoff, MD, Marjorie Bunch, MD Dzintra Celmins, MD, Kelly Donnelly, DO, Jennifer Durphy, MD, Bridget Frawley, MD, Allen Gerber, MD, Era Hanspal, MD, Arnulf H. Koeppen, MD, John Lansing, DO, Timothy Lynch, MD, Maryann McKee, MD, Eric Molho, MD, Matthew J Murnane, MD, Laura Risley, MD, Kimberly Robeson, MD, Mariana Spanaki, MD, James Wyant, MD, Earl A. Zimmerman, MD

**PEDIATRIC NEUROLOGY (Tel: 518-262 1700) Fax: 518-262-9985):** John Pugh, MD, PhD

# EXHIBIT S

Albany Medical Center

43 New Scotland Avenue, Mail Code 50, Albany, New York 12208-3478

Joel M. Bartfield, MD, FACEP
Associate Dean
Graduate Medical Education

Phone: (518) 262-7302
Fax: (518) 262-6014
Email: bartfij@mail.amc.edu

October 19, 2022

Stella Pak, MD

Neurology Resident

Dr. Pak,

This letter is to inform you that the neurology residency program leadership has recommended that you be dismissed from the program. I have reviewed your file and have determined that this decision is in order.

You have three options:

> You can accept the dismissal decision without appeal.
>
> You can appeal the decision per the appeal process which will be given to you (deadline five business days from the date of this letter).
>
> You can withdraw from the program by signing a separation agreement (deadline to review and sign is 20 calendar days from the date of this letter). As noted below, a copy of the separation agreement is included with this letter and should be reviewed carefully as it includes additional terms and consideration related to your separation from Albany Med.

Note that the option to withdraw from the program will not be available after the 20 calendar days deadline set forth in the separation agreement.

In addition to a copy of this letter, you will be given a dismissal letter signed by your program director which outlines the reasons why you are being dismissed, a copy of our appeals policy, and a separation agreement.

Joel M. Bartfield, MD

Associate Dean for GME

# EXHIBIT T

ALBANY MEDICAL COLLEGE

47 New Scotland Avenue, Mail Code 34, Albany, New York 12208-3497

P 518.262.6008
F 518.262.6515
www.amc.edu

ALAN S. BOULOS, MD, FACS, FAANS
*Dean, Albany Medical College*

January 19, 2023

Stella Pak, M.D.
17 New Scotland Ave
Apt. 409
Albany, NY 12208

Re: Decision on Appeal

Dear Dr. Pak:

As you know, the most recent appeal of the termination of your employment as a resident physician with Albany Medical College was conducted on December 30th, 2022. After careful review of the nearly hour-long discussion that you presented, as well as the notes you provided and those that were in your file, I find no reason to overturn the decision and the decision to terminate your employment is confirmed.

Respectfully,

Alan S. Boulos
Dean, Albany Medical College
Executive Vice President for System Care Delivery
Albany Med Health System

# EXHIBIT U

Albany Medical Center Internal Medicine and Pediatrics
1019 New Loudon Road
Cohoes, NY 12047
518-262-7500

**Brady J. Bowen, DO, CAQSM**
Assistant Professor of Internal Medicine and Pediatrics
Faculty, Sports Medicine Fellowship

**Yvonne C. Chow MD, FACEP, MSMS, CAQSM**
Faculty, Sports Medicine Fellowship
Associate Program Director, Emergency Medicine Residency
Associate Professor Emergency Medicine

**Hamish A. Kerr MD, MSc, FAAP, FACSM, CAQSM**
Fellowship Director, Sports Medicine
Professor Internal Medicine and Pediatrics
Head Team Physician Siena College
Medical Advisory Board, NYS Athletic Commission
Chair, Medical & Risk Committee USA Rugby
Tournament Team Physician, World Rugby

**Mae Huo, MD**
Assistant Professor, Internal Medicine and Pediatrics
Associate Program Director Internal Medicine and Pediatrics Residency

**Daniel Lavelle, MD PhD**
Instructor, Internal Medicine and Pediatrics

**Deborah Light, MD, CAQSM**
Assistant Professor Internal Medicine and Pediatrics
Team Physician, Siena College
Member, USA Boxing Medical Commission

**Jennifer Lindstrom, MD FACP FAAP**
Division Head, Internal Medicine and Pediatrics
Associate Professor Internal Medicine and Pediatrics
Medical Director, Bariatrics and Nutrition

**Tricia Pelnik-Fecko, MD**
Assistant Professor Internal Medicine and Pediatrics

**Paul Sorum, MD PhD FACP FAAP**
Professor Internal Medicine and Pediatrics

**Ivelisse Verrico, MD FACP FAAP**
Residency Program Director, Internal Medicine and Pediatrics
Associate Professor Internal Medicine and Pediatrics

**Danielle Wales, MD MPH FACP FAAP**
Assistant Professor Internal Medicine and Pediatrics

**Joseph Wayne, MD MPH MACP**
Professor Internal Medicine and Pediatrics

**Kathleen Zabinski-Kramer, MD**
Assistant Professor Internal Medicine and Pediatrics

Stella Pak, MD
17 New Scotland Ave., Apt 409
Albany NY 12208

Dear Dr. Pak,

On November 18, 2022, an Ad Hoc Committee met with you to discuss your appeal of your termination from the Neurology program. The meeting consisted of interviews with Drs. Amory, Robeson, Durphy and you, followed by discussion amongst the committee members. Based on these interviews and review of documentation, the committee voted unanimously to uphold the termination.

You may further appeal this decision to the Vice Dean of Academic Administration as outlined in the attached policy.

Sincerely,

Ivelisse Verrico, MD
Chair, Ad Hoc Committee
Program Director, Medicine/Pediatrics

# EXHIBIT V

From: Pak, Stella <paks@amc.edu>
Sent: Friday, February 4, 2022 1:02:49 AM
To: Antonikowski, Angela <AntoniA@amc.edu>
Subject: Concern for Stigma in Patient Care

Dr. Antonikowski,
As you are aware, I struggle with social challenges associated with Asperger Syndrome. The consequence of failing to catch subtle social cues can be sometimes excruciatingly painful. Having a slightly different way of perceiving and processing information can also put individuals with Asperger Syndrome at a significant disadvantage. I did not disclose the diagnosis of Asperger Syndrome due to the stigma associated with the medical condition in our society.
Yesterday, I was signing out a patient to one of the resident in Neurology Residency Program (Maria Koffman). When I told her the patient has autism, she stated "no, she is just making an excuse to be a jerk." I was very hurt that health care providers could have this hurtful opinion for the patients with such a painful medical condition. Another resident commented "yeah, people grow out of autism before hitting the puberty. There is no autism for adolescents and adults."
There is a lot of overlap between neurology and psychiatry; and a large percent of our neurology clinic patients have autism diagnosis. I did not say anything to confront the residents because I was afraid this may raise a suspicion (last thing I want is to disclose the diagnosis of autism spectrum disorder to the colleagues, as they would think I am making an excuse, or trying to get sympathy from them based on the way they think about autism spectrum disorder).
This was hurtful, so I scheduled a therapy session as you advised. I really wish if the health care providers at Albany Medical Center treat patients with autism spectrum disorder in the same way they treat patients without the medical condition.

From: Antonikowski, Angela <AntoniA@amc.edu>
Sent: Friday, February 4, 2022 7:35 AM
To: Pak, Stella <paks@amc.edu>
Subject: Re: Concern for Stigma in Patient Care

Good Morning Stella - I'm very glad you have started therapy.

Angela Antonikowski, PhD, MA
Associate Dean of Wellness | Chief Health Equity, Diversity & Inclusion Officer
Albany Medical College | Albany Medical Center
47 New Scotland Avenue
Albany, NY 12208
518.262.5548 (p); 518.262.7261 (f)
Co-Director - Neurology Headache & Pain Behavioral Health Program
Department of Neurology
518-262-1700 (p); 518-262-9985 (f)

From: Pak, Stella <paks@amc.edu>
Sent: Friday, February 4, 2022 1:43 PM
To: Antonikowski, Angela <AntoniA@amc.edu>
Subject: Re: Concern for Stigma in Patient Care

Since you are also the Division and Inclusion Officer, I hope you could please improve my learning environment to become more supportive to individuals with developmental disorders. Would it be possible for you to provide an education to the residents in our program, so they could stop disrespecting and harming the well-being of the patients, their loved ones, and the colleagues at this work place?

# EXHIBIT W

# *COMMITTEE FOR PHYSICIAN HEALTH*

*a division of the Medical Society of the State of New York*

99 Washington Avenue, Suite 410, Albany, NY 12210-2856
Main: (518) 436-4723 Fax: (518) 436-7943 In state: (800) 338-1833
www.cphny.org

*Terrance M. Bedient, FACHE*
*Sr. Vice President & Director*
*Terry@cphny.org*


May 24, 2022

Sandra Castilla
Vice President of Human Resources
Albany Medical Center
43 New Scotland Avenue
Albany, NY 12208

RE: Stella Pak, M.D.

Dear Ms. Castilla:

Representing the interests of the medical profession across the state, the Medical Society of the State of New York (MSSNY) strives to promote ambitious standards in clinical practice and medical education. The Committee for Physician Health (CPH) is a division of MSSNY committed to advocating for physicians recovering from psychiatric illnesses. CPH is writing to express our strong advocacy and support for Albany Medical Center physicians who are actively taking part in the CPH monitoring program.

Dr. Pak first contacted CPH on January 28th,2022. She has been fully cooperative with our initial assessment process which includes a comprehensive psychiatric evaluation by an independent medical examiner (IME). Though the issue of accommodation is not within purview of the IME evaluation, it is our hope that Dr. Pak will find any accommodation which she believes might be of help to her.

Physicians with illness do not necessarily present risks to patient safety when compliant with a robust monitoring program such as that offered by CPH. If returned to clinical practice, we recommend a schedule which would enable Dr. Pak to participant in clinically appropriate treatment for herself. CPH is committed to support Dr. Pak through the stages of training required for Dr. Pak to achieve best potential as a professional. Dr. Pak signed a 2-year Conditions for Participation with CPH on 5/5/2022. Her monitoring protocol consist of ongoing treatment with a Psychiatrist and an Individual Therapist. She will also have a Practice monitor when she is working.

CPH is committed to supply an added layer of support for Dr. Pak's treatment needs throughout her residency training. Dr. Pak reports that upon completion of training, she wishes to provide medical care for a growing population such as Albany County. With continuing training, treatment and monitoring, Dr. Pak has the potential to become a valuable asset to the medical community.

For further information about Dr. Pak's participating and compliance with CPH monitoring requirements, please contact me directly (susan@cphny.org, 518) 694-0003). We look forward to working with AMC in providing support and monitoring for Dr. Pak's ongoing participation with the CPH monitoring program.

Sincerely,

Susan Hill, MA, LMHC, CASAC
Assistant Director
Committee for Physician Health
The Medical Society of the State of New York
Phone: 518) 694-0003
E-mail: susan@cphny.org

# EXHIBIT X

*Due to the overwhelming volume of verification requests we receive, we are able to provide you with this summary information in response to your inquiry regarding:*

**DR. *STELLA PAK***

Albany Medical Center
Graduate Medical Education Department, MC- 50
Phone (518)262-3593, Fax 262-6014

**1. VERIFICATION**: Our records show that this physician served in the following ACGME-accredited training program(s) at Albany Medical Center:

| | | | | | | Completed YES | Completed NO |
|---|---|---|---|---|---|---|---|
| Internship PGY- | | from | | to | | | |
| Residency PGY-2 | NEUROLOGY | from | 9/15/2021 | to | 1/20/2023 | | X |
| Chief Residency PGY- | | from | | to | | | |
| Fellowship PGY- | | from | | to | | | |

**2. EVALUATION of ACGME COMPETENCIES**: *Based on demonstrated performance and composite of supervisor evaluations, compared to reasonable expectations for the level of training completed, this resident's competence in these skills is rated as:*

| | Superior | Good | Fair | Poor |
|---|---|---|---|---|
| Demonstrates knowledge of established and evolving biomedical, clinical epidemiological and social-behavioral sciences | | X | | |
| Applies this knowledge to patient care | | | | X |
| ***OVERALL MEDICAL KNOWLEDGE*** | | | X | |

| | Superior | Good | Fair | Poor |
|---|---|---|---|---|
| Communicates effectively with patients, families, and the public across a broad range of socioeconomic and cultural backgrounds | | | | X |
| Communicates effectively with physicians, health professionals and health related agencies | | | | X |
| Works effectively as a member or leader of a health care team or other professional group, | | | | X |
| Participates in the education of patients, families, students, residents and other health professionals | | | X | |
| Acts in a consultative role to other physicians and health professionals | | | X | |
| Maintains comprehensive, timely and legible medical records, if applicable | | X | | |
| ***OVERALL INTERPERSONAL AND COMMUNICATION SKILLS*** | | | | X |

| | Superior | Good | Fair | Poor |
|---|---|---|---|---|
| Ability to provide patient care that is compassionate, appropriate and effective for the treatment of health problems | | | | X |
| Ability to provide patient care that is compassionate, appropriate, and effective for the promotion of health | | | X | |
| ***OVERALL PATIENT CARE*** | | | | X |

| | Superior | Good | Fair | Poor |
|---|---|---|---|---|
| Demonstrates compassion, integrity and respect for others | | | | X |
| Shows responsiveness to patient needs that supersedes self-interest | | X | | |
| Respects patient privacy and autonomy | | X | | |
| Demonstrates accountability to patients, society and the profession | | | | X |
| Shows respect and responsiveness to a diverse patient population, including diversity in gender, age, culture, race, religion, disabilities, national origin, socioeconomic status, and sexual orientation | | | X | |
| Recognizes and develops a plan for one's own personal and professional well-being | | | | X |
| Appropriately discloses and addresses conflict or duality of interest | | X | | |
| ***OVERALL PROFESSIONALISM*** | | | | X |

| | Superior | Good | Fair | Poor |
|---|---|---|---|---|
| Works effectively in various health care continuum and beyond as relevant to their clinical specialty | | | X | |
| Coordinates patient care across the health care system relevant to their clinical specialty | | | X | |
| Incorporates considerations of value, cost awareness, delivery and payment, and risk-benefit analysis in patient and/or population-based care as appropriate | | X | | |
| Advocates for quality patient care and optimal patient care systems | | X | | |
| Works in interdisciplinary teams to enhance patient safety and improve patient care quality | | | | X |

COPY

| | Superior | Good | Fair | Poor |
|---|---|---|---|---|
| Participates in identifying system errors and implementing potential systems solutions | | | x | |
| Understands health care finances and its impact on individual patients' health decisions | | x | | |
| ***OVERALL SYSTEMS-BASED PRACTICE*** | | | x | |

| | *Superior* | *Good* | *Fair* | *Poor* |
|---|---|---|---|---|
| Identifies strengths, deficiencies, and limits in one's knowledge and expertise | | | | x |
| Sets learning improvement goals | | | | x |
| Identifies and performs appropriate learning activities | | | x | |
| Systematically analyzes practice using quality improvement methods, and implements changes with the goal of practice improvement | | | | x |
| Incorporates formative evaluation feedback into daily practice | | | | x |
| Locates, appraises, and assimilates evidence from scientific studies related to their patients' health problems | | | x | |
| Uses information technology to optimize learning | | x | | |
| ***OVERALL PRACTICE-BASED LEARNING AND IMPROVEMENT*** | | | | x |

**3. PROFESSIONAL CONDUCT:**

| ***During training in this program, has the physician:*** | YES | NO |
|---|---|---|
| Been the subject of any professional (OPMC, NYS, etc.) misconduct action? | | **x** |
| Been subject to any corrective or disciplinary action? | x | |
| Been subject to suspension, termination, or voluntary/involuntary limitation regarding house staff membership or privileges for non-academic reasons? | | **x** |
| Been a defendant in any professional liability suits? | | **x** |
| Been involved in substance abuse? | | **x** |
| | | |
| Are you aware of any facts relating to professionalism regarding the physician that cause you to hesitate in any way in recommending membership to the medical staff of any institution? | x | |

COPY

**4. ACADEMIC PERFORMANCE:**

| | YES | NO |
|---|---|---|
| Has the physician ever been subject to suspension, termination, or voluntary/involuntary limitation regarding house staff membership for academic reasons? | **x** | |

**5. RECOMMENDATION MADE BY THE CLINICAL COMPETENCY COMMITTEE:**

___ This physician has demonstrated the knowledge, skills and behaviors necessary to enter autonomous practice.
OR
_x__ This physician has not met board eligibility requirements in this specialty, so is ineligible to enter autonomous practice.

**6. COMMENTS, REMARKS, EXPLANATIONS (Please provide an explanation for any extended training, any items marked as "Poor" and any items marked "Yes" above.)**

Dr. Pak had ongoing medical knowledge, communication, and professionalism issues while in our program and failed to improve despite repeated attempts at remediation, which ultimately resulted in her termination from the Program.

| | |
|---|---|
| [signature] | Kimberly Robeson-Gewuerz, M.D. |
| Program Director Signature | NAME (PRINTED/TYPED) |
| 1/31/23 | Program Director |
| DATE | |
| | |
| Resident/Fellow Signature | DATE |
| | |
| Catherine Riddle, Director, Graduate Medical Education | DATE |

# EXHIBIT Y

***COMMITTEE FOR PHYSICIAN HEALTH***
**MEDICAL SOCIETY OF THE STATE OF NEW YORK**
**99 WASHINGTON AVENUE, SUITE 410**
**ALBANY, NEW YORK 12210**
**(518) 436-4723 – 800-338-1833 – Fax: (518) 436-7943**
Downloadable form at www.cphny.org (select "Forms)

**QUARTERLY WORK-SITE MONITOR REPORT**
(Please Print Clearly)

Date: 11/2/2022

Work-site Monitor Name: Colum Amory

CPH Participant Name or Number: STELLA PAK

Practice Site: ALBANY MEDICAL CTR

CPH Assistant Director: ____________

**REPORTING PERIOD: (Please CHECK)**

✓ 1st Quarter (January – March) – **Due March 31**

____ 3rd Quarter (July – September) – **Due September 30**

____ 2nd Quarter (April – June) – **Due June 30**

____ 4th Quarter (October – December) – **Due December 31**

| | (1) Consistently Poor Quality - (5) Consistently High Quality | | | | |
|---|---|---|---|---|---|
| Record keeping | 1 | 2 | 3 | (4) | 5 |
| Available for practice and on-call schedule | 1 | 2 | (3) | 4 | 5 |
| Professional conduct/behavior with patients | 1 | 2 | (3) | 4 | 5 |
| Professional conduct/behavior with colleagues/staff | 1 | 2 | (3) | 4 | 5 |

Would you like CPH to call you about this individual? ____ Yes ✓ No

Any comments about this individual (compliments, investigations, complaints, etc)?

No evidence of mental health issues.

[signature]
**Monitor Signature**

11/2/2022
**Date**

AmoryC@AMC.EDU
**E-Mail Address**

# *COMMITTEE FOR PHYSICIAN HEALTH*

**MEDICAL SOCIETY OF THE STATE OF NEW YORK**
**99 WASHINGTON AVENUE, SUITE 410**
**ALBANY, NEW YORK 12210**
**(518) 436-4723 – 800-338-1833 – Fax: (518) 436-7943**
**Downloadable form at www.cphny.org (select "Forms)**

## QUARTERLY WORK-SITE MONITOR REPORT

(Please Print Clearly)

Date: 11/2/2022

Work-site Monitor Name: Colum Amory

CPH Participant Name or Number: Stella Park

Practice Site: Albany Medical Center

CPH Assistant Director: ____________________

---

**REPORTING PERIOD: (Please CHECK)**

____1st Quarter (January – March) – **Due March 31**

✓ 2nd Quarter (April – June) – **Due June 30**

____3rd Quarter (July – September) – **Due September 30**

____4th Quarter (October – December) – **Due December 31**

---

| | (1) Consistently Poor Quality - (5) Consistently High Quality | | | | |
|---|---|---|---|---|---|
| Record keeping | 1 | 2 | 3 | (4) | 5 |
| Available for practice and on-call schedule | 1 | 2 | (3) | 4 | 5 |
| Professional conduct/behavior with patients | 1 | 2 | (3) | 4 | 5 |
| Professional conduct/behavior with colleagues/staff | 1 | 2 | (3) | 4 | 5 |

---

Would you like CPH to call you about this individual? ____ Yes ✓ No

Any comments about this individual (compliments, investigations, complaints, etc)?

No evidence of mental health issues.

[signature] 11/2/2022 AmoryC@AMC.EDU

**Monitor Signature** **Date** **E-Mail Address**

# *COMMITTEE FOR PHYSICIAN HEALTH*

**MEDICAL SOCIETY OF THE STATE OF NEW YORK**
**99 WASHINGTON AVENUE, SUITE 410**
**ALBANY, NEW YORK 12210**
**(518) 436-4723 – 800-338-1833 – Fax: (518) 436-7943**
**Downloadable form at www.cphny.org** (select "Forms)

## QUARTERLY WORK-SITE MONITOR REPORT

(Please Print Clearly)

Date: 11/2/22

Work-site Monitor Name: Kimberly Robeson-Gewuen CPH Participant Name or Number: Stella Pak

Practice Site: Albany Med Center CPH Assistant Director: ____________

**REPORTING PERIOD: (Please CHECK)**

____1st Quarter (January – March) – **Due March 31**

____2nd Quarter (April – June) – **Due June 30**

✓ 3rd Quarter (July – September) – **Due September 30**

____4th Quarter (October – December) – **Due December 31**

| | (1) Consistently Poor Quality - (5) Consistently High Quality | | | | |
|---|---|---|---|---|---|
| Record keeping | 1 | 2 | 3 | (4) | 5 |
| Available for practice and on-call schedule | 1 | 2 | (3) | 4 | 5 |
| Professional conduct/behavior with patients | 1 | 2 | (3) | 4 | 5 |
| Professional conduct/behavior with colleagues/staff | 1 | 2 | (3) | 4 | 5 |

Would you like CPH to call you about this individual? ____ Yes ✓ No

Any comments about this individual (compliments, investigations, complaints, etc)?

No evidence of mental health issues

[signature] — **Monitor Signature**

11/2/22 — **Date**

Robesok@amc.edu — **E-Mail Address**

# EXHIBIT Z

# HOUSE STAFF APPOINTMENT AGREEMENT

between

ALBANY MEDICAL CENTER HOSPITAL ("AMCH")

and

Stella Pak, MD ("Resident" or "you")

1. Appointment Term: The Resident is appointed to the position of

PGY-2 Resident in Neurology

on the House Staff of Albany Medical Center Hospital* for the term of

09/16/2022 through 12/15/2022

2. Applicable Regulations: This appointment is subject to the bylaws of Albany Medical Center Hospital and of its Medical Staff, as well as any rules, regulations, policies and procedures promulgated under those bylaws and any applicable federal, State, and local accreditation requirements, laws and regulations. In support of a safe, drug free workplace, criminal background checks and drug testing are part of AMCH's hiring process. Copies of all AMCH'S rules, regulations, policies and procedures are available to the Resident.

3. Program: AMCH will provide a training program in accordance with the "Essentials of Accredited Residencies" adopted by the Accreditation Council for Graduate Medical Education and published at www.acgme.org.

4. Resident Responsibilities:

   A. Patient Care Under Supervision: The Resident will provide safe and appropriate patient care as required by the training program, under the general supervision of the Program Director and at a level of achievement consistent with the standards set by the Resident's Department.

   B. Compliance: The Resident will at all times act in conformity with all federal, State and local laws and regulations and AMCH policies and procedures applicable to the practice of medicine, operation of medical facilities and provision of services under this Agreement.

   C. Rotations: While assigned to rotation at affiliated hospitals or practice sites, the Resident will comply with the educational and clinical policies and regulations in effect at each such affiliated hospital or site.

* As used in this Agreement, "Albany Medical Center Hospital," or "AMCH," includes Albany Medical Center Hospital itself (including its Albany Medical Center – South Clinical Campus location), Albany Medical College (including its Faculty Practice), Albany Med Health System (formerly known as Albany Medical Center) and their respective corporate affiliated entities, as the context and circumstances may require or imply.

D. Medical Records: The Resident will complete in a timely fashion the medical records which are his/her responsibility and hereby attests that she/he will make every effort to write legibly; use abbreviations that are clear, unambiguous and approved; co-sign all telephone and other verbal orders as soon as possible, and in all circumstances within 48 hours; date and time all entries and identify him/herself, using his/her identification number, in all entries made in the medical record; and identify supervising attending physicians for all patient care, including consultations.

E. Defense of Claims; Professional Liability Insurance: The Resident agrees to cooperate with the investigation and defense by Albany Med Health System and its insurance program or carrier of any incident, claim or lawsuit which may arise in connection with patient care activities taking place during the term of this appointment or in which the Resident may be involved, whether or not the Resident is a named defendant. In the event that the Resident is served with any summons, subpoena or other legal process, request or demand pertaining to Albany Med Health System, or any of its constituent entities or their respective officers or employees, or in any manner pertaining to the Resident's activities authorized by this Agreement, the Resident will promptly notify the Albany Med Health System Risk Management Department or the Albany Med Health System Legal Department. The Resident will be covered on an occurrence basis under the self-insurance program of Albany Med Health System for claims arising out of duties performed within the scope of the Resident's employment at AMCH. While on rotation at any affiliated hospital or practice site, the Resident will be subject to the coverage noted above or the insurance coverage, policies and programs in effect at such affiliated hospital or practice site according to the institutional affiliation agreement then in place between such hospital or practice site and AMCH. The parties' obligations as set forth in this paragraph will survive the expiration or termination of the Resident's employment at AMCH.

F. Work Hours, including Dual Employment: The Resident's employment will encompass the Resident's entire professional effort and, as such, the Resident's participation in any professional activities outside of AMCH will require approval in advance by his or her Program Director. The Program will not require "moonlighting," and will not permit same in absence of such advance approval. Additionally, the Resident is prohibited from working additional hours as a physician rendering patient care services elsewhere if such dual employment would cause him or her to exceed the maximum number of work hours permitted by any accreditation requirement or regulation. Any failure to comply with this section of the Appointment Agreement will be deemed a material breach of this Agreement, and may cause the Resident to be subject to disciplinary action, up to and including termination. The Resident is required to follow all AMCH Resident policies for compliance with ACGME and New York State "Part 405" Duty Hour Regulations. This includes obtaining prospective, written permission that discloses the number of hours devoted to such activity in advance of any proposed employment outside of AMCH and retrospective monitoring by the Residency Program of the number of hours devoted to this activity.

5. Compensation and Benefits: The Resident's salary will be established at the annualized rate of $, payable bi-weekly. If the Resident accepts an assignment during which the Resident is paid by another institution, or by a grant or a fellowship, the Resident will not be entitled to a salary from AMCH for that period. Benefits and services currently available to the Resident are described below. Such benefits and services as are covered by AMCH's employee benefit plan, as amended from time to time, shall generally be the same as those available to other full-time AMCH employees and shall be at all times subject to the terms and

provisions of that plan. More information on employee benefits will be available for the Resident's information on the Albany Med Health System Intranet>Workforce>Benefits page.

A. Medical, Dental and Vision Insurance: The Resident is eligible for individual or family medical, dental and vision insurance programs offered to AMCH employees under the Albany Med Health System's group plans with coverage commencing on the first day of employment. Any applicable premiums for which the Resident will be responsible will be paid by the Resident by payroll deduction. If the Resident waives participation in Albany Med Health System's medical insurance benefit coverage, the Resident must provide proof of alternative medical insurance coverage and maintain such coverage throughout the term of this Agreement.

B. Short Term Disability: The Resident is eligible for New York State Disability benefits after four weeks of employment. Supplemental short-term disability benefits are also available as of date of hire, and coordinate with New York State Disability benefits to provide a disabled employee with a weekly benefit equal to 50% of basic earnings (maximum benefit of $1,750 per week) payable for up to 26 weeks during a 52 consecutive week period

C. Long Term Disability: Long-term disability insurance is effective after a disability extends beyond six months. The program provides a monthly benefit of 60% of basic monthly earnings up to a maximum of $8,500. Coverage becomes effective after three months of employment.

D. Life Insurance: The Resident is eligible for life insurance coverage equal to two times the Resident's base annual salary rounded to the next higher $1,000. Coverage will become effective after 90 days of employment.

E. Retirement Plan: The Resident is permitted to participate in the Retirement Plan and 403 (b) Plan offered by AMCH to its employees, subject to applicable eligibility requirements.

F. Other Benefits:

(1) The Employee Assistance Program (EAP) provides a confidential counseling resource to employees who may be experiencing personal problems. The EAP will help to identify and explore alternative solutions to problems that may be emotional, financial, legal, marital or drug related, including identifying medical or psychological support services

(2) Uniforms and laundry services for the Resident's will be provided by AMCH.

(3) The Resident may park free of charge in a Center parking lot or garage in an area so designated.

(4) A subsidy for meals will be provided at AMCH based on extended work hours. Private on-call rooms with housecleaning services are also available.

(5) Lockers are provided to the Resident at AMCH.

6. Leave Policy:

A. Vacation Leave: The Resident may receive up to a maximum of three weeks leave time (21 days, including 15 weekdays and 6 weekend days) per academic year, to be scheduled by agreement with the Program Director. Unused leave time may not be carried over to the next academic year, nor will payment be made for unused leave time.

B. Wellness Days: Two wellness days may be used per academic year for illness or injury, or medical, mental health, or dental care appointments or other wellness-related activities. Time off beyond these two days will be deemed Vacation Leave or Sick Leave (at the Resident's option), and will be deducted as such.

C. Sick Leave: Sick Leave, up to a maximum of fifty-six hours per academic year (in increments of up to four hours), may be arranged upon oral or written notice to the Program Director, in accordance with AMCH Residency Program policy and applicable law. A printed summary of New York Paid Sick Leave requirements will be available for review in the Graduate Medical Education office.

D. Professional Leave: House staff presenting at a conference or attending a conference required by their program are to be permitted time for these activities and should not have this time deducted from Vacation Leave. If a Resident chooses to attend a conference where they are not presenting or mandated to attend, whether or not this is deducted from Vacation Leave will be determined at the discretion of the Program Director and based on program/educational needs and ACGME/ABMS requirements. House staff may be allotted up to five days in total for professional interviews during their training program. This time away must not interfere with specialty board requirements and is at the discretion of the Program Director.

E. Family and Medical Leave of Absence: The Resident shall be eligible for and have access to leave time pursuant to the federal Family and Medical Leave of Act (FMLA) to the same extent and in the same manner as are all other AMCH employees. (See AMC House Staff Handbook for details.) Time spent on FMLA is unpaid unless the Resident is eligible for disability payment and/or chooses to apply unused Vacation Leave.

F. Holidays: AMCH holidays do not apply to House Staff. Due to the nature of the Residency training program and responsibilities for patient care, House Staff are scheduled for duty without regard to AMCH Observed Holidays.

G. In General: All leaves must be reviewed by the Resident's Program Director to determine the effect of the leave on satisfying the criteria for completion of the residency program and on eventual board eligibility. Access to information related to specialty board requirements and eligibility can be found in the House Staff Handbook.

7. Policies:

A. Credit: Credit for completion of the program year, and certification of completion of a terminal program year, will be contingent upon satisfactory performance and in accordance with the requirements of the Resident's Department, Division or Program, as well as with applicable ACGME Program, Common Program and Institutional Requirements.

B. Term: The term of this Agreement and the Resident's appointment will not exceed one year; provided, however, that if the Resident is designated as "PGY-1" in Section 1 hereof, the term of this Agreement and the Resident's appointment will be as specified in the said Section 1 in order to accommodate the Resident's initial orientation activities. Appointment for a subsequent program year ("renewal") will be at the discretion of AMCH and the Program, and will be contingent upon satisfactory completion by the Resident of all applicable requirements, including without limitation execution of a new House Staff Appointment Agreement.

C. Renewal and Promotion: Decisions regarding promotion and/or renewal will generally be communicated in writing at least four months prior to the expiration of this Agreement. If the primary reason for any non-renewal or non-promotion occurs within the four months prior to expiration of this Agreement, the Resident will be given as much advance, written notice as is reasonably possible, under the circumstances, prior to such expiration. Each resident hired on or after July 1, 2011 must adhere to the requirements for taking and passing USMLE III as outlined in the House Staff Handbook. (See AMC House Staff Handbook for more details).

D. Discipline – Suspension and Termination: The Resident may be subject to disciplinary action, up to and including suspension and/or termination by AMCH, in accordance with its Disciplinary and Dismissal policies, or for breach of the terms of this Agreement by the Resident, or for other reasonable cause.

E. Grievances and Appeals: If a Resident believes that s/he is being treated in a manner that is inconsistent with the treatment of other Residents, or if the Resident wishes to challenge an appealable adverse decision made by his/her Program Director, the Resident may elect to appeal the matter to the Graduate Medical Education Council (GMEC). All such appeals shall be subject to the limitations and other provisions set forth in Albany Medical Center's Resident Policy on Grievances and Appeals. (See AMCH House Staff Handbook.)

F. Invention and Patent Rights. As a condition of employment, the Resident assigns to Albany Medical College full title to all inventions and discoveries and all patent rights created or disclosed by him or her during such employment, unless such assignment is waived in writing by the College in accordance with the provisions contained in its institutional patent policy, and the Resident agrees to promptly disclose the existence of all such inventions and rights and to execute such assignments and other documents as the College may require and to otherwise cooperate in the College's efforts to prosecute or protect its interest therein.

G. Substance Abuse: It is the policy of AMCH that the unlawful manufacture, distribution, sale, dispensation, possession or use of any drug or alcoholic beverage is prohibited in the workplace and the classroom. Residents must not report for duty while impaired in any manner by any substance or while under the influence of any illegal drug or any alcoholic beverage or other intoxicant. Any Resident who fails to abide by this policy will be subject to corrective action up to and including termination in accordance with Human Resources Policies. Such corrective action may be subject to mandatory reporting to the State and/or federal authorities. (See AMCH Policy on Alcohol and Drugs and Resident Impairment: An Addendum)

H. Sexual, Gender and Other Forms of Harassment: Any Resident who believes she or he is being harassed by an employee of AMCH or any of its affiliated entities, or anyone on Albany Med Health System premises, should report such harassment to his/her immediate supervisor or to the Human Resources Department. Any employee who is found by AMCH to have harassed an employee, student or applicant will be subject to corrective action, up to and including discharge. AMCH's prohibition of sexual harassment is set forth in the House Staff Handbook's Policy on Discrimination and Harassment in the Workplace.

I. Accommodation for Disabilities: AMCH will provide reasonable accommodations to otherwise qualified Residents with known disabilities to the full extent required by applicable State and federal law.

8. Non-Exclusion: As an additional condition of your appointment and employment, you warrant and covenant that you are and will remain qualified to participate fully as a Resident in the provision of services supported by any and all federal and state sponsored or funded health care and research programs; that neither you nor any entity in which you have or had a controlling or shareholder interest has ever been sanctioned or excluded by such a program; and that neither you nor such an entity has ever withdrawn voluntarily or involuntarily from such a program in settlement of government allegations or in order to avoid such sanctions or exclusion, or any civil or criminal proceeding relating to such programs. You further warrant that you are not now and never have been included on the FDA or any other federal or state debarment list or similar exclusion mechanism, and that your privileges or eligibility to engage in human subject research or other research have never been voluntarily or involuntarily suspended, limited or curtailed, whether by government, a research sponsor, or a research institution. You shall notify AMCH immediately upon learning of a past or pending investigation, suspension, limitation or exclusion from participation in any federal or state sponsored or funded health care or research program, whether directed at yourself, AMCH or any entity in connection with your professional or other activities. You shall also inform AMCH immediately in the event your staff or other privileges at any other medical facility are terminated, limited, curtailed or suspended, or are relinquished by you; failure to do so within seven (7) days of notice to you of such change in privileges shall effect an automatic termination of your appointment and employment effective the date such privileges are limited, curtailed, suspended or terminated. Your appointment and employment shall terminate immediately upon your exclusion or suspension from, or a finding that you are otherwise ineligible to participate in, a federal or state sponsored or funded health care program. You agree to indemnify and hold harmless AMCH and its affiliated entities, and their respective officers and employees for any and all claims asserted, costs, damages, losses, and/or penalties assessed with respect to misrepresentations made or failure to disclose material information to AMCH regarding your authority to participate in federal and state sponsored or funded health care or research programs. This indemnification provision shall survive the termination or expiration of your appointment and/or employment at AMCH.

9. General Terms:

A. Governing Law: This Agreement shall be governed by and construed in accordance with the laws of the State of New York, and any action or other legal proceeding brought pursuant to or in connection with this Agreement by either party hereto shall be venued and maintained, except upon mutual written consent of such parties, within the County of Albany and State of New York.

B. Third Parties: Unless and except as specifically provided herein, only the parties hereto shall have the right to enforce or benefit from the provisions of this Agreement, and no term or condition of this Agreement shall be deemed or construed to confer any direct or indirect right or benefit on any person or entity not a party to this Agreement.

C. Entire Agreement: This document shall constitute the entire Agreement between you and AMC, merges with and supersedes any previous or contemporaneous understandings, written or verbal representations, terms or conditions by either party regarding the subject matter hereof and shall not be modified, amended, revised, transferred, conveyed or assigned by either party except upon mutual written agreement signed by both parties' respective authorized agents.

| RESIDENT | ALBANY MEDICAL CENTER HOSPITAL |
|---|---|
| Stella Pak, M.D. | By: Alan Boulos, M.D.<br>Interim Dean<br>Albany Medical College |
| 9/15/2022<br>DATE | DATE |

# EXHIBIT AA

ACGME

Accreditation Council for
Graduate Medical Education

# ACGME
# Common Program Requirements (Residency)

ACGME-approved focused revision: June 13, 2021; effective July 1, 2022
Editorial Revision: Background and Intent below II.C.2., VI.C., and VI.C.1.e) updated March 2022

## Common Program Requirements (Residency) Contents


Introduction ..... 3
Int.A. Preamble ..... 3
Int.B. Definition of Specialty ..... 3
Int.C. Length of Educational Program ..... 3
I. Oversight ..... 4
I.A. Sponsoring Institution ..... 4
I.B. Participating Sites ..... 4
I.C. Recruitment ..... 5
I.D. Resources ..... 5
I.E. Other Learners and Other Care Providers ..... 7
II. Personnel ..... 7
II.A. Program Director ..... 7
II.B. Faculty ..... 12
II.C. Program Coordinator ..... 15
II.D. Other Program Personnel ..... 16
III. Resident Appointments ..... 16
III.A. Eligibility Requirements ..... 16
III.B. Number of Residents ..... 18
III.C. Resident Transfers ..... 18
IV. Educational Program ..... 18
IV.A. Curriculum Components ..... 19
IV.B. ACGME Competencies ..... 20
IV.C. Curriculum Organization and Resident Experiences ..... 25
IV.D. Scholarship ..... 25
V. Evaluation ..... 27
V.A. Resident Evaluation ..... 27
V.B. Faculty Evaluation ..... 31
V.C. Program Evaluation and Improvement ..... 32
VI. The Learning and Working Environment ..... 35
VI.A. Patient Safety, Quality Improvement, Supervision, and Accountability ..... 36
VI.B. Professionalism ..... 42
VI.C. Well-Being ..... 44
VI.D. Fatigue Mitigation ..... 47
VI.E. Clinical Responsibilities, Teamwork, and Transitions of Care ..... 48
VI.F. Clinical Experience and Education ..... 49



©2022 Accreditation Council for Graduate Medical Education (ACGME)

**Common Program Requirements (Residency)**

**Where applicable, text in italics describes the underlying philosophy of the requirements in that section. These philosophic statements are not program requirements and are therefore not citable.**

**Note: Review Committees may further specify only where indicated by "The Review Committee may/must further specify."**

**Introduction**

**Int.A.** ***Graduate medical education is the crucial step of professional development between medical school and autonomous clinical practice. It is in this vital phase of the continuum of medical education that residents learn to provide optimal patient care under the supervision of faculty members who not only instruct, but serve as role models of excellence, compassion, professionalism, and scholarship.***

***Graduate medical education transforms medical students into physician scholars who care for the patient, family, and a diverse community; create and integrate new knowledge into practice; and educate future generations of physicians to serve the public. Practice patterns established during graduate medical education persist many years later.***

***Graduate medical education has as a core tenet the graded authority and responsibility for patient care. The care of patients is undertaken with appropriate faculty supervision and conditional independence, allowing residents to attain the knowledge, skills, attitudes, and empathy required for autonomous practice. Graduate medical education develops physicians who focus on excellence in delivery of safe, equitable, affordable, quality care; and the health of the populations they serve. Graduate medical education values the strength that a diverse group of physicians brings to medical care.***

***Graduate medical education occurs in clinical settings that establish the foundation for practice-based and lifelong learning. The professional development of the physician, begun in medical school, continues through faculty modeling of the effacement of self-interest in a humanistic environment that emphasizes joy in curiosity, problem-solving, academic rigor, and discovery. This transformation is often physically, emotionally, and intellectually demanding and occurs in a variety of clinical learning environments committed to graduate medical education and the well-being of patients, residents, fellows, faculty members, students, and all members of the health care team.***

**Int.B.** **Definition of Specialty**

**[The Review Committee must further specify]**

**Int.C.** **Length of Educational Program**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**[The Review Committee must further specify]**

## I. Oversight

### I.A. Sponsoring Institution

***The Sponsoring Institution is the organization or entity that assumes the ultimate financial and academic responsibility for a program of graduate medical education, consistent with the ACGME Institutional Requirements.***

***When the Sponsoring Institution is not a rotation site for the program, the most commonly utilized site of clinical activity for the program is the primary clinical site.***

| Background and Intent: Participating sites will reflect the health care needs of the community and the educational needs of the residents. A wide variety of organizations may provide a robust educational experience and, thus, Sponsoring Institutions and participating sites may encompass inpatient and outpatient settings including, but not limited to a university, a medical school, a teaching hospital, a nursing home, a school of public health, a health department, a public health agency, an organized health care delivery system, a medical examiner's office, an educational consortium, a teaching health center, a physician group practice, federally qualified health center, or an educational foundation. |
|---|

**I.A.1.** **The program must be sponsored by one ACGME-accredited Sponsoring Institution.** (Core)*

### I.B. Participating Sites

***A participating site is an organization providing educational experiences or educational assignments/rotations for residents.***

**I.B.1.** **The program, with approval of its Sponsoring Institution, must designate a primary clinical site.** (Core)

**[The Review Committee may specify which other specialties/programs must be present at the primary clinical site]**

**I.B.2.** **There must be a program letter of agreement (PLA) between the program and each participating site that governs the relationship between the program and the participating site providing a required assignment.** (Core)

**I.B.2.a)** **The PLA must:**

**I.B.2.a).(1)** **be renewed at least every 10 years; and,** (Core)

**I.B.2.a).(2)** **be approved by the designated institutional official (DIO).** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**I.B.3.** **The program must monitor the clinical learning and working environment at all participating sites.** (Core)

**I.B.3.a)** **At each participating site there must be one faculty member, designated by the program director as the site director, who is accountable for resident education at that site, in collaboration with the program director.** (Core)

| |
|---|
| Background and Intent: While all residency programs must be sponsored by a single ACGME-accredited Sponsoring Institution, many programs will utilize other clinical settings to provide required or elective training experiences. At times it is appropriate to utilize community sites that are not owned by or affiliated with the Sponsoring Institution. Some of these sites may be remote for geographic, transportation, or communication issues. When utilizing such sites the program must ensure the quality of the educational experience. The requirements under I.B.3. are intended to ensure that this will be the case.<br><br>Suggested elements to be considered in PLAs will be found in the ACGME Program Director's Guide to the Common Program Requirements. These include:<br>• Identifying the faculty members who will assume educational and supervisory responsibility for residents<br>• Specifying the responsibilities for teaching, supervision, and formal evaluation of residents<br>• Specifying the duration and content of the educational experience<br>• Stating the policies and procedures that will govern resident education during the assignment |

**I.B.4.** **The program director must submit any additions or deletions of participating sites routinely providing an educational experience, required for all residents, of one month full time equivalent (FTE) or more through the ACGME's Accreditation Data System (ADS).** (Core)

**[The Review Committee may further specify]**

**I.C.** **The program, in partnership with its Sponsoring Institution, must engage in practices that focus on mission-driven, ongoing, systematic recruitment and retention of a diverse and inclusive workforce of residents, fellows (if present), faculty members, senior administrative staff members, and other relevant members of its academic community.** (Core)

| |
|---|
| Background and Intent: It is expected that the Sponsoring Institution has, and programs implement, policies and procedures related to recruitment and retention of minorities underrepresented in medicine and medical leadership in accordance with the Sponsoring Institution's mission and aims. The program's annual evaluation must include an assessment of the program's efforts to recruit and retain a diverse workforce, as noted in V.C.1.c).(5).(c). |

**I.D.** **Resources**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**I.D.1.** **The program, in partnership with its Sponsoring Institution, must ensure the availability of adequate resources for resident education.** (Core)

**[The Review Committee must further specify]**

**I.D.2.** **The program, in partnership with its Sponsoring Institution, must ensure healthy and safe learning and working environments that promote resident well-being and provide for:** (Core)

**I.D.2.a)** **access to food while on duty;** (Core)

**I.D.2.b)** **safe, quiet, clean, and private sleep/rest facilities available and accessible for residents with proximity appropriate for safe patient care;** (Core)

| Background and Intent: Care of patients within a hospital or health system occurs continually through the day and night. Such care requires that residents function at their peak abilities, which requires the work environment to provide them with the ability to meet their basic needs within proximity of their clinical responsibilities. Access to food and rest are examples of these basic needs, which must be met while residents are working. Residents should have access to refrigeration where food may be stored. Food should be available when residents are required to be in the hospital overnight. Rest facilities are necessary, even when overnight call is not required, to accommodate the fatigued resident. |
| --- |

**I.D.2.c)** **clean and private facilities for lactation that have refrigeration capabilities, with proximity appropriate for safe patient care;** (Core)

| Background and Intent: Sites must provide private and clean locations where residents may lactate and store the milk within a refrigerator. These locations should be in close proximity to clinical responsibilities. It would be helpful to have additional support within these locations that may assist the resident with the continued care of patients, such as a computer and a phone. While space is important, the time required for lactation is also critical for the well-being of the resident and the resident's family, as outlined in VI.C.1.d).(1). |
| --- |

**I.D.2.d)** **security and safety measures appropriate to the participating site; and,** (Core)

**I.D.2.e)** **accommodations for residents with disabilities consistent with the Sponsoring Institution's policy.** (Core)

**I.D.3.** **Residents must have ready access to specialty-specific and other appropriate reference material in print or electronic format. This must include access to electronic medical literature databases with full text capabilities.** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**I.D.4.** **The program's educational and clinical resources must be adequate to support the number of residents appointed to the program.** (Core)

**[The Review Committee may further specify]**

**I.E.** **The presence of other learners and other care providers, including, but not limited to, residents from other programs, subspecialty fellows, and advanced practice providers, must enrich the appointed residents' education.** (Core)

**I.E.1.** **The program must report circumstances when the presence of other learners has interfered with the residents' education to the DIO and Graduate Medical Education Committee (GMEC).** (Core)

| |
|---|
| Background and Intent: The clinical learning environment has become increasingly complex and often includes care providers, students, and post-graduate residents and fellows from multiple disciplines. The presence of these practitioners and their learners enriches the learning environment. Programs have a responsibility to monitor the learning environment to ensure that residents' education is not compromised by the presence of other providers and learners. |

**II. Personnel**

**II.A. Program Director**

**II.A.1.** **There must be one faculty member appointed as program director with authority and accountability for the overall program, including compliance with all applicable program requirements.** (Core)

**II.A.1.a)** **The Sponsoring Institution's GMEC must approve a change in program director.** (Core)

**II.A.1.b)** **Final approval of the program director resides with the Review Committee.** (Core)

| |
|---|
| Background and Intent: While the ACGME recognizes the value of input from numerous individuals in the management of a residency, a single individual must be designated as program director and have overall responsibility for the program. The program director's nomination is reviewed and approved by the GMEC. Final approval of the program director resides with the applicable ACGME Review Committee. |

**II.A.1.c)** **The program must demonstrate retention of the program director for a length of time adequate to maintain continuity of leadership and program stability.** (Core)

**[The Review Committee may further specify]**

| |
|---|
| Background and Intent: The success of residency programs is generally enhanced by continuity in the program director position. The professional activities required of a program director are unique and complex and take time to master. All programs are |


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**encouraged to undertake succession planning to facilitate program stability when there is necessary turnover in the program director position.**

**II.A.2.** **The program director and, as applicable, the program's leadership team, must be provided with support adequate for administration of the program based upon its size and configuration.** (Core)

**[The Review Committee must further specify minimum dedicated time for program administration, and will determine whether program leadership refers to the program director or both the program director and associate/assistant program director(s).]**

Background and Intent: To achieve successful graduate medical education, individuals serving as education and administrative leaders of residency programs, as well as those significantly engaged in the education, supervision, evaluation, and mentoring of residents, must have sufficient dedicated professional time to perform the vital activities required to sustain an accredited program.

The ultimate outcome of graduate medical education is excellence in resident education and patient care.

The program director and, as applicable, the program leadership team, devote a portion of their professional effort to the oversight and management of the residency program, as defined in II.A.4.-II.A.4.a).(16). Both provision of support for the time required for the leadership effort and flexibility regarding how this support is provided are important. Programs, in partnership with their Sponsoring Institutions, may provide support for this time in a variety of ways. Examples of support may include, but are not limited to, salary support, supplemental compensation, educational value units, or relief of time from other professional duties.

Program directors and, as applicable, members of the program leadership team, who are new to the role may need to devote additional time to program oversight and management initially as they learn and become proficient in administering the program. It is suggested that during this initial period the support described above be increased as needed.

**II.A.3.** **Qualifications of the program director:**

**II.A.3.a)** **must include specialty expertise and at least three years of documented educational and/or administrative experience, or qualifications acceptable to the Review Committee;** (Core)

Background and Intent: Leading a program requires knowledge and skills that are established during residency and subsequently further developed. The time period from completion of residency until assuming the role of program director allows the individual to cultivate leadership abilities while becoming professionally established. The three-year period is intended for the individual's professional maturation.

The broad allowance for educational and/or administrative experience recognizes that strong leaders arise through diverse pathways. These areas of expertise are important


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**when identifying and appointing a program director. The choice of a program director should be informed by the mission of the program and the needs of the community.**

**In certain circumstances, the program and Sponsoring Institution may propose and the Review Committee may accept a candidate for program director who fulfills these goals but does not meet the three-year minimum.**

**II.A.3.b)** **must include current certification in the specialty for which they are the program director by the American Board of _____ or by the American Osteopathic Board of _____, or specialty qualifications that are acceptable to the Review Committee;** (Core)

**[The Review Committee may further specify acceptable specialty qualifications or that only ABMS and AOA certification will be considered acceptable]**

**II.A.3.c)** **must include current medical licensure and appropriate medical staff appointment; and,** (Core)

**II.A.3.d)** **must include ongoing clinical activity.** (Core)

**Background and Intent: A program director is a role model for faculty members and residents. The program director must participate in clinical activity consistent with the specialty. This activity will allow the program director to role model the Core Competencies for the faculty members and residents.**

**[The Review Committee may further specify additional program director qualifications]**

**II.A.4.** **Program Director Responsibilities**

**The program director must have responsibility, authority, and accountability for: administration and operations; teaching and scholarly activity; resident recruitment and selection, evaluation, and promotion of residents, and disciplinary action; supervision of residents; and resident education in the context of patient care.** (Core)

**II.A.4.a)** **The program director must:**

**II.A.4.a).(1)** **be a role model of professionalism;** (Core)

**Background and Intent: The program director, as the leader of the program, must serve as a role model to residents in addition to fulfilling the technical aspects of the role. As residents are expected to demonstrate compassion, integrity, and respect for others, they must be able to look to the program director as an exemplar. It is of utmost importance, therefore, that the program director model outstanding professionalism, high quality patient care, educational excellence, and a scholarly approach to work. The program director creates an environment where respectful**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**discussion is welcome, with the goal of continued improvement of the educational experience.**

**II.A.4.a).(2)** **design and conduct the program in a fashion consistent with the needs of the community, the mission(s) of the Sponsoring Institution, and the mission(s) of the program;** (Core)

**Background and Intent: The mission of institutions participating in graduate medical education is to improve the health of the public. Each community has health needs that vary based upon location and demographics. Programs must understand the social determinants of health of the populations they serve and incorporate them in the design and implementation of the program curriculum, with the ultimate goal of addressing these needs and health disparities.**

**II.A.4.a).(3)** **administer and maintain a learning environment conducive to educating the residents in each of the ACGME Competency domains;** (Core)

**Background and Intent: The program director may establish a leadership team to assist in the accomplishment of program goals. Residency programs can be highly complex. In a complex organization, the leader typically has the ability to delegate authority to others, yet remains accountable. The leadership team may include physician and non-physician personnel with varying levels of education, training, and experience.**

**II.A.4.a).(4)** **develop and oversee a process to evaluate candidates prior to approval as program faculty members for participation in the residency program education and at least annually thereafter, as outlined in V.B.;** (Core)

**II.A.4.a).(5)** **have the authority to approve program faculty members for participation in the residency program education at all sites;** (Core)

**II.A.4.a).(6)** **have the authority to remove program faculty members from participation in the residency program education at all sites;** (Core)

**II.A.4.a).(7)** **have the authority to remove residents from supervising interactions and/or learning environments that do not meet the standards of the program;** (Core)

**Background and Intent: The program director has the responsibility to ensure that all who educate residents effectively role model the Core Competencies. Working with a resident is a privilege that is earned through effective teaching and professional role modeling. This privilege may be removed by the program director when the standards of the clinical learning environment are not met.**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

| |
|---|
| **There may be faculty in a department who are not part of the educational program, and the program director controls who is teaching the residents.** |

**II.A.4.a).(8)** **submit accurate and complete information required and requested by the DIO, GMEC, and ACGME;** (Core)

**II.A.4.a).(9)** **provide applicants who are offered an interview with information related to the applicant's eligibility for the relevant specialty board examination(s);** (Core)

**II.A.4.a).(10)** **provide a learning and working environment in which residents have the opportunity to raise concerns and provide feedback in a confidential manner as appropriate, without fear of intimidation or retaliation;** (Core)

**II.A.4.a).(11)** **ensure the program's compliance with the Sponsoring Institution's policies and procedures related to grievances and due process;** (Core)

**II.A.4.a).(12)** **ensure the program's compliance with the Sponsoring Institution's policies and procedures for due process when action is taken to suspend or dismiss, not to promote, or not to renew the appointment of a resident;** (Core)

| |
|---|
| **Background and Intent: A program does not operate independently of its Sponsoring Institution. It is expected that the program director will be aware of the Sponsoring Institution's policies and procedures, and will ensure they are followed by the program's leadership, faculty members, support personnel, and residents.** |

**II.A.4.a).(13)** **ensure the program's compliance with the Sponsoring Institution's policies and procedures on employment and non-discrimination;** (Core)

**II.A.4.a).(13).(a)** **Residents must not be required to sign a non-competition guarantee or restrictive covenant.** (Core)

**II.A.4.a).(14)** **document verification of program completion for all graduating residents within 30 days;** (Core)

**II.A.4.a).(15)** **provide verification of an individual resident's completion upon the resident's request, within 30 days; and,** (Core)

| |
|---|
| **Background and Intent: Primary verification of graduate medical education is important to credentialing of physicians for further training and practice. Such verification must be accurate and timely. Sponsoring Institution and program policies for record retention are important to facilitate timely documentation of residents who** |


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**have previously completed the program. Residents who leave the program prior to completion also require timely documentation of their summative evaluation.**

**II.A.4.a).(16)** **obtain review and approval of the Sponsoring Institution's DIO before submitting information or requests to the ACGME, as required in the Institutional Requirements and outlined in the ACGME Program Director's Guide to the Common Program Requirements.** (Core)

**II.B.** **Faculty**

***Faculty members are a foundational element of graduate medical education – faculty members teach residents how to care for patients. Faculty members provide an important bridge allowing residents to grow and become practice-ready, ensuring that patients receive the highest quality of care. They are role models for future generations of physicians by demonstrating compassion, commitment to excellence in teaching and patient care, professionalism, and a dedication to lifelong learning. Faculty members experience the pride and joy of fostering the growth and development of future colleagues. The care they provide is enhanced by the opportunity to teach. By employing a scholarly approach to patient care, faculty members, through the graduate medical education system, improve the health of the individual and the population.***

***Faculty members ensure that patients receive the level of care expected from a specialist in the field. They recognize and respond to the needs of the patients, residents, community, and institution. Faculty members provide appropriate levels of supervision to promote patient safety. Faculty members create an effective learning environment by acting in a professional manner and attending to the well-being of the residents and themselves.***

**Background and Intent: "Faculty" refers to the entire teaching force responsible for educating residents. The term "faculty," including "core faculty," does not imply or require an academic appointment.**

**II.B.1.** **At each participating site, there must be a sufficient number of faculty members with competence to instruct and supervise all residents at that location.** (Core)

**[The Review Committee may further specify]**

**II.B.2.** **Faculty members must:**

**II.B.2.a)** **be role models of professionalism;** (Core)

**II.B.2.b)** **demonstrate commitment to the delivery of safe, quality, cost-effective, patient-centered care;** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**Background and Intent: Patients have the right to expect quality, cost-effective care with patient safety at its core. The foundation for meeting this expectation is formed during residency and fellowship. Faculty members model these goals and continually strive for improvement in care and cost, embracing a commitment to the patient and the community they serve.**

**II.B.2.c)** **demonstrate a strong interest in the education of residents;** (Core)

**II.B.2.d)** **devote sufficient time to the educational program to fulfill their supervisory and teaching responsibilities;** (Core)

**II.B.2.e)** **administer and maintain an educational environment conducive to educating residents;** (Core)

**II.B.2.f)** **regularly participate in organized clinical discussions, rounds, journal clubs, and conferences; and,** (Core)

**II.B.2.g)** **pursue faculty development designed to enhance their skills at least annually:** (Core)

**Background and Intent: Faculty development is intended to describe structured programming developed for the purpose of enhancing transference of knowledge, skill, and behavior from the educator to the learner. Faculty development may occur in a variety of configurations (lecture, workshop, etc.) using internal and/or external resources. Programming is typically needs-based (individual or group) and may be specific to the institution or the program. Faculty development programming is to be reported for the residency program faculty in the aggregate.**

**II.B.2.g).(1)** **as educators;** (Core)

**II.B.2.g).(2)** **in quality improvement and patient safety;** (Core)

**II.B.2.g).(3)** **in fostering their own and their residents' well-being; and,** (Core)

**II.B.2.g).(4)** **in patient care based on their practice-based learning and improvement efforts.** (Core)

**Background and Intent: Practice-based learning serves as the foundation for the practice of medicine. Through a systematic analysis of one's practice and review of the literature, one is able to make adjustments that improve patient outcomes and care. Thoughtful consideration to practice-based analysis improves quality of care, as well as patient safety. This allows faculty members to serve as role models for residents in practice-based learning.**

**[The Review Committee may further specify additional faculty responsibilities]**

**II.B.3.** **Faculty Qualifications**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

II.B.3.a) **Faculty members must have appropriate qualifications in their field and hold appropriate institutional appointments.** (Core)

**[The Review Committee may further specify]**

II.B.3.b) **Physician faculty members must:**

II.B.3.b).(1) **have current certification in the specialty by the American Board of _____ or the American Osteopathic Board of _____, or possess qualifications judged acceptable to the Review Committee.** (Core)

**[The Review Committee may further specify additional qualifications]**

II.B.3.c) **Any non-physician faculty members who participate in residency program education must be approved by the program director.** (Core)

**[The Review Committee may further specify]**

| Background and Intent: The provision of optimal and safe patient care requires a team approach. The education of residents by non-physician educators enables the resident to better manage patient care and provides valuable advancement of the residents' knowledge. Furthermore, other individuals contribute to the education of the resident in the basic science of the specialty or in research methodology. If the program director determines that the contribution of a non-physician individual is significant to the education of the residents, the program director may designate the individual as a program faculty member or a program core faculty member. |
|---|

II.B.4. Core Faculty

**Core faculty members must have a significant role in the education and supervision of residents and must devote a significant portion of their entire effort to resident education and/or administration, and must, as a component of their activities, teach, evaluate, and provide formative feedback to residents.** (Core)

| Background and Intent: Core faculty members are critical to the success of resident education. They support the program leadership in developing, implementing, and assessing curriculum, mentoring residents, and assessing residents' progress toward achievement of competence in and the independent practice of the specialty. Core faculty members should be selected for their broad knowledge of and involvement in the program, permitting them to effectively evaluate the program. Core faculty members may also be selected for their specific expertise and unique contribution to the program. Core faculty members are engaged in a broad range of activities, which may vary across programs and specialties. Core faculty members provide clinical teaching and supervision of residents, and also participate in non-clinical activities related to resident education and program administration. Examples of these non- |
|---|


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**clinical activities include, but are not limited to, interviewing and selecting resident applicants, providing didactic instruction, mentoring residents, simulation exercises, completing the annual ACGME Faculty Survey, and participating on the program's Clinical Competency Committee, Program Evaluation Committee, and other GME committees.**

**II.B.4.a)** **Core faculty members must be designated by the program director.** (Core)

**II.B.4.b)** **Core faculty members must complete the annual ACGME Faculty Survey.** (Core)

**[The Review Committee must specify the minimum number of core faculty and/or the core faculty-resident ratio]**

**[The Review Committee may further specify requirements regarding dedicated time for core faculty members]**

**[The Review Committee may specify requirements specific to associate program director(s)]**

**II.C.** **Program Coordinator**

**II.C.1.** **There must be a program coordinator.** (Core)

**II.C.2.** **The program coordinator must be provided with dedicated time and support adequate for administration of the program based upon its size and configuration.** (Core)

**[The Review Committee must further specify minimum dedicated time for the program coordinator.]**

**Background and Intent: The requirement does not address the source of funding required to provide the specified salary support.**

**Each program requires a lead administrative person, frequently referred to as a program coordinator, administrator, or as otherwise titled by the institution. This person will frequently manage the day-to-day operations of the program and serve as an important liaison and facilitator between the learners, faculty and other staff members, and the ACGME. Individuals serving in this role are recognized as program coordinators by the ACGME.**

**The program coordinator is a key member of the leadership team and is critical to the success of the program. As such, the program coordinator must possess skills in leadership and personnel management appropriate to the complexity of the program. Program coordinators are expected to develop in-depth knowledge of the ACGME and Program Requirements, including policies and procedures. Program coordinators assist the program director in meeting accreditation requirements, educational programming, and support of residents.**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

> **Programs, in partnership with their Sponsoring Institutions, should encourage the professional development of their program coordinators and avail them of opportunities for both professional and personal growth. Programs with fewer residents may not require a full-time coordinator; one coordinator may support more than one program.**
>
> **The minimum required dedicated time and support specified in II.C.2.a) is inclusive of activities directly related to administration of the accredited program. It is understood that coordinators often have additional responsibilities, beyond those directly related to program administration, including, but not limited to, departmental administrative responsibilities, medical school clerkships, planning lectures that are not solely intended for the accredited program, and mandatory reporting for entities other than the ACGME. Assignment of these other responsibilities will necessitate consideration of allocation of additional support so as not to preclude the coordinator from devoting the time specified above solely to administrative activities that support the accredited program.**
>
> **In addition, it is important to remember that the dedicated time and support requirement for ACGME activities is a minimum, recognizing that, depending on the unique needs of the program, additional support may be warranted.**

**II.D.** **Other Program Personnel**

**The program, in partnership with its Sponsoring Institution, must jointly ensure the availability of necessary personnel for the effective administration of the program.** (Core)

**[The Review Committee may further specify]**

> **Background and Intent: Multiple personnel may be required to effectively administer a program. These may include staff members with clerical skills, project managers, education experts, and staff members to maintain electronic communication for the program. These personnel may support more than one program in more than one discipline.**

**III.** **Resident Appointments**

**III.A.** **Eligibility Requirements**

**III.A.1.** **An applicant must meet one of the following qualifications to be eligible for appointment to an ACGME-accredited program:** (Core)

**III.A.1.a)** **graduation from a medical school in the United States or Canada, accredited by the Liaison Committee on Medical Education (LCME) or graduation from a college of osteopathic medicine in the United States, accredited by the American Osteopathic Association Commission on Osteopathic College Accreditation (AOACOCA); or,** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**III.A.1.b)** **graduation from a medical school outside of the United States or Canada, and meeting one of the following additional qualifications:** (Core)

**III.A.1.b).(1)** **holding a currently valid certificate from the Educational Commission for Foreign Medical Graduates (ECFMG) prior to appointment; or,** (Core)

**III.A.1.b).(2)** **holding a full and unrestricted license to practice medicine in the United States licensing jurisdiction in which the ACGME-accredited program is located.** (Core)

**III.A.2.** **All prerequisite post-graduate clinical education required for initial entry or transfer into ACGME-accredited residency programs must be completed in ACGME-accredited residency programs, AOA-approved residency programs, Royal College of Physicians and Surgeons of Canada (RCPSC)-accredited or College of Family Physicians of Canada (CFPC)-accredited residency programs located in Canada, or in residency programs with ACGME International (ACGME-I) Advanced Specialty Accreditation.** (Core)

**III.A.2.a)** **Residency programs must receive verification of each resident's level of competency in the required clinical field using ACGME, CanMEDS, or ACGME-I Milestones evaluations from the prior training program upon matriculation.** (Core)

**[The Review Committee may further specify prerequisite postgraduate clinical education]**

| |
|---|
| **Background and Intent: Programs with ACGME-I Foundational Accreditation or from institutions with ACGME-I accreditation do not qualify unless the program has also achieved ACGME-I Advanced Specialty Accreditation. To ensure entrants into ACGME-accredited programs from ACGME-I programs have attained the prerequisite milestones for this training, they must be from programs that have ACGME-I Advanced Specialty Accreditation.** |

**III.A.3.** **A physician who has completed a residency program that was not accredited by ACGME, AOA, RCPSC, CFPC, or ACGME-I (with Advanced Specialty Accreditation) may enter an ACGME-accredited residency program in the same specialty at the PGY-1 level and, at the discretion of the program director of the ACGME-accredited program and with approval by the GMEC, may be advanced to the PGY-2 level based on ACGME Milestones evaluations at the ACGME-accredited program. This provision applies only to entry into residency in those specialties for which an initial clinical year is not required for entry.** (Core)

**III.A.4.** **Resident Eligibility Exception**

**The Review Committee for ______ will allow the following exception to the resident eligibility requirements:** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**[Note: A Review Committee may permit the eligibility exception if the specialty requires completion of a prerequisite residency program prior to admission. If the specialty-specific Program Requirements define multiple program formats, the Review Committee may permit the exception only for the format(s) that require completion of a prerequisite residency program prior to admission. If this language is not applicable, this section will not appear in the specialty-specific requirements.]**

**III.A.4.a)** **An ACGME-accredited residency program may accept an exceptionally qualified international graduate applicant who does not satisfy the eligibility requirements listed in III.A.1.-III.A.3., but who does meet all of the following additional qualifications and conditions:** (Core)

**III.A.4.a).(1)** **evaluation by the program director and residency selection committee of the applicant's suitability to enter the program, based on prior training and review of the summative evaluations of this training; and,** (Core)

**III.A.4.a).(2)** **review and approval of the applicant's exceptional qualifications by the GMEC; and,** (Core)

**III.A.4.a).(3)** **verification of Educational Commission for Foreign Medical Graduates (ECFMG) certification.** (Core)

**III.A.4.b)** **Applicants accepted through this exception must have an evaluation of their performance by the Clinical Competency Committee within 12 weeks of matriculation.** (Core)

**III.B.** **The program director must not appoint more residents than approved by the Review Committee.** (Core)

**III.B.1.** **All complement increases must be approved by the Review Committee.** (Core)

**[The Review Committee may further specify minimum complement numbers]**

**III.C.** **Resident Transfers**

**The program must obtain verification of previous educational experiences and a summative competency-based performance evaluation prior to acceptance of a transferring resident, and Milestones evaluations upon matriculation.** (Core)

**[The Review Committee may further specify]**

## IV. Educational Program


©2022 Accreditation Council for Graduate Medical Education (ACGME)

***The ACGME accreditation system is designed to encourage excellence and innovation in graduate medical education regardless of the organizational affiliation, size, or location of the program.***

***The educational program must support the development of knowledgeable, skillful physicians who provide compassionate care.***

***In addition, the program is expected to define its specific program aims consistent with the overall mission of its Sponsoring Institution, the needs of the community it serves and that its graduates will serve, and the distinctive capabilities of physicians it intends to graduate. While programs must demonstrate substantial compliance with the Common and specialty-specific Program Requirements, it is recognized that within this framework, programs may place different emphasis on research, leadership, public health, etc. It is expected that the program aims will reflect the nuanced program-specific goals for it and its graduates; for example, it is expected that a program aiming to prepare physician-scientists will have a different curriculum from one focusing on community health.***

**IV.A. The curriculum must contain the following educational components:** (Core)

**IV.A.1. a set of program aims consistent with the Sponsoring Institution's mission, the needs of the community it serves, and the desired distinctive capabilities of its graduates;** (Core)

**IV.A.1.a) The program's aims must be made available to program applicants, residents, and faculty members.** (Core)

**IV.A.2. competency-based goals and objectives for each educational experience designed to promote progress on a trajectory to autonomous practice. These must be distributed, reviewed, and available to residents and faculty members;** (Core)

| Background and Intent: The trajectory to autonomous practice is documented by Milestones evaluation. The Milestones detail the progress of a resident in attaining skill in each competency domain. They are developed by each specialty group and allow evaluation based on observable behaviors. Milestones are considered formative and should be used to identify learning needs. This may lead to focused or general curricular revision in any given program or to individualized learning plans for any specific resident. |
|---|

**IV.A.3. delineation of resident responsibilities for patient care, progressive responsibility for patient management, and graded supervision;** (Core)

| Background and Intent: These responsibilities may generally be described by PGY level and specifically by Milestones progress as determined by the Clinical Competency Committee. This approach encourages the transition to competency-based education. An advanced learner may be granted more responsibility independent of PGY level and a learner needing more time to accomplish a certain task may do so in a focused rather than global manner. |
|---|

**IV.A.4. a broad range of structured didactic activities;** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**IV.A.4.a) Residents must be provided with protected time to participate in core didactic activities.** (Core)

| |
|---|
| **Background and Intent: It is intended that residents will participate in structured didactic activities. It is recognized that there may be circumstances in which this is not possible. Programs should define core didactic activities for which time is protected and the circumstances in which residents may be excused from these didactic activities. Didactic activities may include, but are not limited to, lectures, conferences, courses, labs, asynchronous learning, simulations, drills, case discussions, grand rounds, didactic teaching, and education in critical appraisal of medical evidence.** |

**IV.A.5. advancement of residents' knowledge of ethical principles foundational to medical professionalism; and,** (Core)

**IV.A.6. advancement in the residents' knowledge of the basic principles of scientific inquiry, including how research is designed, conducted, evaluated, explained to patients, and applied to patient care.** (Core)

**IV.B. ACGME Competencies**

| |
|---|
| **Background and Intent: The Competencies provide a conceptual framework describing the required domains for a trusted physician to enter autonomous practice. These Competencies are core to the practice of all physicians, although the specifics are further defined by each specialty. The developmental trajectories in each of the Competencies are articulated through the Milestones for each specialty.** |

**IV.B.1. The program must integrate the following ACGME Competencies into the curriculum:** (Core)

**IV.B.1.a) Professionalism**

**Residents must demonstrate a commitment to professionalism and an adherence to ethical principles.** (Core)

**IV.B.1.a).(1) Residents must demonstrate competence in:**

**IV.B.1.a).(1).(a) compassion, integrity, and respect for others;** (Core)

**IV.B.1.a).(1).(b) responsiveness to patient needs that supersedes self-interest;** (Core)

| |
|---|
| **Background and Intent: This includes the recognition that under certain circumstances, the interests of the patient may be best served by transitioning care to another provider. Examples include fatigue, conflict or duality of interest, not connecting well with a patient, or when another physician would be better for the situation based on skill set or knowledge base.** |


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**IV.B.1.a).(1).(c)** **respect for patient privacy and autonomy;** (Core)

**IV.B.1.a).(1).(d)** **accountability to patients, society, and the profession;** (Core)

**IV.B.1.a).(1).(e)** **respect and responsiveness to diverse patient populations, including but not limited to diversity in gender, age, culture, race, religion, disabilities, national origin, socioeconomic status, and sexual orientation;** (Core)

**IV.B.1.a).(1).(f)** **ability to recognize and develop a plan for one's own personal and professional well-being; and,** (Core)

**IV.B.1.a).(1).(g)** **appropriately disclosing and addressing conflict or duality of interest.** (Core)

**IV.B.1.b)** **Patient Care and Procedural Skills**

Background and Intent: Quality patient care is safe, effective, timely, efficient, patient-centered, equitable, and designed to improve population health, while reducing per capita costs. (See the Institute of Medicine [IOM]'s *Crossing the Quality Chasm: A New Health System for the 21st Century*, 2001 and Berwick D, Nolan T, Whittington J. *The Triple Aim: care, cost, and quality. Health Affairs.* 2008; 27(3):759-769.). In addition, there should be a focus on improving the clinician's well-being as a means to improve patient care and reduce burnout among residents, fellows, and practicing physicians.

These organizing principles inform the Common Program Requirements across all Competency domains. Specific content is determined by the Review Committees with input from the appropriate professional societies, certifying boards, and the community.

**IV.B.1.b).(1)** **Residents must be able to provide patient care that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health.** (Core)

**[The Review Committee must further specify]**

**IV.B.1.b).(2)** **Residents must be able to perform all medical, diagnostic, and surgical procedures considered essential for the area of practice.** (Core)

**[The Review Committee may further specify]**

**IV.B.1.c)** **Medical Knowledge**

**Residents must demonstrate knowledge of established and evolving biomedical, clinical, epidemiological and social-**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**behavioral sciences, as well as the application of this knowledge to patient care.** (Core)

**[The Review Committee must further specify]**

**IV.B.1.d) Practice-based Learning and Improvement**

**Residents must demonstrate the ability to investigate and evaluate their care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and lifelong learning.** (Core)

> **Background and Intent: Practice-based learning and improvement is one of the defining characteristics of being a physician. It is the ability to investigate and evaluate the care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and lifelong learning.**
>
> **The intention of this Competency is to help a physician develop the habits of mind required to continuously pursue quality improvement, well past the completion of residency.**

**IV.B.1.d).(1) Residents must demonstrate competence in:**

**IV.B.1.d).(1).(a) identifying strengths, deficiencies, and limits in one's knowledge and expertise;** (Core)

**IV.B.1.d).(1).(b) setting learning and improvement goals;** (Core)

**IV.B.1.d).(1).(c) identifying and performing appropriate learning activities;** (Core)

**IV.B.1.d).(1).(d) systematically analyzing practice using quality improvement methods, and implementing changes with the goal of practice improvement;** (Core)

**IV.B.1.d).(1).(e) incorporating feedback and formative evaluation into daily practice;** (Core)

**IV.B.1.d).(1).(f) locating, appraising, and assimilating evidence from scientific studies related to their patients' health problems; and,** (Core)

**IV.B.1.d).(1).(g) using information technology to optimize learning.** (Core)

**[The Review Committee may further specify by adding to the list of sub-competencies]**

**IV.B.1.e) Interpersonal and Communication Skills**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**Residents must demonstrate interpersonal and communication skills that result in the effective exchange of information and collaboration with patients, their families, and health professionals.** (Core)

**IV.B.1.e).(1)** **Residents must demonstrate competence in:**

**IV.B.1.e).(1).(a)** **communicating effectively with patients, families, and the public, as appropriate, across a broad range of socioeconomic and cultural backgrounds;** (Core)

**IV.B.1.e).(1).(b)** **communicating effectively with physicians, other health professionals, and health-related agencies;** (Core)

**IV.B.1.e).(1).(c)** **working effectively as a member or leader of a health care team or other professional group;** (Core)

**IV.B.1.e).(1).(d)** **educating patients, families, students, residents, and other health professionals;** (Core)

**IV.B.1.e).(1).(e)** **acting in a consultative role to other physicians and health professionals; and,** (Core)

**IV.B.1.e).(1).(f)** **maintaining comprehensive, timely, and legible medical records, if applicable.** (Core)

**IV.B.1.e).(2)** **Residents must learn to communicate with patients and families to partner with them to assess their care goals, including, when appropriate, end-of-life goals.** (Core)

**[The Review Committee may further specify by adding to the list of sub-competencies]**

**Background and Intent: When there are no more medications or interventions that can achieve a patient's goals or provide meaningful improvements in quality or length of life, a discussion about the patient's goals, values, and choices surrounding the end of life is one of the most important conversations that can occur. Residents must learn to participate effectively and compassionately in these meaningful human interactions, for the sake of their patients and themselves.**

**Programs may teach this skill through direct clinical experience, simulation, or other means of active learning.**

**IV.B.1.f)** **Systems-based Practice**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**Residents must demonstrate an awareness of and responsiveness to the larger context and system of health care, including the social determinants of health, as well as the ability to call effectively on other resources to provide optimal health care.** (Core)

**IV.B.1.f).(1)** **Residents must demonstrate competence in:**

**IV.B.1.f).(1).(a)** **working effectively in various health care delivery settings and systems relevant to their clinical specialty;** (Core)

| |
|---|
| **Background and Intent: Medical practice occurs in the context of an increasingly complex clinical care environment where optimal patient care requires attention to compliance with external and internal administrative and regulatory requirements.** |

**IV.B.1.f).(1).(b)** **coordinating patient care across the health care continuum and beyond as relevant to their clinical specialty;** (Core)

| |
|---|
| **Background and Intent: Every patient deserves to be treated as a whole person. Therefore it is recognized that any one component of the health care system does not meet the totality of the patient's needs. An appropriate transition plan requires coordination and forethought by an interdisciplinary team. The patient benefits from proper care and the system benefits from proper use of resources.** |

**IV.B.1.f).(1).(c)** **advocating for quality patient care and optimal patient care systems;** (Core)

**IV.B.1.f).(1).(d)** **working in interprofessional teams to enhance patient safety and improve patient care quality;** (Core)

**IV.B.1.f).(1).(e)** **participating in identifying system errors and implementing potential systems solutions;** (Core)

**IV.B.1.f).(1).(f)** **incorporating considerations of value, cost awareness, delivery and payment, and risk-benefit analysis in patient and/or population-based care as appropriate; and,** (Core)

**IV.B.1.f).(1).(g)** **understanding health care finances and its impact on individual patients' health decisions.** (Core)

**IV.B.1.f).(2)** **Residents must learn to advocate for patients within the health care system to achieve the patient's and family's care goals, including, when appropriate, end-of-life goals.** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**[The Review Committee may further specify by adding to the list of sub-competencies]**

**IV.C. Curriculum Organization and Resident Experiences**

**IV.C.1. The curriculum must be structured to optimize resident educational experiences, the length of these experiences, and supervisory continuity.** (Core)

**[The Review Committee must further specify]**

| Background and Intent: In some specialties, frequent rotational transitions, inadequate continuity of faculty member supervision, and dispersed patient locations within the hospital have adversely affected optimal resident education and effective team-based care. The need for patient care continuity varies from specialty to specialty and by clinical situation, and may be addressed by the individual Review Committee. |
|---|

**IV.C.2. The program must provide instruction and experience in pain management if applicable for the specialty, including recognition of the signs of addiction.** (Core)

**[The Review Committee may further specify]**

**[The Review Committee may specify required didactic and clinical experiences]**

**IV.D. Scholarship**

***Medicine is both an art and a science. The physician is a humanistic scientist who cares for patients. This requires the ability to think critically, evaluate the literature, appropriately assimilate new knowledge, and practice lifelong learning. The program and faculty must create an environment that fosters the acquisition of such skills through resident participation in scholarly activities. Scholarly activities may include discovery, integration, application, and teaching.***

***The ACGME recognizes the diversity of residencies and anticipates that programs prepare physicians for a variety of roles, including clinicians, scientists, and educators. It is expected that the program's scholarship will reflect its mission(s) and aims, and the needs of the community it serves. For example, some programs may concentrate their scholarly activity on quality improvement, population health, and/or teaching, while other programs might choose to utilize more classic forms of biomedical research as the focus for scholarship.***

**IV.D.1. Program Responsibilities**

**IV.D.1.a) The program must demonstrate evidence of scholarly activities consistent with its mission(s) and aims.** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

IV.D.1.b) **The program, in partnership with its Sponsoring Institution, must allocate adequate resources to facilitate resident and faculty involvement in scholarly activities.** (Core)

**[The Review Committee may further specify]**

IV.D.1.c) **The program must advance residents' knowledge and practice of the scholarly approach to evidence-based patient care.** (Core)

Background and Intent: The scholarly approach can be defined as a synthesis of teaching, learning, and research with the aim of encouraging curiosity and critical thinking based on an understanding of physiology, pathophysiology, differential diagnosis, treatments, treatment alternatives, efficiency of care, and patient safety. While some faculty members are responsible for fulfilling the traditional elements of scholarship through research, integration, and teaching, all faculty members are responsible for advancing residents' scholarly approach to patient care.

Elements of a scholarly approach to patient care include:

- Asking meaningful questions to stimulate residents to utilize learning resources to create a differential diagnosis, a diagnostic algorithm, and treatment plan
- Challenging the evidence that the residents use to reach their medical decisions so that they understand the benefits and limits of the medical literature
- When appropriate, dissemination of scholarly learning in a peer-reviewed manner (publication or presentation)
- Improving resident learning by encouraging them to teach using a scholarly approach

The scholarly approach to patient care begins with curiosity, is grounded in the principles of evidence-based medicine, expands the knowledge base through dissemination, and develops the habits of lifelong learning by encouraging residents to be scholarly teachers.

IV.D.2. **Faculty Scholarly Activity**

IV.D.2.a) **Among their scholarly activity, programs must demonstrate accomplishments in at least three of the following domains:** (Core)

- **Research in basic science, education, translational science, patient care, or population health**
- **Peer-reviewed grants**
- **Quality improvement and/or patient safety initiatives**
- **Systematic reviews, meta-analyses, review articles, chapters in medical textbooks, or case reports**
- **Creation of curricula, evaluation tools, didactic educational activities, or electronic educational materials**
- **Contribution to professional committees, educational organizations, or editorial boards**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

- **Innovations in education**

**IV.D.2.b)** **The program must demonstrate dissemination of scholarly activity within and external to the program by the following methods:**

**[Review Committee will choose to require either IV.D.2.b).(1) or both IV.D.2.b).(1) and IV.D.2.b).(2)]**

**Background and Intent: For the purposes of education, metrics of scholarly activity represent one of the surrogates for the program's effectiveness in the creation of an environment of inquiry that advances the residents' scholarly approach to patient care. The Review Committee will evaluate the dissemination of scholarship for the program as a whole, not for individual faculty members, for a five-year interval, for both core and non-core faculty members, with the goal of assessing the effectiveness of the creation of such an environment. The ACGME recognizes that there may be differences in scholarship requirements between different specialties and between residencies and fellowships in the same specialty.**

**IV.D.2.b).(1)** **faculty participation in grand rounds, posters, workshops, quality improvement presentations, podium presentations, grant leadership, non-peer-reviewed print/electronic resources, articles or publications, book chapters, textbooks, webinars, service on professional committees, or serving as a journal reviewer, journal editorial board member, or editor; (Outcome)‡**

**IV.D.2.b).(2)** **peer-reviewed publication. (Outcome)**

**IV.D.3.** **Resident Scholarly Activity**

**IV.D.3.a)** **Residents must participate in scholarship. (Core)**

**[The Review Committee may further specify]**

## V. Evaluation

### V.A. Resident Evaluation

#### V.A.1. Feedback and Evaluation

**Background and Intent: Feedback is ongoing information provided regarding aspects of one's performance, knowledge, or understanding. The faculty empower residents to provide much of that feedback themselves in a spirit of continuous learning and self-reflection. Feedback from faculty members in the context of routine clinical care should be frequent, and need not always be formally documented.**

**Formative and summative evaluation have distinct definitions. Formative evaluation is *monitoring resident learning* and providing ongoing feedback that can be used by**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**residents to improve their learning in the context of provision of patient care or other educational opportunities. More specifically, formative evaluations help:**

- **residents identify their strengths and weaknesses and target areas that need work**
- **program directors and faculty members recognize where residents are struggling and address problems immediately**

**Summative evaluation is *evaluating a resident's learning* by comparing the residents against the goals and objectives of the rotation and program, respectively. Summative evaluation is utilized to make decisions about promotion to the next level of training, or program completion.**

**End-of-rotation and end-of-year evaluations have both summative and formative components. Information from a summative evaluation can be used formatively when residents or faculty members use it to guide their efforts and activities in subsequent rotations and to successfully complete the residency program.**

**Feedback, formative evaluation, and summative evaluation compare intentions with accomplishments, enabling the transformation of a neophyte physician to one with growing expertise.**

**V.A.1.a)** **Faculty members must directly observe, evaluate, and frequently provide feedback on resident performance during each rotation or similar educational assignment.** (Core)

**Background and Intent: Faculty members should provide feedback frequently throughout the course of each rotation. Residents require feedback from faculty members to reinforce well-performed duties and tasks, as well as to correct deficiencies. This feedback will allow for the development of the learner as they strive to achieve the Milestones. More frequent feedback is strongly encouraged for residents who have deficiencies that may result in a poor final rotation evaluation.**

**V.A.1.b)** **Evaluation must be documented at the completion of the assignment.** (Core)

**V.A.1.b).(1)** **For block rotations of greater than three months in duration, evaluation must be documented at least every three months.** (Core)

**V.A.1.b).(2)** **Longitudinal experiences, such as continuity clinic in the context of other clinical responsibilities, must be evaluated at least every three months and at completion.** (Core)

**V.A.1.c)** **The program must provide an objective performance evaluation based on the Competencies and the specialty-specific Milestones, and must:** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**V.A.1.c).(1)** **use multiple evaluators (e.g., faculty members, peers, patients, self, and other professional staff members); and,** (Core)

**V.A.1.c).(2)** **provide that information to the Clinical Competency Committee for its synthesis of progressive resident performance and improvement toward unsupervised practice.** (Core)

**V.A.1.d)** **The program director or their designee, with input from the Clinical Competency Committee, must:**

**V.A.1.d).(1)** **meet with and review with each resident their documented semi-annual evaluation of performance, including progress along the specialty-specific Milestones;** (Core)

**V.A.1.d).(2)** **assist residents in developing individualized learning plans to capitalize on their strengths and identify areas for growth; and,** (Core)

**V.A.1.d).(3)** **develop plans for residents failing to progress, following institutional policies and procedures.** (Core)

Background and Intent: Learning is an active process that requires effort from the teacher and the learner. Faculty members evaluate a resident's performance at least at the end of each rotation. The program director or their designee will review those evaluations, including their progress on the Milestones, at a minimum of every six months. Residents should be encouraged to reflect upon the evaluation, using the information to reinforce well-performed tasks or knowledge or to modify deficiencies in knowledge or practice. Working together with the faculty members, residents should develop an individualized learning plan.

Residents who are experiencing difficulties with achieving progress along the Milestones may require intervention to address specific deficiencies. Such intervention, documented in an individual remediation plan developed by the program director or a faculty mentor and the resident, will take a variety of forms based on the specific learning needs of the resident. However, the ACGME recognizes that there are situations which require more significant intervention that may alter the time course of resident progression. To ensure due process, it is essential that the program director follow institutional policies and procedures.

**V.A.1.e)** **At least annually, there must be a summative evaluation of each resident that includes their readiness to progress to the next year of the program, if applicable.** (Core)

**V.A.1.f)** **The evaluations of a resident's performance must be accessible for review by the resident.** (Core)

**[The Review Committee may further specify under any requirement in V.A.1.-V.A.1.f)]**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**V.A.2. Final Evaluation**

**V.A.2.a) The program director must provide a final evaluation for each resident upon completion of the program.** (Core)

**V.A.2.a).(1) The specialty-specific Milestones, and when applicable the specialty-specific Case Logs, must be used as tools to ensure residents are able to engage in autonomous practice upon completion of the program.** (Core)

**V.A.2.a).(2) The final evaluation must:**

**V.A.2.a).(2).(a) become part of the resident's permanent record maintained by the institution, and must be accessible for review by the resident in accordance with institutional policy;** (Core)

**V.A.2.a).(2).(b) verify that the resident has demonstrated the knowledge, skills, and behaviors necessary to enter autonomous practice;** (Core)

**V.A.2.a).(2).(c) consider recommendations from the Clinical Competency Committee; and,** (Core)

**V.A.2.a).(2).(d) be shared with the resident upon completion of the program.** (Core)

**V.A.3. A Clinical Competency Committee must be appointed by the program director.** (Core)

**V.A.3.a) At a minimum, the Clinical Competency Committee must include three members of the program faculty, at least one of whom is a core faculty member.** (Core)

**V.A.3.a).(1) Additional members must be faculty members from the same program or other programs, or other health professionals who have extensive contact and experience with the program's residents.** (Core)

Background and Intent: The requirements regarding the Clinical Competency Committee do not preclude or limit a program director's participation on the Clinical Competency Committee. The intent is to leave flexibility for each program to decide the best structure for its own circumstances, but a program should consider: its program director's other roles as resident advocate, advisor, and confidante; the impact of the program director's presence on the other Clinical Competency Committee members' discussions and decisions; the size of the program faculty; and other program-relevant factors. The program director has final responsibility for resident evaluation and promotion decisions.


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**Program faculty may include more than the physician faculty members, such as other physicians and non-physicians who teach and evaluate the program's residents. There may be additional members of the Clinical Competency Committee. Chief residents who have completed core residency programs in their specialty may be members of the Clinical Competency Committee.**

**V.A.3.b) The Clinical Competency Committee must:**

**V.A.3.b).(1) review all resident evaluations at least semi-annually;** (Core)

**V.A.3.b).(2) determine each resident's progress on achievement of the specialty-specific Milestones; and,** (Core)

**V.A.3.b).(3) meet prior to the residents' semi-annual evaluations and advise the program director regarding each resident's progress.** (Core)

**V.B. Faculty Evaluation**

**V.B.1. The program must have a process to evaluate each faculty member's performance as it relates to the educational program at least annually.** (Core)

**Background and Intent: The program director is responsible for the education program and for whom delivers it. While the term "faculty" may be applied to physicians within a given institution for other reasons, it is applied to residency program faculty members only through approval by a program director. The development of the faculty improves the education, clinical, and research aspects of a program. Faculty members have a strong commitment to the resident and desire to provide optimal education and work opportunities. Faculty members must be provided feedback on their contribution to the mission of the program. All faculty members who interact with residents desire feedback on their education, clinical care, and research. If a faculty member does not interact with residents, feedback is not required. With regard to the diverse operating environments and configurations, the residency program director may need to work with others to determine the effectiveness of the program's faculty performance with regard to their role in the educational program. All teaching faculty members should have their educational efforts evaluated by the residents in a confidential and anonymous manner. Other aspects for the feedback may include research or clinical productivity, review of patient outcomes, or peer review of scholarly activity. The process should reflect the local environment and identify the necessary information. The feedback from the various sources should be summarized and provided to the faculty on an annual basis by a member of the leadership team of the program.**

**V.B.1.a) This evaluation must include a review of the faculty member's clinical teaching abilities, engagement with the educational program, participation in faculty development related to their skills as an educator, clinical performance, professionalism, and scholarly activities.** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**V.B.1.b)** **This evaluation must include written, anonymous, and confidential evaluations by the residents.** (Core)

**V.B.2.** **Faculty members must receive feedback on their evaluations at least annually.** (Core)

**V.B.3.** **Results of the faculty educational evaluations should be incorporated into program-wide faculty development plans.** (Core)

| |
|---|
| **Background and Intent: The quality of the faculty's teaching and clinical care is a determinant of the quality of the program and the quality of the residents' future clinical care. Therefore, the program has the responsibility to evaluate and improve the program faculty members' teaching, scholarship, professionalism, and quality care. This section mandates annual review of the program's faculty members for this purpose, and can be used as input into the Annual Program Evaluation.** |

**V.C.** **Program Evaluation and Improvement**

**V.C.1.** **The program director must appoint the Program Evaluation Committee to conduct and document the Annual Program Evaluation as part of the program's continuous improvement process.** (Core)

**V.C.1.a)** **The Program Evaluation Committee must be composed of at least two program faculty members, at least one of whom is a core faculty member, and at least one resident.** (Core)

**V.C.1.b)** **Program Evaluation Committee responsibilities must include:**

**V.C.1.b).(1)** **acting as an advisor to the program director, through program oversight;** (Core)

**V.C.1.b).(2)** **review of the program's self-determined goals and progress toward meeting them;** (Core)

**V.C.1.b).(3)** **guiding ongoing program improvement, including development of new goals, based upon outcomes; and,** (Core)

**V.C.1.b).(4)** **review of the current operating environment to identify strengths, challenges, opportunities, and threats as related to the program's mission and aims.** (Core)

| |
|---|
| **Background and Intent: In order to achieve its mission and train quality physicians, a program must evaluate its performance and plan for improvement in the Annual Program Evaluation. Performance of residents and faculty members is a reflection of program quality, and can use metrics that reflect the goals that a program has set for itself. The Program Evaluation Committee utilizes outcome parameters and other data to assess the program's progress toward achievement of its goals and aims.** |


©2022 Accreditation Council for Graduate Medical Education (ACGME)

V.C.1.c) **The Program Evaluation Committee should consider the following elements in its assessment of the program:**

V.C.1.c).(1) **curriculum;** (Core)

V.C.1.c).(2) **outcomes from prior Annual Program Evaluation(s);** (Core)

V.C.1.c).(3) **ACGME letters of notification, including citations, Areas for Improvement, and comments;** (Core)

V.C.1.c).(4) **quality and safety of patient care;** (Core)

V.C.1.c).(5) **aggregate resident and faculty:**

V.C.1.c).(5).(a) **well-being;** (Core)

V.C.1.c).(5).(b) **recruitment and retention;** (Core)

V.C.1.c).(5).(c) **workforce diversity;** (Core)

V.C.1.c).(5).(d) **engagement in quality improvement and patient safety;** (Core)

V.C.1.c).(5).(e) **scholarly activity;** (Core)

V.C.1.c).(5).(f) **ACGME Resident and Faculty Surveys; and,** (Core)

V.C.1.c).(5).(g) **written evaluations of the program.** (Core)

V.C.1.c).(6) **aggregate resident:**

V.C.1.c).(6).(a) **achievement of the Milestones;** (Core)

V.C.1.c).(6).(b) **in-training examinations (where applicable);** (Core)

V.C.1.c).(6).(c) **board pass and certification rates; and,** (Core)

V.C.1.c).(6).(d) **graduate performance.** (Core)

V.C.1.c).(7) **aggregate faculty:**

V.C.1.c).(7).(a) **evaluation; and,** (Core)

V.C.1.c).(7).(b) **professional development.** (Core)

V.C.1.d) **The Program Evaluation Committee must evaluate the program's mission and aims, strengths, areas for improvement, and threats.** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**V.C.1.e)** **The annual review, including the action plan, must:**

**V.C.1.e).(1)** **be distributed to and discussed with the members of the teaching faculty and the residents; and,** (Core)

**V.C.1.e).(2)** **be submitted to the DIO.** (Core)

**V.C.2.** **The program must complete a Self-Study prior to its 10-Year Accreditation Site Visit.** (Core)

**V.C.2.a)** **A summary of the Self-Study must be submitted to the DIO.** (Core)

Background and Intent: Outcomes of the documented Annual Program Evaluation can be integrated into the 10-year Self-Study process. The Self-Study is an objective, comprehensive evaluation of the residency program, with the aim of improving it. Underlying the Self-Study is this longitudinal evaluation of the program and its learning environment, facilitated through sequential Annual Program Evaluations that focus on the required components, with an emphasis on program strengths and self-identified areas for improvement. Details regarding the timing and expectations for the Self-Study and the 10-Year Accreditation Site Visit are provided in the *ACGME Manual of Policies and Procedures*. Additionally, a description of the Self-Study process, as well as information on how to prepare for the 10-Year Accreditation Site Visit, is available on the ACGME website.

*V.C.3.* *One goal of ACGME-accredited education is to educate physicians who seek and achieve board certification. One measure of the effectiveness of the educational program is the ultimate pass rate.*

*The program director should encourage all eligible program graduates to take the certifying examination offered by the applicable American Board of Medical Specialties (ABMS) member board or American Osteopathic Association (AOA) certifying board.*

**V.C.3.a)** **For specialties in which the ABMS member board and/or AOA certifying board offer(s) an annual written exam, in the preceding three years, the program's aggregate pass rate of those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty.** (Outcome)

**V.C.3.b)** **For specialties in which the ABMS member board and/or AOA certifying board offer(s) a biennial written exam, in the preceding six years, the program's aggregate pass rate of those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty.** (Outcome)

**V.C.3.c)** **For specialties in which the ABMS member board and/or AOA certifying board offer(s) an annual oral exam, in the preceding**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**three years, the program's aggregate pass rate of those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty.** **(Outcome)**

**V.C.3.d)** **For specialties in which the ABMS member board and/or AOA certifying board offer(s) a biennial oral exam, in the preceding six years, the program's aggregate pass rate of those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty.** **(Outcome)**

**V.C.3.e)** **For each of the exams referenced in V.C.3.a)-d), any program whose graduates over the time period specified in the requirement have achieved an 80 percent pass rate will have met this requirement, no matter the percentile rank of the program for pass rate in that specialty.** **(Outcome)**

**Background and Intent: Setting a single standard for pass rate that works across specialties is not supportable based on the heterogeneity of the psychometrics of different examinations. By using a percentile rank, the performance of the lower five percent (fifth percentile) of programs can be identified and set on a path to curricular and test preparation reform.**

**There are specialties where there is a very high board pass rate that could leave successful programs in the bottom five percent (fifth percentile) despite admirable performance. These high-performing programs should not be cited, and V.C.3.e) is designed to address this.**

**V.C.3.f)** **Programs must report, in ADS, board certification status annually for the cohort of board-eligible residents that graduated seven years earlier.** **(Core)**

**Background and Intent: It is essential that residency programs demonstrate knowledge and skill transfer to their residents. One measure of that is the qualifying or initial certification exam pass rate. Another important parameter of the success of the program is the ultimate board certification rate of its graduates. Graduates are eligible for up to seven years from residency graduation for initial certification. The ACGME will calculate a rolling three-year average of the ultimate board certification rate at seven years post-graduation, and the Review Committees will monitor it.**

**The Review Committees will track the rolling seven-year certification rate as an indicator of program quality. Programs are encouraged to monitor their graduates' performance on board certification examinations.**

**In the future, the ACGME may establish parameters related to ultimate board certification rates.**

## VI. The Learning and Working Environment

***Residency education must occur in the context of a learning and working environment that emphasizes the following principles:***


©2022 Accreditation Council for Graduate Medical Education (ACGME)

- ***Excellence in the safety and quality of care rendered to patients by residents today***

- ***Excellence in the safety and quality of care rendered to patients by today's residents in their future practice***

- ***Excellence in professionalism through faculty modeling of:***

    - ***the effacement of self-interest in a humanistic environment that supports the professional development of physicians***

    - ***the joy of curiosity, problem-solving, intellectual rigor, and discovery***

- ***Commitment to the well-being of the students, residents, faculty members, and all members of the health care team***

**Background and Intent: The revised requirements are intended to provide greater flexibility within an established framework, allowing programs and residents more discretion to structure clinical education in a way that best supports the above principles of professional development. With this increased flexibility comes the responsibility for programs and residents to adhere to the 80-hour maximum weekly limit (unless a rotation-specific exception is granted by a Review Committee), and to utilize flexibility in a manner that optimizes patient safety, resident education, and resident well-being. The requirements are intended to support the development of a sense of professionalism by encouraging residents to make decisions based on patient needs and their own well-being, without fear of jeopardizing their program's accreditation status. In addition, the proposed requirements eliminate the burdensome documentation requirement for residents to justify clinical and educational work hour variations.**

**Clinical and educational work hours represent only one part of the larger issue of conditions of the learning and working environment, and Section VI has now been expanded to include greater attention to patient safety and resident and faculty member well-being. The requirements are intended to support programs and residents as they strive for excellence, while also ensuring ethical, humanistic training. Ensuring that flexibility is used in an appropriate manner is a shared responsibility of the program and residents. With this flexibility comes a responsibility for residents and faculty members to recognize the need to hand off care of a patient to another provider when a resident is too fatigued to provide safe, high quality care and for programs to ensure that residents remain within the 80-hour maximum weekly limit.**

**VI.A. Patient Safety, Quality Improvement, Supervision, and Accountability**

**VI.A.1. Patient Safety and Quality Improvement**

***All physicians share responsibility for promoting patient safety and enhancing quality of patient care. Graduate medical education must prepare residents to provide the highest level of clinical care with continuous focus on the safety, individual needs, and humanity of***


©2022 Accreditation Council for Graduate Medical Education (ACGME)

***their patients. It is the right of each patient to be cared for by residents who are appropriately supervised; possess the requisite knowledge, skills, and abilities; understand the limits of their knowledge and experience; and seek assistance as required to provide optimal patient care.***

***Residents must demonstrate the ability to analyze the care they provide, understand their roles within health care teams, and play an active role in system improvement processes. Graduating residents will apply these skills to critique their future unsupervised practice and effect quality improvement measures.***

***It is necessary for residents and faculty members to consistently work in a well-coordinated manner with other health care professionals to achieve organizational patient safety goals.***

**VI.A.1.a)** **Patient Safety**

**VI.A.1.a).(1)** **Culture of Safety**

***A culture of safety requires continuous identification of vulnerabilities and a willingness to transparently deal with them. An effective organization has formal mechanisms to assess the knowledge, skills, and attitudes of its personnel toward safety in order to identify areas for improvement.***

**VI.A.1.a).(1).(a)** **The program, its faculty, residents, and fellows must actively participate in patient safety systems and contribute to a culture of safety.** **(Core)**

**VI.A.1.a).(1).(b)** **The program must have a structure that promotes safe, interprofessional, team-based care.** **(Core)**

**VI.A.1.a).(2)** **Education on Patient Safety**

**Programs must provide formal educational activities that promote patient safety-related goals, tools, and techniques.** **(Core)**

| **Background and Intent: Optimal patient safety occurs in the setting of a coordinated interprofessional learning and working environment.** |
|---|

**[The Review Committee may further specify]**

**VI.A.1.a).(3)** **Patient Safety Events**

***Reporting, investigation, and follow-up of adverse events, near misses, and unsafe conditions are pivotal***


©2022 Accreditation Council for Graduate Medical Education (ACGME)

***mechanisms for improving patient safety, and are essential for the success of any patient safety program. Feedback and experiential learning are essential to developing true competence in the ability to identify causes and institute sustainable systems-based changes to ameliorate patient safety vulnerabilities.***

**VI.A.1.a).(3).(a)** **Residents, fellows, faculty members, and other clinical staff members must:**

**VI.A.1.a).(3).(a).(i)** **know their responsibilities in reporting patient safety events at the clinical site; (Core)**

**VI.A.1.a).(3).(a).(ii)** **know how to report patient safety events, including near misses, at the clinical site; and, (Core)**

**VI.A.1.a).(3).(a).(iii)** **be provided with summary information of their institution's patient safety reports. (Core)**

**VI.A.1.a).(3).(b)** **Residents must participate as team members in real and/or simulated interprofessional clinical patient safety activities, such as root cause analyses or other activities that include analysis, as well as formulation and implementation of actions. (Core)**

**VI.A.1.a).(4)** **Resident Education and Experience in Disclosure of Adverse Events**

***Patient-centered care requires patients, and when appropriate families, to be apprised of clinical situations that affect them, including adverse events. This is an important skill for faculty physicians to model, and for residents to develop and apply.***

**VI.A.1.a).(4).(a)** **All residents must receive training in how to disclose adverse events to patients and families. (Core)**

**VI.A.1.a).(4).(b)** **Residents should have the opportunity to participate in the disclosure of patient safety events, real or simulated. (Detail)†**

**VI.A.1.b)** **Quality Improvement**

**VI.A.1.b).(1)** **Education in Quality Improvement**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

*A cohesive model of health care includes quality-related goals, tools, and techniques that are necessary in order for health care professionals to achieve quality improvement goals.*

**VI.A.1.b).(1).(a)** **Residents must receive training and experience in quality improvement processes, including an understanding of health care disparities.** (Core)

**VI.A.1.b).(2)** **Quality Metrics**

*Access to data is essential to prioritizing activities for care improvement and evaluating success of improvement efforts.*

**VI.A.1.b).(2).(a)** **Residents and faculty members must receive data on quality metrics and benchmarks related to their patient populations.** (Core)

**VI.A.1.b).(3)** **Engagement in Quality Improvement Activities**

*Experiential learning is essential to developing the ability to identify and institute sustainable systems-based changes to improve patient care.*

**VI.A.1.b).(3).(a)** **Residents must have the opportunity to participate in interprofessional quality improvement activities.** (Core)

**VI.A.1.b).(3).(a).(i)** **This should include activities aimed at reducing health care disparities.** (Detail)

**[The Review Committee may further specify under any requirement in VI.A.1.b)-VI.A.1.b).(3).(a).(i)]**

**VI.A.2.** **Supervision and Accountability**

**VI.A.2.a)** *Although the attending physician is ultimately responsible for the care of the patient, every physician shares in the responsibility and accountability for their efforts in the provision of care. Effective programs, in partnership with their Sponsoring Institutions, define, widely communicate, and monitor a structured chain of responsibility and accountability as it relates to the supervision of all patient care.*

*Supervision in the setting of graduate medical education provides safe and effective care to patients; ensures each resident's development of the skills, knowledge, and attitudes required to enter the unsupervised practice of medicine; and establishes a foundation for continued professional growth.*


©2022 Accreditation Council for Graduate Medical Education (ACGME)

VI.A.2.a).(1) **Each patient must have an identifiable and appropriately-credentialed and privileged attending physician (or licensed independent practitioner as specified by the applicable Review Committee) who is responsible and accountable for the patient's care.** (Core)

VI.A.2.a).(1).(a) **This information must be available to residents, faculty members, other members of the health care team, and patients.** (Core)

VI.A.2.a).(1).(b) **Residents and faculty members must inform each patient of their respective roles in that patient's care when providing direct patient care.** (Core)

VI.A.2.b) ***Supervision may be exercised through a variety of methods. For many aspects of patient care, the supervising physician may be a more advanced resident or fellow. Other portions of care provided by the resident can be adequately supervised by the appropriate availability of the supervising faculty member, fellow, or senior resident physician, either on site or by means of telecommunication technology. Some activities require the physical presence of the supervising faculty member. In some circumstances, supervision may include post-hoc review of resident-delivered care with feedback.***

Background and Intent: Appropriate supervision is essential for patient safety and high-quality teaching. Supervision is also contextual. There is tremendous diversity of resident patient interactions, education and training locations, and resident skills and abilities even at the same level of the educational program. The degree of supervision is expected to evolve progressively as a resident gains more experience, even with the same patient condition or procedure. All residents have a level of supervision commensurate with their level of autonomy in practice; this level of supervision may be enhanced based on factors such as patient safety, complexity, acuity, urgency, risk of serious adverse events, or other pertinent variables.

VI.A.2.b).(1) **The program must demonstrate that the appropriate level of supervision in place for all residents is based on each resident's level of training and ability, as well as patient complexity and acuity. Supervision may be exercised through a variety of methods, as appropriate to the situation.** (Core)

**[The Review Committee may specify which activities require different levels of supervision.]**

VI.A.2.b).(2) **The program must define when physical presence of a supervising physician is required.** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**VI.A.2.c)** **Levels of Supervision**

**To promote appropriate resident supervision while providing for graded authority and responsibility, the program must use the following classification of supervision:** (Core)

**VI.A.2.c).(1)** **Direct Supervision:**

**VI.A.2.c).(1).(a)** **the supervising physician is physically present with the resident during the key portions of the patient interaction; or,** (Core)

**[The Review Committee may further specify]**

**VI.A.2.c).(1).(a).(i)** **PGY-1 residents must initially be supervised directly, only as described in VI.A.2.c).(1).(a).** (Core)

**[The Review Committee may describe the conditions under which PGY-1 residents progress to be supervised indirectly]**

**VI.A.2.c).(1).(b)** **the supervising physician and/or patient is not physically present with the resident and the supervising physician is concurrently monitoring the patient care through appropriate telecommunication technology.** (Core)

**[The Review Committee may further specify]**

**[The RC may choose not to permit VI.A.2.c).(1).(b)]**

**VI.A.2.c).(2)** **Indirect Supervision: the supervising physician is not providing physical or concurrent visual or audio supervision but is immediately available to the resident for guidance and is available to provide appropriate direct supervision.** (Core)

**VI.A.2.c).(3)** **Oversight – the supervising physician is available to provide review of procedures/encounters with feedback provided after care is delivered.** (Core)

**VI.A.2.d)** **The privilege of progressive authority and responsibility, conditional independence, and a supervisory role in patient care delegated to each resident must be assigned by the program director and faculty members.** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

VI.A.2.d).(1) **The program director must evaluate each resident's abilities based on specific criteria, guided by the Milestones.** (Core)

VI.A.2.d).(2) **Faculty members functioning as supervising physicians must delegate portions of care to residents based on the needs of the patient and the skills of each resident.** (Core)

VI.A.2.d).(3) **Senior residents or fellows should serve in a supervisory role to junior residents in recognition of their progress toward independence, based on the needs of each patient and the skills of the individual resident or fellow.** (Detail)

VI.A.2.e) **Programs must set guidelines for circumstances and events in which residents must communicate with the supervising faculty member(s).** (Core)

VI.A.2.e).(1) **Each resident must know the limits of their scope of authority, and the circumstances under which the resident is permitted to act with conditional independence.** (Outcome)

| Background and Intent: The ACGME Glossary of Terms defines conditional independence as: Graded, progressive responsibility for patient care with defined oversight. |
| --- |

VI.A.2.f) **Faculty supervision assignments must be of sufficient duration to assess the knowledge and skills of each resident and to delegate to the resident the appropriate level of patient care authority and responsibility.** (Core)

VI.B. **Professionalism**

VI.B.1. **Programs, in partnership with their Sponsoring Institutions, must educate residents and faculty members concerning the professional responsibilities of physicians, including their obligation to be appropriately rested and fit to provide the care required by their patients.** (Core)

VI.B.2. **The learning objectives of the program must:**

VI.B.2.a) **be accomplished through an appropriate blend of supervised patient care responsibilities, clinical teaching, and didactic educational events;** (Core)

VI.B.2.b) **be accomplished without excessive reliance on residents to fulfill non-physician obligations; and,** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**Background and Intent: Routine reliance on residents to fulfill non-physician obligations increases work compression for residents and does not provide an optimal educational experience. Non-physician obligations are those duties which in most institutions are performed by nursing and allied health professionals, transport services, or clerical staff. Examples of such obligations include transport of patients from the wards or units for procedures elsewhere in the hospital; routine blood drawing for laboratory tests; routine monitoring of patients when off the ward; and clerical duties, such as scheduling. While it is understood that residents may be expected to do any of these things on occasion when the need arises, these activities should not be performed by residents routinely and must be kept to a minimum to optimize resident education.**

**VI.B.2.c)** **ensure manageable patient care responsibilities.** (Core)

**[The Review Committee may further specify]**

**Background and Intent: The Common Program Requirements do not define "manageable patient care responsibilities" as this is variable by specialty and PGY level. Review Committees will provide further detail regarding patient care responsibilities in the applicable specialty-specific Program Requirements and accompanying FAQs. However, all programs, regardless of specialty, should carefully assess how the assignment of patient care responsibilities can affect work compression, especially at the PGY-1 level.**

**VI.B.3.** **The program director, in partnership with the Sponsoring Institution, must provide a culture of professionalism that supports patient safety and personal responsibility.** (Core)

**VI.B.4.** **Residents and faculty members must demonstrate an understanding of their personal role in the:**

**VI.B.4.a)** **provision of patient- and family-centered care;** (Outcome)

**VI.B.4.b)** **safety and welfare of patients entrusted to their care, including the ability to report unsafe conditions and adverse events;** (Outcome)

**Background and Intent: This requirement emphasizes that responsibility for reporting unsafe conditions and adverse events is shared by all members of the team and is not solely the responsibility of the resident.**

**VI.B.4.c)** **assurance of their fitness for work, including:** (Outcome)

**Background and Intent: This requirement emphasizes the professional responsibility of faculty members and residents to arrive for work adequately rested and ready to care for patients. It is also the responsibility of faculty members, residents, and other members of the care team to be observant, to intervene, and/or to escalate their concern about resident and faculty member fitness for work, depending on the situation, and in accordance with institutional policies.**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

VI.B.4.c).(1) **management of their time before, during, and after clinical assignments; and,** (Outcome)

VI.B.4.c).(2) **recognition of impairment, including from illness, fatigue, and substance use, in themselves, their peers, and other members of the health care team.** (Outcome)

VI.B.4.d) **commitment to lifelong learning;** (Outcome)

VI.B.4.e) **monitoring of their patient care performance improvement indicators; and,** (Outcome)

VI.B.4.f) **accurate reporting of clinical and educational work hours, patient outcomes, and clinical experience data.** (Outcome)

VI.B.5. **All residents and faculty members must demonstrate responsiveness to patient needs that supersedes self-interest. This includes the recognition that under certain circumstances, the best interests of the patient may be served by transitioning that patient's care to another qualified and rested provider.** (Outcome)

VI.B.6. **Programs, in partnership with their Sponsoring Institutions, must provide a professional, equitable, respectful, and civil environment that is free from discrimination, sexual and other forms of harassment, mistreatment, abuse, or coercion of students, residents, faculty, and staff.** (Core)

VI.B.7. **Programs, in partnership with their Sponsoring Institutions, should have a process for education of residents and faculty regarding unprofessional behavior and a confidential process for reporting, investigating, and addressing such concerns.** (Core)

VI.C. **Well-Being**

***Psychological, emotional, and physical well-being are critical in the development of the competent, caring, and resilient physician and require proactive attention to life inside and outside of medicine. Well-being requires that physicians retain the joy in medicine while managing their own real-life stresses. Self-care and responsibility to support other members of the health care team are important components of professionalism; they are also skills that must be modeled, learned, and nurtured in the context of other aspects of residency training.***

***Residents and faculty members are at risk for burnout and depression. Programs, in partnership with their Sponsoring Institutions, have the same responsibility to address well-being as other aspects of resident competence. Physicians and all members of the health care team share responsibility for the well-being of each other. For example, a culture which encourages covering for colleagues after an illness without the expectation of reciprocity reflects the ideal of professionalism. A positive culture in a clinical learning environment models constructive behaviors, and prepares***


©2022 Accreditation Council for Graduate Medical Education (ACGME)

***residents with the skills and attitudes needed to thrive throughout their careers.***

**Background and Intent: The ACGME is committed to addressing physician well-being for individuals and as it relates to the learning and working environment. The creation of a learning and working environment with a culture of respect and accountability for physician well-being is crucial to physicians' ability to deliver the safest, best possible care to patients. The ACGME is leveraging its resources in four key areas to support the ongoing focus on physician well-being: education, influence, research, and collaboration. Information regarding the ACGME's ongoing efforts in this area is available on the ACGME website: www.acgme.org/physicianwellbeing.**

**The ACGME also created a repository for well-being materials, assessments, presentations, and more on the Well-Being Tools and Resources page in Learn at ACGME for programs seeking to develop or strengthen their own well-being initiatives. There are many activities that programs can implement now to assess and support physician well-being. These include the distribution and analysis of culture of safety surveys, ensuring the availability of counseling services, and paying attention to the safety of the entire health care team.**

**VI.C.1.** **The responsibility of the program, in partnership with the Sponsoring Institution, to address well-being must include:**

**VI.C.1.a)** **efforts to enhance the meaning that each resident finds in the experience of being a physician, including protecting time with patients, minimizing non-physician obligations, providing administrative support, promoting progressive autonomy and flexibility, and enhancing professional relationships;** (Core)

**VI.C.1.b)** **attention to scheduling, work intensity, and work compression that impacts resident well-being;** (Core)

**VI.C.1.c)** **evaluating workplace safety data and addressing the safety of residents and faculty members;** (Core)

**Background and Intent: This requirement emphasizes the responsibility shared by the Sponsoring Institution and its programs to gather information and utilize systems that monitor and enhance resident and faculty member safety, including physical safety. Issues to be addressed include, but are not limited to, monitoring of workplace injuries, physical or emotional violence, vehicle collisions, and emotional well-being after adverse events.**

**VI.C.1.d)** **policies and programs that encourage optimal resident and faculty member well-being; and,** (Core)

**Background and Intent: Well-being includes having time away from work to engage with family and friends, as well as to attend to personal needs and to one's own health, including adequate rest, healthy diet, and regular exercise.**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

VI.C.1.d).(1) **Residents must be given the opportunity to attend medical, mental health, and dental care appointments, including those scheduled during their working hours.** (Core)

| |
|---|
| **Background and Intent: The intent of this requirement is to ensure that residents have the opportunity to access medical and dental care, including mental health care, at times that are appropriate to their individual circumstances. Residents must be provided with time away from the program as needed to access care, including appointments scheduled during their working hours.** |

VI.C.1.e) **attention to resident and faculty member burnout, depression, and substance use disorders. The program, in partnership with its Sponsoring Institution, must educate faculty members and residents in identification of the symptoms of burnout, depression, and substance use disorders, including means to assist those who experience these conditions. Residents and faculty members must also be educated to recognize those symptoms in themselves and how to seek appropriate care. The program, in partnership with its Sponsoring Institution, must:** (Core)

| |
|---|
| **Background and Intent: Programs and Sponsoring Institutions are encouraged to review materials to create systems for identification of burnout, depression, and substance use disorders. Materials and more information are available in Learn at ACGME (https://dl.acgme.org/pages/well-being-tools-resources).** |

VI.C.1.e).(1) **encourage residents and faculty members to alert the program director or other designated personnel or programs when they are concerned that another resident, fellow, or faculty member may be displaying signs of burnout, depression, a substance use disorder, suicidal ideation, or potential for violence;** (Core)

| |
|---|
| **Background and Intent: Individuals experiencing burnout, depression, a substance use disorder, and/or suicidal ideation are often reluctant to reach out for help due to the stigma associated with these conditions, and are concerned that seeking help may have a negative impact on their career. Recognizing that physicians are at increased risk in these areas, it is essential that residents and faculty members are able to report their concerns when another resident or faculty member displays signs of any of these conditions, so that the program director or other designated personnel, such as the department chair, may assess the situation and intervene as necessary to facilitate access to appropriate care. Residents and faculty members must know which personnel, in addition to the program director, have been designated with this responsibility; those personnel and the program director should be familiar with the institution's impaired physician policy and any employee health, employee assistance, and/or wellness programs within the institution. In cases of physician impairment, the program director or designated personnel should follow the policies of their institution for reporting.** |


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**VI.C.1.e).(2)** **provide access to appropriate tools for self-screening; and,** (Core)

**VI.C.1.e).(3)** **provide access to confidential, affordable mental health assessment, counseling, and treatment, including access to urgent and emergent care 24 hours a day, seven days a week.** (Core)

**Background and Intent: The intent of this requirement is to ensure that residents have immediate access at all times to a mental health professional (psychiatrist, psychologist, Licensed Clinical Social Worker, Primary Mental Health Nurse Practitioner, or Licensed Professional Counselor) for urgent or emergent mental health issues. In-person, telemedicine, or telephonic means may be utilized to satisfy this requirement. Care in the Emergency Department may be necessary in some cases, but not as the primary or sole means to meet the requirement.**

**The reference to affordable counseling is intended to require that financial cost not be a barrier to obtaining care.**

**VI.C.2.** **There are circumstances in which residents may be unable to attend work, including but not limited to fatigue, illness, family emergencies, and parental leave. Each program must allow an appropriate length of absence for residents unable to perform their patient care responsibilities.** (Core)

**VI.C.2.a)** **The program must have policies and procedures in place to ensure coverage of patient care.** (Core)

**VI.C.2.b)** **These policies must be implemented without fear of negative consequences for the resident who is or was unable to provide the clinical work.** (Core)

**Background and Intent: Residents may need to extend their length of training depending on length of absence and specialty board eligibility requirements. Teammates should assist colleagues in need and equitably reintegrate them upon return.**

**VI.D.** **Fatigue Mitigation**

**VI.D.1.** **Programs must:**

**VI.D.1.a)** **educate all faculty members and residents to recognize the signs of fatigue and sleep deprivation;** (Core)

**VI.D.1.b)** **educate all faculty members and residents in alertness management and fatigue mitigation processes; and,** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**VI.D.1.c)** **encourage residents to use fatigue mitigation processes to manage the potential negative effects of fatigue on patient care and learning.** (Detail)

| |
|---|
| **Background and Intent: Providing medical care to patients is physically and mentally demanding. Night shifts, even for those who have had enough rest, cause fatigue. Experiencing fatigue in a supervised environment during training prepares residents for managing fatigue in practice. It is expected that programs adopt fatigue mitigation processes and ensure that there are no negative consequences and/or stigma for using fatigue mitigation strategies.**<br><br>**This requirement emphasizes the importance of adequate rest before and after clinical responsibilities. Strategies that may be used include, but are not limited to, strategic napping; the judicious use of caffeine; availability of other caregivers; time management to maximize sleep off-duty; learning to recognize the signs of fatigue, and self-monitoring performance and/or asking others to monitor performance; remaining active to promote alertness; maintaining a healthy diet; using relaxation techniques to fall asleep; maintaining a consistent sleep routine; exercising regularly; increasing sleep time before and after call; and ensuring sufficient sleep recovery periods.** |

**VI.D.2.** **Each program must ensure continuity of patient care, consistent with the program's policies and procedures referenced in VI.C.2–VI.C.2.b), in the event that a resident may be unable to perform their patient care responsibilities due to excessive fatigue.** (Core)

**VI.D.3.** **The program, in partnership with its Sponsoring Institution, must ensure adequate sleep facilities and safe transportation options for residents who may be too fatigued to safely return home.** (Core)

**VI.E.** **Clinical Responsibilities, Teamwork, and Transitions of Care**

**VI.E.1.** **Clinical Responsibilities**

**The clinical responsibilities for each resident must be based on PGY level, patient safety, resident ability, severity and complexity of patient illness/condition, and available support services.** (Core)

**[Optimal clinical workload may be further specified by each Review Committee]**

| |
|---|
| **Background and Intent: The changing clinical care environment of medicine has meant that work compression due to high complexity has increased stress on residents. Faculty members and program directors need to make sure residents function in an environment that has safe patient care and a sense of resident well-being. Some Review Committees have addressed this by setting limits on patient admissions, and it is an essential responsibility of the program director to monitor resident workload. Workload should be distributed among the resident team and interdisciplinary teams to minimize work compression.** |

**VI.E.2.** **Teamwork**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**Residents must care for patients in an environment that maximizes communication. This must include the opportunity to work as a member of effective interprofessional teams that are appropriate to the delivery of care in the specialty and larger health system.** (Core)

**[The Review Committee may further specify]**

**VI.E.3. Transitions of Care**

**VI.E.3.a) Programs must design clinical assignments to optimize transitions in patient care, including their safety, frequency, and structure.** (Core)

**VI.E.3.b) Programs, in partnership with their Sponsoring Institutions, must ensure and monitor effective, structured hand-over processes to facilitate both continuity of care and patient safety.** (Core)

**VI.E.3.c) Programs must ensure that residents are competent in communicating with team members in the hand-over process.** (Outcome)

**VI.E.3.d) Programs and clinical sites must maintain and communicate schedules of attending physicians and residents currently responsible for care.** (Core)

**VI.E.3.e) Each program must ensure continuity of patient care, consistent with the program's policies and procedures referenced in VI.C.2-VI.C.2.b), in the event that a resident may be unable to perform their patient care responsibilities due to excessive fatigue or illness, or family emergency.** (Core)

**VI.F. Clinical Experience and Education**

***Programs, in partnership with their Sponsoring Institutions, must design an effective program structure that is configured to provide residents with educational and clinical experience opportunities, as well as reasonable opportunities for rest and personal activities.***

| Background and Intent: In the new requirements, the terms "clinical experience and education," "clinical and educational work," and "clinical and educational work hours" replace the terms "duty hours," "duty periods," and "duty." These changes have been made in response to concerns that the previous use of the term "duty" in reference to number of hours worked may have led some to conclude that residents' duty to "clock out" on time superseded their duty to their patients. |
|---|

**VI.F.1. Maximum Hours of Clinical and Educational Work per Week**

**Clinical and educational work hours must be limited to no more than 80 hours per week, averaged over a four-week period, inclusive of all**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**in-house clinical and educational activities, clinical work done from home, and all moonlighting.** (Core)

**Background and Intent: Programs and residents have a shared responsibility to ensure that the 80-hour maximum weekly limit is not exceeded. While the requirement has been written with the intent of allowing residents to remain beyond their scheduled work periods to care for a patient or participate in an educational activity, these additional hours must be accounted for in the allocated 80 hours when averaged over four weeks.**

***Scheduling***
**While the ACGME acknowledges that, on rare occasions, a resident may work in excess of 80 hours in a given week, all programs and residents utilizing this flexibility will be required to adhere to the 80-hour maximum weekly limit when averaged over a four-week period. Programs that regularly schedule residents to work 80 hours per week and still permit residents to remain beyond their scheduled work period are likely to exceed the 80-hour maximum, which would not be in substantial compliance with the requirement. These programs should adjust schedules so that residents are scheduled to work fewer than 80 hours per week, which would allow residents to remain beyond their scheduled work period when needed without violating the 80-hour requirement. Programs may wish to consider using night float and/or making adjustments to the frequency of in-house call to ensure compliance with the 80-hour maximum weekly limit.**

***Oversight***
**With increased flexibility introduced into the Requirements, programs permitting this flexibility will need to account for the potential for residents to remain beyond their assigned work periods when developing schedules, to avoid exceeding the 80-hour maximum weekly limit, averaged over four weeks. The ACGME Review Committees will strictly monitor and enforce compliance with the 80-hour requirement. Where violations of the 80-hour requirement are identified, programs will be subject to citation and at risk for an adverse accreditation action.**

***Work from Home***
**While the requirement specifies that clinical work done from home must be counted toward the 80-hour maximum weekly limit, the expectation remains that scheduling be structured so that residents are able to complete most work on site during scheduled clinical work hours without requiring them to take work home. The new requirements acknowledge the changing landscape of medicine, including electronic health records, and the resulting increase in the amount of work residents choose to do from home. The requirement provides flexibility for residents to do this while ensuring that the time spent by residents completing clinical work from home is accomplished within the 80-hour weekly maximum. Types of work from home that must be counted include using an electronic health record and taking calls from home. Reading done in preparation for the following day's cases, studying, and research done from home do not count toward the 80 hours. Resident decisions to leave the hospital before their clinical work has been completed and to finish that work later from home should be made in consultation with the resident's supervisor. In such circumstances, residents should be mindful of their professional responsibility to complete work in a timely manner and to maintain patient confidentiality.**

**During the public comment period many individuals raised questions and concerns related to this change. Some questioned whether minute by minute tracking would be**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**required; in other words, if a resident spends three minutes on a phone call and then a few hours later spends two minutes on another call, will the resident need to report that time. Others raised concerns related to the ability of programs and institutions to verify the accuracy of the information reported by residents. The new requirements are not an attempt to micromanage this process. Residents are to track the time they spend on clinical work from home and to report that time to the program. Decisions regarding whether to report infrequent phone calls of very short duration will be left to the individual resident. Programs will need to factor in time residents are spending on clinical work at home when schedules are developed to ensure that residents are not working in excess of 80 hours per week, averaged over four weeks. There is no requirement that programs assume responsibility for documenting this time. Rather, the program's responsibility is ensuring that residents report their time from home and that schedules are structured to ensure that residents are not working in excess of 80 hours per week, averaged over four weeks.**

***PGY-1 and PGY-2 Residents***
**PGY-1 and PGY-2 residents may not have the experience to make decisions about when it is appropriate to utilize flexibility or may feel pressured to use it when unnecessary. Programs are responsible for ensuring that residents are provided with manageable workloads that can be accomplished during scheduled work hours. This includes ensuring that a resident's assigned direct patient load is manageable, that residents have appropriate support from their clinical teams, and that residents are not overburdened with clerical work and/or other non-physician duties.**

**VI.F.2.** **Mandatory Time Free of Clinical Work and Education**

**VI.F.2.a)** **The program must design an effective program structure that is configured to provide residents with educational opportunities, as well as reasonable opportunities for rest and personal well-being.** (Core)

**VI.F.2.b)** **Residents should have eight hours off between scheduled clinical work and education periods.** (Detail)

**VI.F.2.b).(1)** **There may be circumstances when residents choose to stay to care for their patients or return to the hospital with fewer than eight hours free of clinical experience and education. This must occur within the context of the 80-hour and the one-day-off-in-seven requirements.** (Detail)

**Background and Intent: While it is expected that resident schedules will be structured to ensure that residents are provided with a minimum of eight hours off between scheduled work periods, it is recognized that residents may choose to remain beyond their scheduled time, or return to the clinical site during this time-off period, to care for a patient. The requirement preserves the flexibility for residents to make those choices. It is also noted that the 80-hour weekly limit (averaged over four weeks) is a deterrent for scheduling fewer than eight hours off between clinical and education work periods, as it would be difficult for a program to design a schedule that provides fewer than eight hours off without violating the 80-hour rule.**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**VI.F.2.c)** **Residents must have at least 14 hours free of clinical work and education after 24 hours of in-house call.** **(Core)**

**Background and Intent: Residents have a responsibility to return to work rested, and thus are expected to use this time away from work to get adequate rest. In support of this goal, residents are encouraged to prioritize sleep over other discretionary activities.**

**VI.F.2.d)** **Residents must be scheduled for a minimum of one day in seven free of clinical work and required education (when averaged over four weeks). At-home call cannot be assigned on these free days.** **(Core)**

**Background and Intent: The requirement provides flexibility for programs to distribute days off in a manner that meets program and resident needs. It is strongly recommended that residents' preference regarding how their days off are distributed be considered as schedules are developed. It is desirable that days off be distributed throughout the month, but some residents may prefer to group their days off to have a "golden weekend," meaning a consecutive Saturday and Sunday free from work. The requirement for one free day in seven should not be interpreted as precluding a golden weekend. Where feasible, schedules may be designed to provide residents with a weekend, or two consecutive days, free of work. The applicable Review Committee will evaluate the number of consecutive days of work and determine whether they meet educational objectives. Programs are encouraged to distribute days off in a fashion that optimizes resident well-being, and educational and personal goals. It is noted that a day off is defined in the ACGME Glossary of Terms as "one (1) continuous 24-hour period free from all administrative, clinical, and educational activities."**

**VI.F.3.** **Maximum Clinical Work and Education Period Length**

**VI.F.3.a)** **Clinical and educational work periods for residents must not exceed 24 hours of continuous scheduled clinical assignments.** **(Core)**

**Background and Intent: The Task Force examined the question of "consecutive time on task." It examined the research supporting the current limit of 16 consecutive hours of time on task for PGY-1 residents; the range of often conflicting impacts of this requirement on patient safety, clinical care, and continuity of care by resident teams; and resident learning found in the literature. Finally, it heard a uniform request by the specialty societies, certifying boards, membership societies and organizations, and senior residents to repeal this requirement. It heard conflicting perspectives from resident unions, a medical student association, and a number of public advocacy groups, some arguing for continuation of the requirement, others arguing for extension of the requirement to all residents.**

**Of greatest concern to the Task Force were the observations of disruption of team care and patient care continuity brought about with residents beyond the PGY-1 level adhering to differing requirements. The graduate medical education community uniformly requested that the Task Force remove this requirement. The most frequently-cited reason for this request was the complete disruption of the team, separating the**


©2022 Accreditation Council for Graduate Medical Education (ACGME) 

**PGY-1 from supervisory faculty members and residents who were best able to judge the ability of the resident and customize the supervision of patient care for each PGY-1. Cited nearly as frequently was the separation of the PGY-1 from the team, delaying maturation of clinical skills, and threatening to create a "shift" mentality in disciplines where overnight availability to patients is essential in delivery of care.**

**The Task Force examined the impact of the request to consider 16-consecutive-hour limits for all residents, and rejected the proposition. It found that model incompatible with the actual practice of medicine and surgery in many specialties, excessively limiting in configuration of clinical services in many disciplines, and potentially disruptive of the inculcation of responsibility and professional commitment to altruism and placing the needs of patients above those of the physician.**

**After careful consideration of the information available, the testimony and position of all parties submitting information, and presentations to the Task Force, the Task Force removed the 16-hour-consecutive-time-on-task requirement for PGY-1 residents. It remains crucial that programs ensure that PGY-1 residents are supervised in compliance with the applicable Program Requirements, and that resident well-being is prioritized as described in Section VI.C. of these requirements.**

**VI.F.3.a).(1)** **Up to four hours of additional time may be used for activities related to patient safety, such as providing effective transitions of care, and/or resident education.** **(Core)**

**VI.F.3.a).(1).(a)** **Additional patient care responsibilities must not be assigned to a resident during this time.** **(Core)**

**Background and Intent: The additional time referenced in VI.F.3.a).(1) should not be used for the care of new patients. It is essential that the resident continue to function as a member of the team in an environment where other members of the team can assess resident fatigue, and that supervision for post-call residents is provided. This 24 hours and up to an additional four hours must occur within the context of 80-hour weekly limit, averaged over four weeks.**

**VI.F.4.** **Clinical and Educational Work Hour Exceptions**

**VI.F.4.a)** **In rare circumstances, after handing off all other responsibilities, a resident, on their own initiative, may elect to remain or return to the clinical site in the following circumstances:**

**VI.F.4.a).(1)** **to continue to provide care to a single severely ill or unstable patient;** **(Detail)**

**VI.F.4.a).(2)** **humanistic attention to the needs of a patient or family; or,** **(Detail)**

**VI.F.4.a).(3)** **to attend unique educational events.** **(Detail)**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**VI.F.4.b)** **These additional hours of care or education will be counted toward the 80-hour weekly limit.** (Detail)

**Background and Intent: This requirement is intended to provide residents with some control over their schedules by providing the flexibility to voluntarily remain beyond the scheduled responsibilities under the circumstances described above. It is important to note that a resident may remain to attend a conference, or return for a conference later in the day, only if the decision is made voluntarily. Residents must not be required to stay. Programs allowing residents to remain or return beyond the scheduled work and clinical education period must ensure that the decision to remain is initiated by the resident and that residents are not coerced. This additional time must be counted toward the 80-hour maximum weekly limit.**

**VI.F.4.c)** **A Review Committee may grant rotation-specific exceptions for up to 10 percent or a maximum of 88 clinical and educational work hours to individual programs based on a sound educational rationale.**

**VI.F.4.c).(1)** **In preparing a request for an exception, the program director must follow the clinical and educational work hour exception policy from the *ACGME Manual of Policies and Procedures*.** (Core)

**VI.F.4.c).(2)** **Prior to submitting the request to the Review Committee, the program director must obtain approval from the Sponsoring Institution's GMEC and DIO.** (Core)

**Background and Intent: The provision for exceptions for up to 88 hours per week has been modified to specify that exceptions may be granted for specific rotations if the program can justify the increase based on criteria specified by the Review Committee. As in the past, Review Committees may opt not to permit exceptions. The underlying philosophy for this requirement is that while it is expected that all residents should be able to train within an 80-hour work week, it is recognized that some programs may include rotations with alternate structures based on the nature of the specialty. DIO/GMEC approval is required before the request will be considered by the Review Committee.**

**VI.F.5.** **Moonlighting**

**VI.F.5.a)** **Moonlighting must not interfere with the ability of the resident to achieve the goals and objectives of the educational program, and must not interfere with the resident's fitness for work nor compromise patient safety.** (Core)

**VI.F.5.b)** **Time spent by residents in internal and external moonlighting (as defined in the ACGME Glossary of Terms) must be counted toward the 80-hour maximum weekly limit.** (Core)

**VI.F.5.c)** **PGY-1 residents are not permitted to moonlight.** (Core)


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**Background and Intent: For additional clarification of the expectations related to moonlighting, please refer to the Common Program Requirement FAQs (available at http://www.acgme.org/What-We-Do/Accreditation/Common-Program-Requirements).**

**VI.F.6. In-House Night Float**

**Night float must occur within the context of the 80-hour and one-day-off-in-seven requirements.** (Core)

**[The maximum number of consecutive weeks of night float, and maximum number of months of night float per year may be further specified by the Review Committee.]**

**Background and Intent: The requirement for no more than six consecutive nights of night float was removed to provide programs with increased flexibility in scheduling.**

**VI.F.7. Maximum In-House On-Call Frequency**

**Residents must be scheduled for in-house call no more frequently than every third night (when averaged over a four-week period).** (Core)

**VI.F.8. At-Home Call**

**VI.F.8.a) Time spent on patient care activities by residents on at-home call must count toward the 80-hour maximum weekly limit. The frequency of at-home call is not subject to the every-third-night limitation, but must satisfy the requirement for one day in seven free of clinical work and education, when averaged over four weeks.** (Core)

**VI.F.8.a).(1) At-home call must not be so frequent or taxing as to preclude rest or reasonable personal time for each resident.** (Core)

**VI.F.8.b) Residents are permitted to return to the hospital while on at-home call to provide direct care for new or established patients. These hours of inpatient patient care must be included in the 80-hour maximum weekly limit.** (Detail)

**[The Review Committee may further specify under any requirement in VI.F.-VI.F.8.b)]**

**Background and Intent: This requirement has been modified to specify that clinical work done from home when a resident is taking at-home call must count toward the 80-hour maximum weekly limit. This change acknowledges the often significant amount of time residents devote to clinical activities when taking at-home call, and ensures that taking at-home call does not result in residents routinely working more than 80 hours per week. At-home call activities that must be counted include responding to phone calls and other forms of communication, as well as documentation, such as entering notes in**


©2022 Accreditation Council for Graduate Medical Education (ACGME)

**an electronic health record. Activities such as reading about the next day's case, studying, or research activities do not count toward the 80-hour weekly limit.**

**In their evaluation of residency/fellowship programs, Review Committees will look at the overall impact of at-home call on resident/fellow rest and personal time.**

***

***Core Requirements:** Statements that define structure, resource, or process elements essential to every graduate medical educational program.

†**Detail Requirements:** Statements that describe a specific structure, resource, or process, for achieving compliance with a Core Requirement. Programs and sponsoring institutions in substantial compliance with the Outcome Requirements may utilize alternative or innovative approaches to meet Core Requirements.

‡**Outcome Requirements:** Statements that specify expected measurable or observable attributes (knowledge, abilities, skills, or attitudes) of residents or fellows at key stages of their graduate medical education.

**Osteopathic Recognition**
For programs with or applying for Osteopathic Recognition, the Osteopathic Recognition Requirements also apply (www.acgme.org/OsteopathicRecognition).


©2022 Accreditation Council for Graduate Medical Education (ACGME)