UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

STELLA PAK, M.D.,

Plaintiff,

Civil Action No.: 1:23-cv-00378-DNH-DJS

-against-

ALBANY MED HEALTH SYSTEM,

Defendant.
-------------------------------------------------------------------X

**DECLARATION OF STELLA PAK, M.D., IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

1. I am the Plaintiff in the above-captioned action. I make this declaration in support of the motion for a preliminary injunction reinstating me into the Neurology Residency training program at Defendant Albany Med Health System ("Albany Med") or alternatively, an order to correct the false and defamatory final summative evaluation.

2. I received a Bachelor of Science degree from Austin Peay State University in Clarksville, Tennessee, in 2013. At Austin Peay, I was one of the top two students in the Department of Biology and I received numerous awards, including Tutor of the Year; the Presidential Research Scholar award; the Outstanding Biology Student award; and the Silent Inspiration award, in recognition of the 400 hours of volunteer work I logged at a local community hospital. I also served as the founding President of Women's Leadership Organization.

3. I was accepted to numerous top-tier medical schools, including NYU and Vanderbilt University. I chose to attend University of Toledo College of Medicine in Ohio,

because I was awarded the Presidential Scholarship, a merit-based, full scholarship that is given to the top two students in each graduating class. I graduated from medical school in 2017.

4. I passed all the United States Medical Licensure Exams on my first attempts.

5. When I was approximately three years old, I was diagnosed with autism spectrum disorder ("ASD"). During college and medical school, I received accommodations for my ASD. My disability has not prevented me from excelling both academically and clinically.

6. My autism manifests itself in several ways. First, I have been told that I have a tendency to be overly inclusive in my communications, and sometimes provide excessive details. Second, I have been told I am very literal in my interpretation of language and that I have difficulty picking up on sarcasm, innuendo, and subtleties. Finally, when faced with a surprise or sudden new information, I have difficulty displaying the appropriate emotion in the moment; I need time to process the information and to react accordingly.

7. Following medical school, I began training as a medical resident. From 2017-2018, I was a Junior Resident at the Kettering Medical Center in Kettering, Ohio. From 2018-2019, I was a Senior Resident at the Garnet Health Medical Center (formerly the Orange Regional Medical Center) in Middletown, New York. From 2020-2021, I was trained in Family Medicine at the Desert Regional Medical Center in Palm Springs, California. From July to September 2021, I served as Chief Resident for Patient Safety at the University of Maryland Medical Center in Baltimore, Maryland.

8. I entered the four-year Neurology Residency Program at Albany Med in September 2021, which is the middle of the academic year in residency training. Because I had prior post-graduate medical training, I entered the Albany Med Neurology Residency Program in the second year of the program ("PGY-2"). As stated above, immediately before I began my training at Albany Med, I served as Chief Resident for Patient Safety at the University of

Maryland Medical Center, where I had been in training to become a primary care physician. I left that program because I decided to pursue a different specialty, in neurology. Clinical neurology fulfills my intellectual curiosity and passion to help the people whose lives are affected by neurological illness.

9. During the Albany Med Neurology Residency Program, several of the faculty evaluated me as having satisfactory performance and showing the improvement expected of a physician in a residency training.

10. Even faculty members who had criticisms of my performance noted I was improving as the year progressed and I gained more experience.

11. Many of the criticisms of my performance related to characteristics that were directly related to my disability, such as my communication style.

12. In addition to my clinical performance, I also excel at research. I was one of only two residents who presented projects to Albany Med's annual research conference in 2022 and was the only resident at Albany Med who presented research both inside and outside the hospital for the academic year 2021-2022. In 2022 alone, I published two articles and seven new abstracts.

13. Soon after I joined the Residency Program in September 2021, some of the other residents began to mistreat, harass, and bully me, and spread false rumors about me. From what I heard, this hostility had nothing to do with my clinical performance, and was based on my interpersonal communication style, which is a manifestation of my autism. For example, after joining the program in September, several residents began to ridicule me for wearing the same clothing every day, falsely assuming and teasing that I did not wash my clothes. (The truth is that, to accommodate my disability, I find it helpful to wear the same monochromatic clothing

every day and to not vary my wardrobe.) Although I explained that I purchased multiple shirts of the same color and design and that I wear clean clothing every day, some of the residents teased me nonetheless. I was also laughed at for wearing a "lace lock device," which secures my shoelaces so they do not become untied. In addition, I always wear a fanny pack, which has my medications in it, as well as an orange wrist wallet. The lace lock, fanny pack, and wrist wallet are all accommodations that I have implemented in my life to help me function as a person with ASD.

14. One of the residents in particular, Trent Roubleau, M.D. (PGY-4 at the time), repeatedly called me a plumber based on my attire. In December of 2021, I disclosed this teasing, as well as the emotional distress it was causing me, to Dr. Column Amory, one of the Neurology Residency Program Directors. Although Dr. Amory appeared sympathetic and supportive, I do not know if he took any steps to stop the bullying and harassment.

15. Dr. Amory, along with his colleague Dr. Kimberly Robeson, who was co-Program Director of the Neurology Residency at the time and would later take over as Program Director in mid-2022, explained to me that the hostility of the other residents was based on my communication style. For example, on one occasion, I was overly literal in my interpretation of the instructions of Brian Dahlben, M.D., one of the Chief Residents. Dr. Dahlben had encouraged me to either call, text, or email him whenever I needed any advice or guidance because, he said, he wanted to help me as I joined the program in the middle of the academic year. When I texted him, he complained to other residents and the Program Directors I texted him for non-urgent matters. He said I should have emailed him instead.

16. In January 2022, I was placed on remediation to mainly address interpersonal and communication skills.[1] No accommodations were offered to me at this time, and no one provided specific examples of any supposed deficiency in my clinical performance at this time. Dr. Amory, who expressed concern about my ability to function as a physician, given my autism diagnosis, required that, as part of the remediation plan, I obtain an independent psychiatric evaluation. Even though this made no sense to me, as I was already in treatment with a psychiatrist and my communication challenges are not connected to a psychiatric illness, I complied.

17. Dr Amory chose the Committee for Physician Health ("CPH") to arrange for the evaluation. The psychiatrist who performed the evaluation, Dr. Abigail J. Herron, found me competent to perform my work responsibilities but noted my communication and social issues and recommended additional training and psychiatric care.[2]

18. As a result, I was required to attend weekly appointments with a psychiatrist and a clinical psychologist. However, the Chief Residents, who were my immediate supervisors, told me I could not leave the hospital to attend these appointments.

19. I was forced to conduct the psychiatric appointments by phone while I was sitting at the nurses' station of the hospital. Neither I nor my therapist were comfortable with the lack of privacy at the nurses' station, which resulted in me missing several appointments.

20. In March and April 2022, Dr. Amory advised me to disclose my autism diagnosis to the other neurology residents. He said that this would be a way to gain their support. I complied. Meanwhile, Dr. Robeson, who at the time was gradually assuming Dr. Amory's responsibilities as Program Director, suggested that I find another specialty.

---

[1] The January 2022 remediation plan is attached to the Declaration of Jason Solotaroff as Exhibit E.
[2] The evaluation is attached to the Solotaroff Decl. as Exhibit F.

21. After I disclosed my autism to the other residents, there was a general negative reaction. Some residents began to claim that they did not trust me; Maria Kofman, D.O., and Chief Resident Amit Shetty, D.O., told me that "autism is only for little children" and that "people grow out of it."

22. Also in March and April of 2022, I reached out to Dr. Amory and Dr. Robeson for feedback on my performance since the remediation plan had been in place for a few months and they had not given me any feedback. Dr. Amory told me that my clinical performance and interpersonal skills were improving. Dr. Robeson told me that there had been no complaints about me.

23. On April 14, 2022, I asked Dr. Shetty to cover for me for 30 minutes so I could attend an appointment with my psychiatrist. Dr. Shetty became angry and told me that covering for me was ruining his educational experience. Dr. Shetty told me he would be bringing up the issue with program leadership because it was not fair that I was requesting coverage.

24. Dr. Shetty also asked me outrageously intrusive questions related to my psychiatric care that demonstrated his discriminatory bias against me, such as who diagnosed me with autism, who is currently treating me for autism, when and where I was diagnosed with autism, how the diagnosis was made, and what are/were the symptoms. When I expressed discomfort with disclosing private medical information, Dr. Shetty said the residents, including himself, need to know because it was affecting the wellbeing and educational experience of others in the program.

25. In response to this incident, on April 18, 2022, I called Dr. Amory to request an explicit accommodation that would require the program to provide coverage to enable me to attend my weekly appointments with my psychiatrist and clinical psychologist, which were

required under my remediation plan. Dr. Amory did not offer such a solution. Instead, Dr. Amory suggested that I send an email to my fellow residents referencing my autism diagnosis and requesting their support.

26. Following Dr. Amory's advice, I disclosed additional information regarding my diagnosis to my colleagues and explained why it was important for me to obtain coverage so that I could attend weekly medical appointments.

27. On April 25, 2022, while working a shift at the hospital, I became ill as a result of exposure to a patient with norovirus. I developed a fever of 103 degrees and experienced other severe symptoms of norovirus. I called Alan Vera, M.D., the Chief Resident in charge of scheduling, who expressed empathy, instructed me to go home, and sent in a back-up resident to cover for me. As I was leaving the hospital, I ran into Dr. Shetty. He scolded me for leaving the hospital, accusing me of stranding the team and only looking out for myself. Dr. Shetty threatened a "major consequence" for leaving the hospital and that I would have a difficult time finding a position at another residency program. Dr. Shetty added that the residents were already accommodating me and asked, facetiously, "how much more help do you need from us?" When I explained that I was sick and that remaining at the hospital would only endanger the health of patients and staff, Dr. Shetty ignored me. As I was leaving, Dr. Shetty told me he was going to report me to program leadership.

28. The following day, April 26, 2022, I was told not return to work, but to attend a meeting with Dr. Amory and Dr. Robeson on April 28, 2022, which I did. During that April 28 meeting, Dr. Amory and Dr. Robeson told me that I was being terminated from the Neurology Residency Program because I had not been complying with the social training aspect of my remediation plan.

29. Additionally, Dr. Amory and Dr. Robeson aggressively questioned me about items that had been reported missing from the residents' workroom, including a cell phone charger and a small reflex hammer, as well as vandalism on some of the artwork exhibited on the wall of the clinic, in an area that staff, visitors, and patients had access to.[3] Dr. Amory and Dr. Robeson strongly implied that I bore responsibility for the theft and vandalism. These implications were and are completely baseless as I never stole or vandalized anything and there was no evidence suggesting that I had done so. When I asked the Program Directors why they thought it was me, they responded, in sum and substance, "who would it be if not you"?

30. Dr. Amory, supported by Dr. Robeson, stated that several of the neurology residents suspected me and that "what matters is that some people here think that you did it." Dr. Amory further stated that the accusations were a symptom of the mistrust that I had cultivated in my fellow residents.

31. I became extremely upset upon hearing this, began to cry, and said that I did not feel much hope in my career as a doctor. In response, Dr. Amory ordered that I be taken to the Albany Med Emergency Department ("ED"). I clarified that I had no intention of harming myself or others, but Dr. Amory threatened to call security and asked me if I wanted to make a scene. I begged Dr. Amory to allow me to go to a hospital other than Albany Med, as I did not want the attending physicians, residents, and nurses to see me being taken to the ED. Dr. Amory refused and he and Dr. Robeson then forced me to sit in a wheelchair and took me to the Albany Med ED against my wishes.

---

[3] Indeed, one day earlier, on April 27, 2022, Dr. Robeson had sent an email to all neurology residents regarding missing items. This email is attached to the Solotaroff Dec. as Exhibit K.

32. At the Albany Med ED, the attending physician said he had no ground to hold me against my will, as I was a competent adult with no indication of suicidal or self-injurious ideation.

33. This episode was very traumatic for me.

34. Soon after I was notified that I had been terminated from the Neurology Residency Program, I requested an appeal of the decision.

35. On May 25, 2022, I was told that Dr. Amory had rescinded his decision to terminate me.

36. On May 26, 2022, Dr. Amory and Dr. Robeson sent me a letter stating I had failed to meet the terms of the remediation plan, and that remediation would be extended until September 1, 2022.

37. On June 1, 2022, I met with Dr. Robeson, Dr. Amory, and Catherine Riddle, the Director of Graduate Medical Education ("GME") at Albany Med. During this meeting, Dr. Amory said he believed Albany Med should not accommodate me, but instead I should change to accommodate Albany Med. Dr. Robeson suggested that I find another residency program. I was also informed that I would not be allowed to directly care for patients, and that I could only shadow other physicians. Dr. Amory claimed that this arrangement would be in place while the Albany Med Human Resources ("HR") Department figured out appropriate accommodations for me.

38. I faced renewed hostility from my fellow residents when I returned to the program. This, I believe, was due to the fact that many residents incorrectly assumed I had been responsible for the theft and vandalism in the residents' room and that I had been terminated for theft, and then reinstated because I was not given an accommodation for my disability.

Furthermore, according to several of my former colleagues, when residents asked Dr. Robeson why I had been dismissed from the program, Dr. Robeson obliquely told them, in sum and substance, that the Program Directors "have information that residents are not privy to." I believe this vague and mysterious response further reinforced the suspicion among many residents that I had been guilty of theft.

39. On July 11, 2022, I emailed Ellen Cosgrove, Albany's Vice-Dean for Academic Administration seeking assistance with challenges arising from the hostile work environment.[4]

40. On July 22, 2022, Albany Med's HR Department sent a memorandum, explaining several accommodations that would be provided at work, including intermittent time off for medical appointments and the assistance of an employment specialist to observe my meetings with Dr. Robeson and provide feedback on social cues and subtleties in communication.

41. Unfortunately, many of these accommodations were never provided to me in a meaningful or consistent manner. For example:

a. I missed several appointments with my psychiatrist because the residents covering my shift did not arrive on time;

b. My assigned employment specialist was only permitted to attend certain meetings and was excluded from others;

c. My assigned faculty mentor failed to provide guidance or support and instead simply advised me to look for other residency programs;

d. Dr. Amory and Dr. Robeson refused to allow my job coach on-site.

42. Meanwhile, many residents continued to display hostility toward me. One manifestation of such hostility was in August 2022, when all but one resident refused to cover my shifts so I could take a scheduled vacation. (And even then, I was only able to get partial

[4] My email to Ellen Cosgrove is attached to the Solotaroff Dec. as Exhibit L.

coverage, so I had to work 60% of my vacation.) In contrast, I had frequently accommodated other residents' requests for coverage.

43. During a meeting with Dr. Robeson in September 2022, Dr. Robeson claimed that there were "inconsistencies" in my autism diagnosis. She gave specific examples, such as me spending time in the resident workroom despite my previous complaints about sensory overload from loud noise and bright background light. This, however, was the result of the program not providing me with an acceptable workspace. Dr. Robeson cited this as a "severe deficiency" that I would need to address in order to remain in the residency program.

44. Based on this interaction with Dr. Robeson, I was concerned that I was still being discriminated against based on my disability. I contacted Albany Med HR Partner Kathryn Vandenburgh to report my concern about discrimination, but nothing was done.

45. I had been scheduled to advance to the PGY-3 year on September 15, 2022, having started the Neurology Residency Program at Albany Med in a PGY-2 year in September 2021. However, on July 18, 2022, a week after I had reached out to Vice-Dean Cosgrove, Dr. Robeson notified me that I would not be moving to PGY-3 and instead presented me with a three-month contract that extended my PGY-2 year until December 2022.[5] According to one of the Neurology Chief Residents, Brett Friedler, D.O., residents at Albany Med are never given three-month contracts. Residents without disabilities were given annual contracts.

46. I appealed the decision to extend my PGY-2 year. On October 5, 2022, I met with Dr. Alan S. Boulos, Dean of the Albany Med Medical College, in connection with the appeal. During the meeting, I complained to Dr. Boulos that I was being discriminated against based on my disability, that I had been severely bullied by my fellow residents and program

[5] The July 18 email from Dr. Robeson and the Contract Extension are attached to the Solotaroff Dec. as Exhibits P and Z, respectively.

leadership, that my reputation and mental well-being had been damaged, and that the three-month contract given to me was setting me up for failure.

47. Later in October 2022, just a few days after I complained to Dr. Boulos, Dr. Robeson falsely accused me of mishandling a patient's care. Although the patient at issue, who had previously been under my care, had an adverse event at the hospital, I was in no way involved or responsible for the situation.

48. I was not even at the hospital when the critical safety event took place, on October 8, 2022, and had no involvement in the case at that time. Dr. Robeson accused me of changing an order remotely from home and of prescribing medications for the patient, both of which are not true and are directly contradicted by the patient's medical records (which is, and has always been, in Albany Med's possession). Furthermore, the events leading up to the patient safety concern – including the patient's intubation, the ordering and administration of certain medications, and the discontinuation of hypertonic saline for the patient – were all performed by other doctors at Albany Med, not by me.

49. By letters dated October 17 and October 19, 2022, I was terminated from the Albany Med Neurology Residency Program. Dr. Robeson falsely stated in her October 17 letter that my "deficiencies in Interpersonal Communication Skills and Patient Care have contributed to patient harm."[6] Even if I had been at fault with this patient, in the past, other residents in the neurology department who had endangered patients were either placed on leave or were asked to repeat a year of the residency program. Each of those residents – who, notably, do not have disabilities – then successfully reentered the program.

[6] The October 17, 2022 Letter from Dr. Robeson is attached as Exhibit R to the Solotaroff Dec.

50. I appealed my termination internally to the Albany GME office, which convened a residency dismissal ad hoc committee. I presented rebuttal evidence and explained my disability to the committee.

51. The ad hoc committee affirmed my dismissal, which I appealed to Vice-Dean Cosgrove and eventually to Dean Boulos. My appeals were unsuccessful. The decision to terminate me was confirmed on January 19, 2023.

52. During my tenure in the residency program, I made numerous concerted efforts to help educate my colleagues and supervisors in the Neurology Department about working with adults with autism, including patients and coworkers.

53. In February 2022, I emailed Angela Antonikowski, Albany Med's Chief Health Equity, Diversity & Inclusion Officer. I complained to Dr. Antonikowski about specific instances of disability discrimination I had endured from other residents, including an instance where fellow resident Maria Kofman, D.O., had denied that a patient with autism was truly autistic, stating that the patient was "just making an excuse to be a jerk."[7] I also relayed to Dr. Antonikowski that Dr. Kofman and Dr. Shetty had commented that "people grow out of autism before hitting puberty" and that autism does not exist for adolescents or adults. I asked Dr. Antonikowski, in her capacity as diversity and inclusion officer, to help educate my fellow residents on individuals with developmental disorders. Dr. Antonikowski did not respond to this request.

54. I also reached out to numerous individuals and organizations outside of Albany Med for encouragement, support, and resources. In May 2022, at my request, Dr. Mary Doherty, the founder of Autistic Doctors International ("ADI"), a peer support and advocacy group for

---

[7] A print-out of this email is attached to the Solotaroff Dec. as Exhibit V.

autistic doctors, contacted Albany Med President and CEO Dr. Dennis McKenna to offer autism-related support and resources to Albany Med.[8] Dr. McKenna did not respond to Dr. Doherty.

55. Also in May 2022, Susan Hill from New York's Committee for Physician Health ("CPH") contacted Albany Med Human Resources to "express [its] strong advocacy and support" for me.[9]

56. At approximately the same time, I spoke with David Morrell, who was, at the time, the Director of Benefits at Albany Med.[10] Although Mr. Morrell was very supportive of me and attempted to arrange an autism awareness training for my colleagues in the neurology department, which the Chair of the department supported, the neurology residency program ultimately declined the training. The Program Directors told me that they believed an autism awareness training would be tantamount to placing the onus on others, rather than working hard to improve myself.

57. A few months later, in September 2022, Dr. Doherty from ADI contacted Dean Boulos in order to help provide support and resources on my behalf.[11] Dr. Boulos did not respond.[12] Dr. Doherty told me Albany Med is the only residency program that has failed to accept her offers to provide support and resources to residents with Autism.

58. In October 2022, I sent an email to Dr. Bartfield, offering to connect him with David Caudel, an expert in Autism and the Associate Director of the Frist Center for Autism and Innovation at Vanderbilt University.[13] Dr. Bartfield did not respond.

---

[8] Dr. Doherty's efforts are described in the Declaration of Dr. Mary Doherty ("Doherty Dec."), filed herewith.
[9] The letter from CPH is attached to the Solotaroff Dec. as Exhibit W.
[10] Mr. Morrell's efforts are described in the Declaration of David Morrell, filed herewith.
[11] *See* Doherty Dec. at ¶ 6.
[12] *Id.*
[13] Dr. Caudel's efforts are described in the Declaration of Dave Caudel, filed herewith.

59. Since my termination from the Albany Med Neurology Residency Program was finalized, I have applied to numerous residency programs in a variety of different specialties, including neurology, family medicine, internal medicine, emergency medicine, and anesthesiology. Although many program directors have expressed interest in moving forward with my application, and have asked for additional information, all residency programs require receipt of my Final Summative Evaluation from Albany Med or, at the very least, a letter of recommendation from the Program Director. Some programs require both.

60. Albany Med's Final Summative Evaluation portrays my performance very poorly; in fact, contemporaneous records of my performance are far more balanced and favorable overall.[14] Furthermore, Albany Med has told me that any letter of recommendation would be based on the Final Summative Evaluation, and therefore would be extremely negative.

61. Any program that would consider my residency application would likely insist on reviewing the Final Summative Evaluation document, especially in the absence of a recommendation from the Program Director.

62. Without a fair and accurate Final Summative Evaluation or letter of recommendation, it has been impossible for me to secure a spot in another residency program and continue my training.

63. I hereby declare under penalty of perjury that the foregoing statements are true.

---

[14] My New Innovations Evaluations and the Final Summative Evaluation are attached as Exhibits A and X to the Solotaroff Dec., respectively.

DATED: Albany, NY
July 6, 2023

Stella Pak, M.D.