UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

STELLA PAK, M.D.
Plaintiff,

-against-

ALBANY MED HEALTH SYSTEM,

Defendants.
-------------------------------------------------------------------X

Case No. 1:23-cv-378 (DNH/DJS)

**DECLARATION OF STELLA PAK**

1. I am the Plaintiff in the above captioned matter and submit this declaration in opposition to Defendant's motion for summary judgment.

2. I was first diagnosed with autism spectrum disorder ("ASD" or "autism") when I was around three years old.

3. My ASD manifests in several ways. For example, I often add overly inclusive and excessive details in my communications. I also interpret language literally and struggle to pick up on sarcasm, innuendo, and other subtleties and therefore require clear, direct, and explicit communication. Additionally, when presented with information, I have trouble displaying the correct emotion and therefore require time to process new information in order to respond accordingly.

4. I received a Bachelor of Science in Biology from Austin Peay State University in 2013 and a Doctor of Medicine from the University of Toledo College of Medicine in 2017.

5. At Austin Peay State University, I received the following accommodations for my ASD diagnosis: another individual was assigned to take notes for me during classes; I was afforded extra time and a quiet space to take examinations; I was given access to a quiet study area in the library and the college's disability center; and I was given a software that assisted with my learning.

6. The University of Toledo accommodated my ASD diagnosis by allowing me to take exams in a quiet, uncrowded room, giving me extra time to take my exams, providing me with a mentor to assist me in understanding things that were not literal, and letting me take breaks during my surgery rotation in the operating room.

7. In August of 2021, I interviewed for a resident position at Albany Medical Health System's ("Albany Med" or the "Hospital") Neurology Department.

8. I wanted to pursue neurology because it provides research opportunities that are more focused and in-depth than those in general medicine.

9. Dr. Colum Amory, the Program Director of the Neurology Department's Residency Program at the time, interviewed me.

10. A medical resident's first year is referred to as the intern year.

11. I was hired at Albany Med as a PGY2 resident because I had already successfully completed my intern year at another hospital.

12. I became credentialed to perform a lumbar puncture in the winter of 2021.

13. I was one of only two residents who presented projects to Albany Med's annual research conference in 2022.

14. I was the only resident at Albany Med who presented research both inside and outside the Hospital for the academic year 2021-2022.

15. In 2022, I also published two articles and seven new abstracts.

16. I disclosed my autism to Dr. Robeson and Dr. Amory in October of 2021.

17. After I contacted Dr. Angela Antonikowski, Albany Med's Associate Dean of Professional Wellbeing and the Chief Health Equity, Diversity & Inclusion Officer, on February 4, 2022 and requested that Albany Med afford me certain accommodations for my ASD diagnosis, Dr. Antonikowski did not initiate a process to provide me with accommodations.

18. As part of my first remediation plan, I underwent an administrative evaluation by Dr. Abigail Herron, a psychiatrist at the Institute for Family Health.

19. Dr. Amit Shetty, a rising chief resident in the neurology residency, instructed me not to attend my psychiatric appointments. He said that attending my psychiatric appointments had a negative impact on the wellbeing and education of the other residents, including himself. He stated that autism isn't like cancer or kidney failure, where something bad could happen if you don't see a doctor and complained that I was being selfish by going to treatment.

20. Soon after I joined the Residency Program in September 2021, some of the other residents began to mistreat, harass, bully, and spread false rumors about me. From what I heard, this hostility had nothing to do with my clinical performance, and was based on my interpersonal communication style, which is a manifestation of my autism. For example, after joining the program in September, several residents began to ridicule me for wearing

the same clothing every day, falsely assuming and teasing that I did not wash my clothes. (The truth is that, to accommodate my disability, I find it helpful to wear the same monochromatic clothing every day and to not vary my wardrobe.) Although I explained that I purchased multiple shirts of the same color and design and that I wear clean clothing every day, some of the residents teased me nonetheless. I was also laughed at for wearing a "lace lock device," which secures my shoelaces so they do not become untied. In addition, I always wear a fanny pack, which has my medications in it, as well as an orange wrist wallet. The lace lock, fanny pack, and wrist wallet are all accommodations that I have implemented in my life to help me function as a person with ASD.

21. One of the residents in particular, Trent Roubleau, M.D. (PGY-4 at the time), repeatedly called me a plumber based on my attire. I disclosed this teasing, as well as the emotional distress it was causing me, to Dr. Column Amory, one of the Neurology Residency Program Directors. Although Dr. Amory appeared sympathetic and supportive, I do not know if he took any steps to stop the bullying and harassment.

22. When I relayed Dr. Kofman's discriminatory comment about a patient who had autism to Dr. Antonikowski and asked if she could educate residents in the program about autism and the harm associated with disrespecting the autistic community, Dr. Antonikowski never responded.

23. I was not responsible for the thefts in the resident lounge or the vandalism of the two seasonal decorations made by other residents. To my knowledge, Drs. Amory and Robeson did nothing to counter my fellow residents' beliefs that I was responsible for these acts.

24. On April 25, 2022, Dr. Angelina Matthew was about a half hour late for her shift. The senior resident on call, Dr. Brett Fridler, told me that I could go home after signing out my patient to him because he planned to stay late to place his remaining orders and finish his notes. So, I signed out the patient in question to Dr. Fridler. It is common practice to sign a patient out to another resident who plans to stay late when your replacement resident is late for their shift.

25. On my way out, I saw Dr. Matthew in the hallway. When she asked me for the sign-out, I told her that the senior resident would provide it. Dr. Matthew insisted that she needed to receive sign-out from me, so I gave her a full sign-out including a full update on the patient in question. Before I left, I asked if Dr. Matthew needed any further information or had any questions, and she said everything was fine.

26. Many hours after I properly updated Dr. Matthew on the patient in question, the patient decided she did not want to stay in the hospital. So, the patient left, took a bus at the bus stop in front of the hospital, and went home against medical advice.

27. In a meeting with Dr. Robeson and Dr. Amory on April 28, 2022, they accused me, without evidence or proof, of being responsible for the theft and vandalism, which I denied.

28. After my reinstatement to Albany Med's neurology program, I returned to work on June 1, 2022.

29. I did not provide the chief residents with detailed information about my ASD diagnosis, the therapeutic treatment I received for my diagnosis, or my discussions with Albany Med's Human Resources ("HR") Department.

30. In the months after I returned to Albany Med after my reinstatement, I experienced bullying and discrimination from Albany Med Faculty.

31. I requested several accommodations upon returning to Albany Med, including: intermittent time off to attend communication coaching and other medical and mental health-related appointments; concrete, written supervisory directives when discussing or reviewing my performance, a faculty mentor from within Albany Med's neurology department to provide guidance, feedback, and support, a quiet, secluded space to work, and for Albany Med to educate my fellow residents and attending physicians about autism.

32. I requested to have my fellow residents and attending physicians educated about autism because I hoped that educating others about my disability would reduce the bullying and challenges I experienced because of my autism.

33. However, residents and attendings still frequently made it difficult for me to attend my medical appointments, causing me to miss several appointments.

34. I reported this to Dr. Amory and Dr. Robeson multiple times, but it never improved.

35. As part of my second remediation plan, Dr. Marianna Varelas Spanaki was assigned to be my mentor.

36. Patients who suffer a stroke are treated by Albany Med's "stroke service."

37. Stroke patients are sometimes injected with saline solutions, mixtures of salt and water, which can be delivered at various concentrations. A saline bolus refers to the rapid administration of a large amount of saline, as opposed to a slower, continuous drip.

38. On October 7, 2022, Dr. Risley instructed me to place an order for F.R. to receive 23.4% saline boluses. At 11:42 A.M., in front of Dr. Risley, I placed the order for F.R. to receive

23.4% saline boluses. At 11:47 A.M., in front of Dr. Risley, I fixed a minor typo in my 11:42 A.M. order for F.R. to receive 23.4% saline boluses. In addition to the 23.4% saline boluses, Dr. Risley had already prescribed F.R. a 3% saline solution. Dr. Risley never instructed me to discontinue the 3% saline solution. Therefore, I did not discontinue the 3% saline solution.

39. That evening, at the end of my shift, I gave updates on my patients to Dr. Collins, the resident taking over for me. I reviewed F.R.'s plan of care as documented in F.R.'s chart with Dr. Collins and advised him to consult the senior resident or attending physician if the patient's neurological status changed. I further requested that both Dr. Collins and his senior resident monitor F.R.'s sodium level overnight to ensure the treatment was carried out as planned.

40. After signing out and handing over my patients, including F.R., to Dr. Collins, I stayed late at the Hospital to finish writing notes for my patients that day. While I wrote my notes, I received a call from Albany Med's pharmacy (the "Pharmacy"). The Pharmacy informed me that the earlier order for 3% saline solution, placed by Dr. Risley, did not have the words ".per protocol" in the notes. ".Per protocol" means following standard practice that is already clearly spelled out in the daily note signed by the attending. Without the words ".per protocol" in the notes of the order for the 3% saline solution, the Pharmacy stated that they would be unable to release the medication to the nurse to administer to the patient because there was no instruction directing them to follow what was written in the note.

41. I notified the senior resident on call about this issue, but the resident stated that this task was part of my shift and therefore I had to add the proper notes myself so that the Pharmacy could carry out the order. At 11:44 P.M., I added the words, ".per protocol" to the notes of Dr. Risley's prior order for 3% saline solution. I did not change Dr. Risley's prior 3% saline solution order in any other way. Other than adding the words ".per protocol" to Dr.

Risley's order for 3% saline solution, I never changed orders for F.R.'s care after signing out to the resident taking over for me.

42. When a patient is intubated, a tube is inserted through their mouth and/or nose and into the windpipe to assist the patient with breathing and keep the airway open and protected.

43. Aspiration pneumonia is a lung infection that occurs when something that should go into the stomach accidentally goes into the lungs, causing inflammation and infection.

44. After his intubation, F.R. was treated with piperacillin-tazobactam, an antibiotic used to treat severe infections like aspiration pneumonia.

45. F.R. eventually showed improvement, and the outcome of his stroke care was considered successful. He was discharged to a post-hospital rehabilitation program approximately a month after his medical event.

46. Pulmonary edema is a condition where fluid fills the lungs and collects in the lung's air sacs, making it difficult to breathe. Flash pulmonary edema is an acute version of pulmonary edema that comes on quickly.

47. Albany Med maintains a safety reporting system in order to report anything that harms or could harm a patient, including errors, near misses, and unsafe conditions. Such a report is referred to as a Significant Incident ("SI") report.

48. To my knowledge, no SI reports have ever been filed for incidents regarding me.

49. The Clinical Competency Committee ("CCC") is the body of physicians at Albany Med responsible for deciding whether or not to terminate residents who are alleged to have engaged in conduct or performance that violates Albany Med's policy or fails to meet competency standards.

50. Maria Kofman was not terminated for her actions regarding F.R.'s care.

51. Maria Kofman was not disciplined for her actions regarding F.R.'s care.

52. Dr. Risley was not terminated for her actions regarding F.R.'s care.

53. Dr. Risley was not disciplined for her actions regarding F.R.'s care.

54. Other than being "educated on the need to clarify such a plan with the on call attending physician," Dr. Collin was not disciplined for his actions regarding F.R.'s care.

55. Dr. Collin was not terminated for his actions regarding F.R.'s care.

56. Dr. Zaky was not disciplined for his actions regarding F.R.'s care.

57. Dr. Zaky was not terminated for his actions regarding F.R.'s care.

58. I appealed the ad hoc committee's decision to Dean Boulos.

59. On January 19, 2023, Dean Boulos upheld my termination.

60. As a medical resident, I was supposed to be subject to the policies and guidelines set forth in the House Staff Handbook (the "Handbook").

61. I was not placed on suspension before my first or second termination.

62. I was not placed on probation prior to either of my terminations.

63. Following my termination, I lost my employment and livelihood, experienced harm to my professional reputation, and suffered a worsening of my depression and anxiety.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of January, 2026.

Stella Pak (Jan 20, 2026 18:31:26 EST)

Stella Pak, M.D.

# 1.20.2026 Pak Declaration Final

Final Audit Report 2026-01-20

| | |
|---|---|
| Created: | 2026-01-20 |
| By: | Symone Yancey (syancey@gslawny.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAAXQakfVFHZr5mEMHxyNOIrm0_2L-c0CI |

## "1.20.2026 Pak Declaration Final" History

- Document created by Symone Yancey (syancey@gslawny.com)
  2026-01-20 - 10:58:26 PM GMT

- Document emailed to Stella Pak (stellacpak@outlook.com) for signature
  2026-01-20 - 10:58:30 PM GMT

- Email viewed by Stella Pak (stellacpak@outlook.com)
  2026-01-20 - 11:31:00 PM GMT

- Document e-signed by Stella Pak (stellacpak@outlook.com)
  Signature Date: 2026-01-20 - 11:31:26 PM GMT - Time Source: server

- Agreement completed.
  2026-01-20 - 11:31:26 PM GMT