UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STELLA PAK, M.D.,

Plaintiff,

-v- 1:23-CV-378 (DNH/DJS)

ALBANY MED HEALTH SYSTEM,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| GISKAN SOLOTAROFF & ANDERSON LLP<br>Attorneys for Plaintiff<br>1 Rockefeller Plaza, 8th Floor<br>New York, NY 10020 | AMY ROBINSON, ESQ.<br>JASON SOLOTAROFF, ESQ. |
| BOND, SCHOENECK & KING, PLLC<br>Attorneys for Defendant<br>22 Corporate Woods Blvd.<br>Suite 501<br>Albany, NY 12211 | ROBERT F. MANFREDO, ESQ. |

DAVID N. HURD
United States District Judge

## DECISION & ORDER

## I. INTRODUCTION

On March 24, 2023, plaintiff Stella Pak, M.D., ("plaintiff"), a former medical resident in the medical residency program (the "Program") at defendant

Albany Med Health System ("Albany Med" or "defendant"), filed this civil rights action alleging that defendant failed to accommodate her, and discriminated and retaliated against her, in violation of Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act" or "Section 504"), the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and the New York State Human Rights Law ("NYSHRL").

Plaintiff's amended complaint alleges that, after she disclosed that she had autism spectrum disorder ("ASD"), defendant discriminated against her, failed to provide reasonable accommodations for her disability, placed her on remediation because of disability-related communication difficulties, and ultimately terminated her from the Program because of her disability and in retaliation for requesting accommodations and complaining about disability discrimination. Dkt. No. 31. The amended complaint further alleges that, although defendant later reinstated her for a period of time and engaged in an accommodation process, it failed to implement meaningful accommodations and later terminated her employment under pretextual circumstances. *See id.*

On October 31, 2025, after the close of discovery, defendant moved for summary judgment. Dkt. No. 52. Defendant also moved to preclude certain

expert testimony from Lauren Koffman, M.D. ("Dr. Koffman"). Dkt. No. 53.[1]

The motion for summary judgment has been fully briefed, Dkt. Nos. 61, 63, and will be considered on the basis of the submissions without oral argument.

## II. **BACKGROUND**[2]

Plaintiff was diagnosed with ASD at age three. Pl.'s Resp. ¶¶ 20, 24, 25; Amory Dec. ¶ 5. Plaintiff did not initially disclose this diagnosis or request any accommodations when she applied to Albany Med's residency Program. *Id.* Plaintiff joined the Program in September 2021 as a second year resident in neurology. Pl.'s Add'l Facts ("Pl.'s Facts"), Dkt. No. 61-1 ¶¶ 7, 11; Amory Dec., Dkt. No. 52-21 ¶ 5; Robeson Dec., Dkt. No. 52-47 ¶ 6. Albany Med was plaintiff's fifth residency program. Pl.'s Resp. to Def.'s Facts ("Pl.'s Resp."), Dkt. No. 63-1 ¶ 19; Pl.'s Dep., Dkt. No. 52-3 at PAK000001.

At the time, Dr. Colum Amory ("Dr. Amory") was defendant's Program Director, and Dr. Kimberly Robeson-Gewuerz ("Dr. Robeson") was the

[1] The parties have submitted letter motions to Judge Stewart, Dkt. Nos. 55, 56, concerning the timing of defendant's motion to preclude Dr. Koffman's testimony. Plaintiff, for her part, requests that consideration of the motion be deferred until after summary judgment or, alternatively, that the motion be denied as premature. Defendant, for its part, acknowledges that it did not seek leave before filing the motion and requests either retroactive permission or a stay pending further proceedings. The motion to preclude will be considered below.

[2] The following facts are taken from a comparison of the parties' Local Rule 56.1 Statements. *Compare* Dkt. No.61-1, *with* Dkt. No. 63-1. Because plaintiff is the non-movant, the Court will adopt her version of events, to the extent those events are supported with non-conclusory citations to the record in accordance with the requirements of Local Rule 56.1.

Associate Program Director. Pl.'s Resp. ¶¶ 6–7; Amory Dec. ¶ 3. In July 2022, Dr. Robeson became Program Director and Dr. Amory became Associate Program Director. Pl.'s Resp. ¶ 7; Robeson Dec. ¶ 4. Albany Med's residency programs are overseen by the Department of Graduate Medical Education ("GME") and accredited by the Accreditation Council for Graduate Medical Education. Pl.'s Resp. ¶¶ 2, 4. Catherine Riddle is Albany Medical College's Director of GME. *Id.* ¶ 5; Riddle Dec., Dkt. No. 52-36 ¶ 1.

The parties sharply dispute the quality of plaintiff's performance throughout her time in the residency program. For instance, defendant points to contemporaneous evaluations and communications identifying concerns regarding plaintiff's judgment, knowledge, communication, and professionalism. *See* Pl.'s Resp. ¶¶ 30, 46–47, 58–65; Robeson Dec., Dkt. No. 52-47 ¶ 7 ("Almost immediately upon entering the Program, [p]laintiff struggled to perform as expected for a physician with her level of training. Plaintiff often lacked professionalism and interpersonal communications skills when interacting with fellow residents and patients . . . I received numerous complaints regarding the difficulties that [p]laintiff was having in this regard."); Amory Dec.¶ 6.

Plaintiff, for her part, points to positive assessments from several faculty members who described her as hardworking, diligent, and committed to patient care. *See* Pl.'s Facts ¶¶ 22–30, 60–62; Varelas Dep., Dkt. No. 61-75 at 2 (describing plaintiff as a "very, very hard worker" and reporting being "happily

impressed" by her interest in research). Those competing assessments continued throughout plaintiff's tenure in the Program.

In January of 2022, Albany Med placed plaintiff on a formal "remediation plan" based on perceived deficiencies in several areas of her performance. Pl.'s Resp. ¶¶ 46–47; Pak Tr., Dkt. No. 52-3 at 103. As part of that process, psychiatrist Dr. Abigail Herron evaluated plaintiff and concluded in April 2022 that her workplace difficulties were primarily communication-related, attributable to her ASD, and potentially manageable with appropriate support and accommodations. *Id.* ¶¶ 48–54; Pak Tr. at 107–12 ("The difficulties [plaintiff] has faced at her current training program are consistent with, and a direct consequence of, her [ASD] . . . her difficulties have been restricted to communication with members of the staff. It is my opinion that [plaintiff] does not experience a level of impairment from her [ASD] that is such to prevent her from practicing medicine."). After her meeting with Dr. Herron, plaintiff began attending weekly psychiatrist appointments. Pak Dec. ¶ 18, Dkt. No. 12-2.

In February of 2022, and while her formal remediation program was ongoing, plaintiff contacted Dr. Angela Antonikowski, Albany Med's Associate Dean of Professional Wellbeing and the Chief Health Equity, Diversity & Inclusion Officer, and requested accommodations for her ASD. Pl.'s Facts ¶ 46; Riddle Tr., Dkt. No. 61-15 at 72; Dkt. No. 61-16. Days after the close of her formal remediation period, Albany Med dismissed plaintiff based on its

conclusion that she had not sufficiently improved. Pl.'s Resp. ¶¶ 66–73; Amory Dec. ¶¶ 25–27, 31; Robeson Dec. ¶¶ 25–27, 31.

During this period, Albany Med's then-Director of Benefits, Brian Morrell, was "very concerned that certain people at Albany Med may have engaged in disability discrimination." Pl.'s Facts ¶ 90; Morrell Dec. ¶ 6, Dkt. No. 12-5. Morrell communicated those concerns to Sandra Castilla, Albany Med's Vice President of Human Resources, but avers that he received no response despite repeated follow-up communications. Pl.'s Facts ¶¶ 91–92; Morrell Dec. ¶ 7.

Plaintiff challenged her dismissal, and on May 25, 2022, Albany Med rescinded the dismissal and reinstated her to the Program under her previous remediation plan. Pl.'s Facts ¶¶ 93–97; Dkt. No. 61–36. Plaintiff returned to the Program on June 1, 2022, with the expectation that she would "work with the Graduate Medical Education office and [HR]" with respect to accommodations for her ASD. Pl.'s Facts ¶¶ 96–97; Dkt. No. 61–36.

Plaintiff contends that Drs. Amory and Robeson immediately opposed her reinstatement and subjected her to heightened scrutiny after her return to the Program. *See* Pl.'s Facts ¶¶ 98–102. In fact, on June 1—the first day of plaintiff's return to the Program—Dr. Amory wrote in an e-mail that he was "concerned[] that [plaintiff] will fail again, and fail soon" and that "[w]e're planning on intensively thorough and comprehensive documentation moving forward," while expressing concern that, "short of a major patient complication,"

the Program would lack sufficient proof for Human Resources to accept another termination. Dkt. No. 61-37. In that e-mail, Dr. Amory also noted that, although plaintiff was still on a formal remediation plan, "many of the items on the plan are difficult to measure and therefore up to interpretation." *Id.*

Plaintiff contends that she experienced hostility from certain faculty members following her reinstatement. For instance, Residency Coordinator Michelle Unser called plaintiff "toxic," stated that "[s]he must go . . . [w]hatever it takes," and later described her as a "manipulative sociopath," stating, "[t]here has to be a loophole that allows us to fire her." Pl.'s Facts ¶¶ 120–122; Dkt. No. 61-42; Dkt. No. 61-43. Plaintiff also points to a text message in which attending physician Laura Risley referred to plaintiff as "insane" and told a colleague that it would be "[m]asochistic" to volunteer to be plaintiff's mentor. Pl.'s Facts ¶¶ 123–128; Dkt. No. 61-43.

Concerns about plaintiff's performance continued after her reinstatement. In July of 2022, Dr. Timothy Lynch emailed Dr. Robeson that plaintiff remained "behind [other second year residents] in answering questions," did not "think or reason," and "should [not] be a clinician." Dkt. No. 52-74. Other faculty and residents likewise reported concerns regarding plaintiff's patient sign-outs, communication with nursing staff, and clinical decision-making during this period. *See generally* Dkt. Nos. 52-61–52-80.

Following her reinstatement, plaintiff requested accommodations for her ASD, including time off for medical appointments, written supervisory directives, a faculty mentor, a quiet workspace, and autism-awareness training. Pl.'s Facts ¶ 129; Dkt. No. 61-45; Dkt. No. 61-46; Dkt. No. 61-47.

Defendant maintains that it engaged in an interactive process with plaintiff and provided her with reasonable accommodations, while plaintiff contends that several approved accommodations were delayed, inconsistently implemented, or ineffective in practice. Pl.'s Facts ¶¶ 129–152; Accommodations Response Email, Dkt. No. 52-53.

The parties also dispute when Drs. Amory and Robeson first learned of plaintiff's ASD. Defendant maintains that the diagnosis was first discussed during the January 21, 2022 remediation meeting, while plaintiff recalls disclosing it several months earlier—in October 2021. *Compare* Pl.'s Resp. ¶ 77; Riddle Dep., Ex. 9, 52-7 ("It does not appear that any formal accommodation request has ever been filed with HR[.]"), *with* Pak Decl. ¶ 16.

During the months following plaintiff's reinstatement, the Program's Clinical Competency Committee continued to review her performance. In August of 2022, plaintiff complained to program leadership and HR that Dr. Risley was mistreating her. Pl.'s Facts ¶¶ 168–76; Dkt. No. 52-46; Dkt. No. 52-31 ("[Plaintiff] thinks that Dr. Risley thought she could treat her poorly after she was fired . . . [r]ecently [plaintiff] has been minimizing her interaction with Dr.

Risley and is worried that is impacting patient care.”). In October of 2022, plaintiff told Dr. Amory that Dr. Risley had told her that “individuals with autism are not capable of learning” and excluded her from workplace teams. Pl.’s Facts ¶¶ 171–76; Dkt. No. 52-25.

On October 7, 2022, while plaintiff was treating a stroke patient under Dr. Risley’s supervision, dispute arose concerning plaintiff’s management of the patient’s saline treatment. *See generally* Pl.’s Facts ¶¶ 177–231. The patient suffered an adverse event. *See id.* Several days later, Dr. Risley reported concerns regarding plaintiff’s care of the patient to Drs. Robeson and Amory, and plaintiff was removed from patient service and placed on leave. *Id.* ¶¶225, 230, 242–63. Plaintiff, on the other hand, contends that Dr. Risley inaccurately attributed the patient’s adverse medical event to her conduct. *Id.*

Following an expedited review, the CCC recommended that plaintiff be terminated from the Program, effective October 19, 2022. Pl.’s Facts ¶ 262; Dkt. No. 61-65. Plaintiff challenged that decision through Albany Med’s internal review process. An *ad hoc* committee subsequently upheld the termination, and plaintiff’s further appeal to the Vice Dean of Academic Administration was denied in December 2022. *See* Pl.’s Facts ¶¶ 277–85; Dkt. No. 61-69.

This civil rights action followed.

## III. LEGAL STANDARD

The entry of summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is considered "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In conducting this analysis, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant. *Id.* at 255. Even so, there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

""The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists,' but 'when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to' an absence of evidence 'on an essential element of the non-movant's claim.'" *Bustamante v. KIND, LLC*, 100 F.4th 419, 432 (2d Cir. 2024) (quoting *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 108 (2d Cir. 2023)).

## IV. DISCUSSION

Plaintiff's amended complaint asserts claims for disability discrimination (Counts One, Three, Five, and Seven) and retaliation (Counts Two, Four, Six, and Eight) under the Rehabilitation Act, the ADA, Title VII, and the NYSHRL. Dkt. No. 31. Defendant has moved for summary judgment on each of those claims, Dkt. No. 52, and has also moved to preclude expert testimony from Dr. Koffman. Dkt. No. 53.

### A. Procedural Deficiencies

Before reaching the merits of plaintiff's claims, there is a threshold matter to address—namely, plaintiff's failure to comply with certain requirements of the Local Rules governing summary judgment practice.

Local Rule 56.1 governs summary judgment procedure in this District. Under Local Rule 56.1, "[a]ny motion for summary judgment shall contain a separate Statement of Material Facts" ("SOMF"). L.R. 56.1(a). The SOMF "shall set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue." L.R. 56.1(a). "Each fact listed shall set forth a specific citation to the record where the fact is established." *Id.* Correspondingly, a non-movant "shall file a separate Response to the Statement of Material Facts." L.R. 56.1(b).

A non-movant's response must "mirror the movant's Statement of Material Facts by admitting and/or denying each of the assertions in a short and concise statement, in matching numbered paragraphs." L.R. 56.1(b). "Each denial shall set forth a specific citation to the record where the factual issue arises." *Id.* The Rule further permits the non-moving party to submit "a *short* and *concise* Statement of Additional Material Facts in Dispute," provided those facts are likewise supported by specific citations to the record. *Id.* (emphasis added).

Here, plaintiff's response to defendant's SOMF does not consistently hew to Local Rule 56.1's requirements. In numerous instances, plaintiff purports to "deny" factual assertions without actually disputing any underlying fact being offered. Instead, plaintiff frequently responds by (1) challenging the *credibility* of defendant's witnesses rather than the factual assertion itself; (2) arguing that defendant omitted *additional* favorable information from the cited record; (3) *objecting* that words or quotations are "argumentative" or "not material"; and/or (4) *interjecting* additional facts that do not directly controvert the fact proposition being asserted.

To take just one example, defendant asserts that Drs. Amory and Robeson considered plaintiff's ASD diagnosis when evaluating her performance. Plaintiff "denies" the statement, not by disputing that the physicians considered her diagnosis, but by asserting that Dr. Robeson "admitted under oath

that she had engaged in deception" in another context and therefore lacks credibility generally. *See* Pl.'s Resp. ¶ 51. This is not a proper response.

Plaintiff's Statement of Additional Material Facts similarly fails to conform to Local Rule 56.1. Rather than setting forth "a short and concise statement" of additional material facts, plaintiff frequently advocates legal points under the guise of factual assertions. *See, e.g.*, Pl.'s Add'l Facts ¶ 119 (asserting that "[i]n the months after Dr. Pak returned to Albany Med, she also experienced bullying and discrimination from Albany Med Faculty.").

"[T]he purpose of . . . the Statement of Additional Material Facts in Dispute, is not to provide a non-movant a convenient spot to slip in additional argument, present wholly superfluous facts, or recharacterize undisputed facts in a favorable gloss." *Butler v. New Paltz Cent. Sch. Dist.*, 2026 WL 849925, at *4 (N.D.N.Y. Mar. 27, 2026) (Brindisi, J.). The Local Rule 56.1 procedure "is not a suggestion, nor is it a rule of general guidance upon which attorneys are free to impose their own interpretations of what must be submitted[.]" *Id.* (quoting *Riley v. Town of Bethlehem*, 5 F. Supp. 2d 92, 93 (N.D.N.Y. 1998)).

Even so, the Court has independently reviewed the record. Although it will not disregard plaintiff's submissions wholesale, plaintiff's approach to this

procedural requirement has made a meaningful legal analysis all the more challenging.[3]

**B. <u>Plaintiff's Discrimination Claims</u>**

Defendant has moved for summary judgment on plaintiff's ADA, Rehabilitation Act, Title VII, and NYSHRL disability discrimination claims.[4] Def.'s Mem. at 11–21.

Section 504 of the Rehabilitation Act "prohibits a program or activity receiving federal funds from excluding or discriminating against persons based on disability." *Biondo v. Kaleida Health*, 935 F.3d 68, 73 (2d Cir. 2019). It provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her [] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Section 504 goes on to define a "qualified individual with a disability" as someone "who,

---

[3] Counsel is further reminded that "[f]ollowing this and other aspects of [the] Local Rule . . . saves the reviewing court the trouble of having to do what this Court is doing right now—double- and triple-checking each individual factual allegation to try to determine whether it is genuinely in dispute or whether the non-movant just wants it to appear to be in dispute[.]'" *Butler*, 2026 WL 849925, at *4 (quoting *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 725 (N.D.N.Y. 2020)).

[4] Plaintiff also asserts disability discrimination and retaliation claims under Title VII. But Title VII does not prohibit discrimination based on disability. *See Collings v. State Univ. of NY at Cortland*, 2025 WL 904649, at *9, n.8 (N.D.N.Y. Mar. 25, 2025) (allegations that plaintiff was retaliated against for requesting disability accommodations cannot support a Title VII retaliation claim because no reasonable person could believe such a request opposed conduct prohibited by Title VII, which "explicitly does not cover disability discrimination"). Accordingly, Counts Seven and Eight fail as a matter of law and will be dismissed.

with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8); 29 U.S.C. § 794(d).

Section 504's employment-discrimination standards mirror those applicable under Title I of the ADA. *Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 148 (2d Cir. 2024); *see also Woods v. Centro of Oneida, Inc.*, 103 F.4th 933, 939 n.1 (2d Cir. 2024). Generally speaking, claims under the ADA, Rehabilitation Act, and NYSHRL are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See, e.g.*, *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74–75 (2d Cir. 2016).

Under that framework, plaintiff must first establish a *prima facie* case by showing that: "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 324 (S.D.N.Y. 2020) (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019)). If plaintiff makes that showing, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the challenged action. *Id.* The burden then shifts back to plaintiff to produce evidence from which a reasonable jury could conclude that defendant's stated reason was

pretextual and that disability was a but-for cause of the challenged action. *See Natofsky v. City of N.Y.*, 921 F.3d 337, 348–49 (2d Cir. 2019).

Defendant first argues that plaintiff cannot establish that she was qualified to remain in the Program because she could not perform the essential functions of a second year neurology resident, even with reasonable accommodation. Def.'s Mem. at 11–14. Defendant points to evidence of deficiencies in plaintiff's "medical knowledge, communication skills, professionalism, and patient care" and argues that those deficiencies implicated the central responsibilities of a neurology resident. Defendant further emphasizes that courts generally defer to medical educators' professional judgments concerning a resident's clinical qualifications.

That may all be true. But the existing record is not so one-sided as to establish plaintiff's lack of qualification as a matter of law. As the Second Circuit has explained, "employers may not discriminate against people with disabilities that do not prevent job performance, but when a disability renders a person unable to perform the essential functions of the job, that disability renders him or her unqualified." *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 229 (2d Cir. 2017).

Although courts give considerable deference to an employer's judgment about what a job requires, *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 469 (2d Cir. 2019), the determination of a job's "essential functions" requires a fact-

specific inquiry into the employer's job description as well as how the job is actually performed in practice, *Stevens*, 851 F.3d at 229; *see also Kelleher*, 939 F.3d at 469 ("Discovery may be necessary to determine whether an employee was qualified for a particular position.").

To be sure, Albany Med's professional judgment concerning the clinical competencies required of its residents is entitled to substantial weight. *See Brief v. Albert Einstein Coll. of Medicine*, 423 F. App'x 88, 91 (2d Cir. 2011) (summary order). But that deference does not permit the Court to resolve genuinely disputed evidence regarding whether plaintiff could satisfy those requirements with reasonable accommodation.

Although defendant has identified substantial evidence of performance concerns, plaintiff points to positive evaluations, evidence of improvement, and Dr. Abigail Herron's opinion that plaintiff's ASD did not prevent her from practicing medicine and that her communication-related difficulties were potentially manageable with appropriate support and accommodations.

The parties also genuinely dispute whether several of plaintiff's requested accommodations were even meaningfully implemented. Thus, whether plaintiff could perform the essential functions of the residency with reasonable accommodations presents a genuine issue of material fact. The first step of *McDonnell Douglas* is satisfied.

Defendant next argues that plaintiff cannot establish that she was terminated because of her ASD. Def.'s Mem. at 15–19. Plaintiff contends that defendant discriminated against her because of her ASD by subjecting her to heightened scrutiny, improperly construing her disability-related communication difficulties as performance deficiencies, and ultimately terminating her residency. Defendant, on the other hand, contends that it terminated plaintiff's residency because of her longstanding deficiencies.

Defendant has plainly met its burden of *production* at the second step of *McDonnell Douglas*. Persistent performance deficiencies, failure to satisfy remediation requirements, professionalism concerns, and patient-safety incidents constitute legitimate, nondiscriminatory reasons for terminating a medical resident. Def.'s Mem. at 16–18.

Defendant points to negative evaluations throughout plaintiff's tenure and predating the disclosure of her ASD, her initial remediation and dismissal, continuing concerns following reinstatement, and the October 2022 incidents that led to her suspension and final termination.

The issue therefore comes down to whether plaintiff has produced sufficient evidence from which a reasonable jury could find those reasons pretextual and conclude that disability discrimination was a but-for cause of her termination from the Program.

Upon review, plaintiff's evidence is sufficient to create a genuine dispute as to whether defendant's performance-based explanation, although well-documented, actually accounts for her termination. Plaintiff's performance concerns were documented beginning shortly after she entered the Program and continued throughout her tenure. At the same time, however, plaintiff points to evidence that Dr. Abigail Herron concluded in April 2022 that plaintiff's workplace difficulties were limited to communication with staff, were attributable to her ASD, and could potentially be addressed with the appropriate accomadations. Pak Tr. at 107–12

Plaintiff also relies on evidence concerning defendant's treatment of her after her dismissal was rescinded. Plaintiff contends that, following her reinstatement, Drs. Amory and Robeson were determined to fire her no matter what—they increased their scrutiny of her and sought to create a record supporting termination.

In particular, plaintiff points to Dr. Amory's June 1 e-mail expressing concern that plaintiff would "fail again, and fail soon" and stating that, absent a "major patient complication," the Program would lack sufficient proof to terminate her. Dkt. No. 61-37. Plaintiff further relies on evidence of disability-related hostility by certain faculty and staff, including comments concerning plaintiff's ASD. *See* Pl.'s Facts ¶¶ 103–128; Dkt. No. 61-42; Dkt. No. 61-43. The parties also genuinely dispute aspects of the factually convoluted October

saline incident with a patient that defendant points to as part of the justification for plaintiff's ultimate termination.

On this record, the Court concludes that plaintiff has identified sufficient evidence from which a reasonable jury could find that defendant's stated performance-based reasons for its actions were pretextual and that plaintiff's disability was a but-for cause of the challenged treatment. Accordingly, defendant's motion for summary judgment on plaintiff's discrimination claim will be denied.

### C. <u>Plaintiff's Failure to Accommodate Claims</u>

Defendant also moves for summary judgment on plaintiff's failure to accommodate claims. *See* Def.'s Mem. at 22–24. As an initial matter, defendant appears to construe plaintiff's disability discrimination claims as encompassing a distinct failure to accommodate theory, notwithstanding the fact that the Amended Complaint does not separately enumerate such a claim.

Courts in the Second Circuit generally treat failure to accommodate claims as a form of disability discrimination. *See, e.g., Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016); *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96–97 (2d Cir. 2009) (describing a *prima facie case* of "disability discrimination arising from a failure to accommodate"); *see also Berger v. N.Y. City Police Dep't*, 304 F. Supp. 3d 360, 368–69 (S.D.N.Y. 2018) (evaluating NYSHRL failure-to-accommodate claim). Because both parties brief the issue on the

merits, *see* Def.'s Mem. at 22–24; Pl.'s Opp. at 25–28, the Court will do the same.

A failure to accommodate claim in the employment context requires the plaintiff to show that: (1) she is a qualified individual with a disability; (2) her covered employer had notice of his disability; (3) with a reasonable accommodation, she could perform the essential functions of the job at issue; and (4) the employer refused to make such accommodations. *Costabile v. N.Y. City Health & Hosps. Corp.*, 951 F.3d 77, 81 (2d Cir. 2020).

If the plaintiff makes this showing, the employer can defeat the claim if it shows that the reasonable accommodation would cause undue hardship. *See, e.g.*, *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997); *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 791–92 (S.D.N.Y. 2020) (defining "undue hardship").

Plaintiff contends that, after disclosing her ASD, she requested accommodations, including intermittent time to attend medical appointments, concrete written supervisory directives, a faculty mentor, a quiet workspace, and autism-awareness training for residents and faculty. Defendant maintains that it engaged in an interactive process with plaintiff and provided reasonable accommodations.

The record contains evidence that plaintiff disclosed her ASD and requested accommodations while her remediation was ongoing. After defendant

reinstated plaintiff to the Program, she returned with the expectation that she would do so with accommodations. Plaintiff contends, however, that defendant failed to consistently implement the accommodations she requested.

In particular, plaintiff asserts that she continued to experience difficulty attending medical appointments, that her faculty mentor was unable to meet with her regularly, that she was not provided a permanent quiet workspace, and that defendant declined to implement proposed autism-awareness training. *See* Pl.'s Facts ¶¶ 129–152.

Defendant, on the other hand, disputes whether each requested accommodation was reasonable or necessary and maintains that plaintiff received reasonable accommodations. The parties' evidentiary showing therefore places in dispute both the accommodations that defendant actually provided and whether the accommodations plaintiff requested were reasonable and necessary to enable her to perform the essential functions of the residency.

To establish a reasonable accommodation, the plaintiff bears only a modest burden of production. *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370 (2d Cir. 2008). Plaintiff has met that burden. Her ASD allegedly causes her to interpret language literally and makes clear, direct communication particularly important. Pl.'s Facts ¶ 2. For that reason, plaintiff requested concrete written supervisory directives and a faculty mentor. *Id.* ¶ 129. Dr. Herron's assessment provides evidence that communication-related accommodations

could have assisted plaintiff in performing her job. *Id.* ¶¶ 51–54. Accordingly, there is evidence from which a reasonable jury could conclude that at least some of plaintiff's requested accommodations were connected to limitations arising from her ASD and could have assisted her in performing the essential functions of the residency.

There is also a genuine dispute over whether defendant meaningfully provided the accommodations that it eventually approved. Defendant emphasizes that it formally granted many of plaintiff's requests and engaged in an interactive process with plaintiff after her reinstatement.

But "[t]he reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder." *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015). And plaintiff has identified evidence suggesting that the accommodations provided on paper were not always implemented in practice.

For example, although defendant approved intermittent time away from work for medical and coaching appointments, plaintiff avers that residents and attending physicians continued to complicate her efforts to attend those appointments and that she repeatedly informed Program leadership of the problem without improvement. Pl.'s Facts ¶¶ 129–31. And although defendant offered plaintiff access to quiet space when it was available, plaintiff points to

testimony that she was never provided a permanent and consistent quiet workspace. *Id.* ¶ 142.

The record also presents a factual dispute concerning plaintiff's request for concrete written supervisory directives. Shortly after that plan was implemented, Dr. Amory himself observed that "many of the items on the [remediation] plan are difficult to measure and therefore up to interpretation." Dkt. No. 61-37. A reasonable jury could conclude that such directives did not satisfy plaintiff's request for concrete and explicit performance guidance tailored to limitations associated with her ASD.

To be sure, not every accommodation identified by plaintiff necessarily qualifies as reasonable. For instance, plaintiff's request that defendant provide autism-awareness training to faculty and residents presents a different question from accommodations directed to plaintiff's own working conditions.

The federal disability statutes "do[ ] not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation provided is reasonable." *Fink v. N.Y.C. Dep't of Personnel*, 53 F.3d 565, 567 (2d Cir.1995). But the Court need not determine at this stage whether each individual proposal was independently required. Plaintiff need only identify evidence from which a reasonable jury could conclude that a reasonable accommodation existed that defendant failed to provide.

Defendant's principal response—that plaintiff remained unable to perform the essential functions of the residency despite the accommodations she received—does not eliminate these factual disputes. To be sure, defendant has produced substantial evidence of continuing performance concerns. But, as discussed above, the record also contains positive evaluations, evidence of improvement following plaintiff's reinstatement, and Dr. Herron's opinion that plaintiff's ASD did not prevent her from practicing medicine and that her communication-related difficulties could potentially be addressed with appropriate accommodations. Thus, whether plaintiff could have performed the essential functions of the position had the disputed accommodations been *effectively* or *meaningfully* implemented cannot be resolved as a matter of law on the present record.

Nor has defendant established undue hardship as a matter of law. Defendant argues that permitting plaintiff to remain in the Program would have endangered patients and placed supervising physicians' licenses at risk. But that argument largely presupposes the correctness of defendant's disputed assessment that plaintiff could not safely perform as a resident even with effective accommodations.

On this record, the competing evidence concerning plaintiff's performance, the effectiveness of the accommodations actually provided, and the extent to which additional or different accommodations could have addressed

plaintiff's limitations presents questions for a factfinder. Accordingly, defendant's motion for summary judgment on plaintiff's failure to accommodate claim will be denied.

**D. Plaintiff's Retaliation Claims**

Finally, defendant has moved for summary judgment on plaintiff's retaliation claims. Def.'s Mem. at 25–27. Section 504 and the ADA prohibit retaliation against an individual for opposing disability discrimination or exercising rights protected by the statute. *See, e.g.*, *Natofsky v. City of N.Y.*, 921 F.3d 337, 353 (2d Cir. 2019). So does the NYSHRL. *See, e.g.*, *Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023).

To establish a retaliation claim, a plaintiff must show that she engaged in protected activity, that defendant was aware of that activity, that defendant thereafter took an adverse action against her, and that a causal connection existed between the protected activity and the adverse action. *Id.* (quoting *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002)). The burden of proof at this stage is "'*de minimis* . . . but it is not non-existent." *Krul v. DeJoy*, 705 F. Supp. 3d 5, 59 (N.D.N.Y. 2023) (quoting *Ringel v. N.Y.C. Dep't of Educ.*, 616 F. Supp. 3d 205, 233 (E.D.N.Y. 2022)).

"A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate

treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015) (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

Plaintiff contends that she engaged in protected activity by requesting accommodations and complaining that she was being discriminated against because of her disability. Pl.'s Opp at 28–29. Defendant does not dispute that plaintiff disclosed her disability and sought accommodations, but contends that her performance deficiencies, rather than any protected activity, account for the adverse actions taken against her.

The timing of the challenged actions present a factual issue. Plaintiff requested accommodations in February 2022 while she was already subject to a remediation plan. Pl.'s Facts ¶ 46. Defendant subsequently terminated her residency in early 2022. Pl.'s Resp. ¶¶ 66–73.

Plaintiff then challenged that decision, and defendant rescinded the dismissal on May 25, 2022. Pl.'s Facts ¶¶ 93–97. Plaintiff returned to the program on June 1, 2022. *Id.* ¶ 96. She contends that, immediately thereafter, Drs. Amory and Robeson increased their scrutiny of her performance and began documenting her conduct with the objective of supporting another termination. *Id.* ¶¶ 98–102.

Plaintiff relies on a June 1 e-mail from Dr. Amory, written immediately following her reinstatement, stating that he was "very concerned that she will fail again, and fail soon" and that, absent "a major patient complication," the program might lack sufficient proof that HR would accept to terminate plaintiff. Dkt. No. 61-37. Plaintiff also relies on evidence that program leadership was aware of complaints concerning disability discrimination and that defendant's own then-Director of Benefits, Brian Morrell, was "concerned that certain people at Albany Med may have engaged in disability discrimination." Pl.'s Facts ¶ 90; Morrell Dec. ¶ 6, Dkt. No. 12-5.

Defendant responds by arguing that the performance concerns underlying both terminations predated plaintiff's protected activity and continued throughout her residency. In defendant's view, the later termination merely reflected the continuation of performance concerns that existed before any protected activity took place.

Defendant's argument has some force. Where an employer's adverse treatment begins before the employee engages in protected activity and merely continues thereafter, temporal proximity alone will ordinarily not establish causation. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). And many of the performance concerns defendant cites predated plaintiff's requests for accommodation and complaints of discrimination.

But plaintiff's retaliation theory is not limited to her initial accommodation request. Plaintiff continued to complain of disability discrimination following her reinstatement and, in August and October 2022, specifically complained about Dr. Risley's alleged treatment of her. Shortly after the October complaint, Dr. Risley reported the disputed saline incident that precipitated plaintiff's final termination. Because plaintiff's proof genuinely places in dispute Dr. Risley's characterization of that medical incident, the incident itself does not necessarily break the causal chain as a matter of law.

Viewed together with Dr. Amory's June 1 e-mail concerning the need for extensive documentation to support another termination and the evidence of heightened scrutiny following plaintiff's reinstatement, the record is sufficient to permit a reasonable jury to find that plaintiff's protected activity was a but-for cause of the challenged adverse action.

Defendant may well persuade a factfinder that plaintiff was terminated solely because of longstanding performance deficiencies and legitimate safety concerns. But choosing between those competing explanations would require weighing disputed evidence and credibility. Accordingly, defendant's motion for summary judgment on plaintiff's retaliation claims will be denied.

**E. <u>Defendant's Motion to Preclude</u>**

Defendant also moves to preclude the testimony and report of plaintiff's expert, Dr. Lauren Koffman. Dkt. No. 53. Defendant filed that motion

contemporaneously with its summary judgment motion based on its expectation that plaintiff would rely on Dr. Koffman's opinions in opposing summary judgment. *See* Dkt. No. 56.

The Court, however, has not relied on Dr. Koffman's report or opinions in resolving defendant's motion for summary judgment. Accordingly, defendant's motion to preclude is denied as moot to the extent it seeks to exclude Dr. Koffman's opinions from consideration at summary judgment. *See Vazquez v. City of New York*, 2014 WL 4388497, at *11 (S.D.N.Y. Sept. 5, 2014) ("To the extent that [d]efendants move to strike [the report] itself . . . the motion is effectively moot as the Court did not rely on the report in reaching its conclusions on the motion for summary judgment.").

To the extent that defendant seeks to preclude Dr. Koffman from testifying at trial, however, that request is premature. The Uniform Pretrial Scheduling Order contemplates that motions *in limine* will be filed in advance of the Final Pretrial Conference absent leave of Court. *See* Dkt. No. 13 at 8. Defendant's motion will therefore be denied without prejudice to renewal.

## V. CONCLUSION

Therefore, it is

ORDERED that

1. Defendant's motion for summary judgment (Dkt. No. 52) is **GRANTED** as to Counts Seven and Eight and otherwise **DENIED**;

2. Defendant's motion to preclude expert testimony from Dr. Koffman (Dkt. No. 53) is **DENIED** as moot to the extent it seeks to preclude consideration of Dr. Koffman's opinions on summary judgment and is otherwise **DENIED** without prejudice to renewal;

3. Plaintiff's disability discrimination / failure-to-accommodate claims under the Rehabilitation Act, the ADA, and the NYSHRL (Counts One, Three, and Five) remain for trial;

4. Plaintiff's retaliation claims under the Rehabilitation Act, the ADA, and the NYSHRL (Counts Two, Four, and Six) remain for trial; and

5. The parties shall file a joint status report advising of trial readiness on or before October 16, 2026.

The Clerk of the Court is directed to terminate the pending motions, including the motion at Dkt. No. 55, and set a status report deadline accordingly.

IT IS SO ORDERED.

Dated: September 22, 2026
Utica, New York.

David N. Hurd
U.S. District Judge